# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 09/21/2021 01:31 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk
21STCV34775
Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: William Crowfoot

Haytham Faraj, Esq. (SBN 291416)
Katherine K. Melik-Stepanyan, Esq. (SBN 315015)
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
Telephone: (323) 463-9200
Facsimile: (202) 280-1039
Email: service@farajlaw.com

Attorneys for Plaintiffs, ANOUSHEH SABOURI and S[redacted] E[redacted], a minor by and through her GAL, SHIRIN SABOURI

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S[redacted] E[redacted], a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, SHIRIN SABOURI,

Plaintiffs,

v.

MONSANTO COMPANY, a corporation; WILBUR-ELLIS COMPANY, LLC, a California limited liability corporation; CHEVRON CORPORATION, a corporation; and DOES 1 through 100, Inclusive,

Defendants.

CASE NO.: 21STCV34775

**COMPLAINT FOR DAMAGES**

1. **STRICT PRODUCTS LIABILITY - DESIGN DEFECT;**
2. **STRICT PRODUCTS LIABILITY – FALURE TO WARN;**
3. **NEGLIGENCE;**
4. **BREACH OF EXPRESS WARRANTIES;**
5. **BREACH OF IMPLIED WARRANTIES;**
6. **FRAUD;**
7. **WRONGFUL DEATH; AND**
8. **EXEMPLARY DAMAGES.**

****DEMAND FOR JURY TRIAL****

1
1-002
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

COME NOW Plaintiffs, ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S[redacted] E[redacted], a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, SHIRIN SABOURI (collectively hereinafter "Plaintiffs"), who for causes of action against the Defendants, MONSANTO COMPANY, a corporation (hereinafter "Monsanto"), WILBUR-ELLIS COMPANY, LLC, a California limited liability corporation (hereinafter "Wilbur-Ellis"), CHEVRON CORPORATION, a corporation (hereinafter "Chevron"), and DOES 1 through 100, Inclusive, and each of them (collectively hereinafter "DEFENDANTS") complain and allege the following causes of action:

**SUMMARY**

1. This case arises out of Monsanto's and Wilbur-Ellis' wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular multiple myeloma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use.

2. On information and belief, Decedent MIKE ESFAHANIAN (herein referred to as "DECEDENT"), who was exposed to Roundup extensively while using Roundup residentially for his personal use, was diagnosed with multiple myeloma in April 2018 and died as a result of his cancer in February 2019. Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S[redacted] E[redacted], a minor, is the surviving daughter of decedent.

/ / /

/ / /

**STATEMENT OF THE CASE**

3. In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of com and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

5. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to

glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

7. On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including multiple myeloma.

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

**THE PARTIES**

8. At all times relevant and mentioned herein, Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S[redacted] E[redacted] a minor, is the surviving daughter of Decedent. Plaintiffs were, and are now, residents of the City of Topanga, County of Los Angeles, California. Pursuant to the operation of *Code of Civil Procedure* section 377.60, Plaintiffs are the heirs, successors in interest and persons lawfully entitled to assert a cause of action of the wrongful death of Decedent. No other persons have any claim, right or interest in the cause of action for wrongful death that is superior to the claims by the Plaintiffs.

9. As a result of decedent MIKE ESFAHANIAN'S exposure to Roundup® and/or other Monsanto and/or Monsanto glyphosate containing products in the state of California from approximately the mid-1990s to around 2018, Decedent was diagnosed with multiple myeloma, which ultimately resulted in his untimely death on February 9, 2019. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' Decedent, MIKE ESFAHANIAN.

10. Plaintiffs are informed and believe and based thereon allege that as a direct and proximate result of Decedent's use of Roundup® and/or other Monsanto and/or Monsanto Chevron glyphosate-containing products ("Roundup"), supplied, marketed, and/or distributed by defendants herein, decedent suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, multiple myeloma and other cancers, other permanent physical deficits, permanent bodily impairment and other injury sequelae. Decedent's injuries required medical intervention to address the adverse physical effects and damage caused by decedent's use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup"). These injuries ultimately resulted in Decedent's untimely death.

11. As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES1 through 100, inclusive, Decedent used and/or was exposed to Roundup® and was diagnosed with serious health injuries including to multiple myeloma and/or other cancers.

12. As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Decedent suffered severe mental and physical pain and have and will sustain permanent injuries and emotional

distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

13.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Decedent required medical intervention in efforts to maintain and/or save Decedent.

14.     Plaintiffs are individuals who suffered damages as a result of injuries resulting from Decedent's use and/or exposure to Roundup® and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs resulting from Decedent's use of Roundup®. Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 1 through 100, inclusive.

15.     The product warnings for Roundup® in effect during the time period Decedent used and/or was exposed to Roundup® were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

16.     The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Decedent and the general public about the increased risk of the serious adverse events described herein.

17.     Had Decedent and/or Plaintiffs been adequately warned by the Defendants and DOES 1 through 100, and each of them, inclusive, of the potential life-threatening side effects of Roundup®, Decedent would not have purchased, used, or been exposed to Roundup®.

18.     By reason of the foregoing, Decedent developed serious and dangerous side effects including multiple myeloma and other cancers, related injury sequelae, physical pain and suffering, mental anguish, loss of enjoyment of life, and death. By reason of the foregoing,

Plaintiffs suffered damages and losses, as alleged herein. Plaintiffs' general and special damages exceed the jurisdictional limits of this Court.

19. Plaintiffs have reviewed potential legal claims and causes of action against the Defendants and have intentionally chosen only to pursue claims based on state law. Any reference to any federal agency, regulation or rule is stated solely as background information, and Plaintiffs are not making any claims which raise federal questions. Thus, California state jurisdiction and venue is proper.

**DEFENDANTS**

20. Plaintiffs are informed and believe, and thereupon allege, that defendant Monsanto Company (hereinafter "Monsanto" or "defendant Monsanto"), is, and at all times relevant was, a Delaware corporation, with its headquarters in St. Louis, Missouri and multiple principal places of business throughout the world, including in St. Louis, Missouri, Oxnard, California, Woodland, and, at all relevant times to this complaint, San Ramon, California. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and conducted business within the State of California and has derived substantial revenue from goods and products, including Roundup®, used in the State of California and employs sales representatives in the State of California. Specifically, Monsanto operated a residential products division known as the Solaris Group of Monsanto Company (hereinafter "Solaris Group"), headquartered in San Ramon, California. Moreover, upon information and belief, Solaris Group manufactured, registered, distributed, marketed, advertised, and sold Roundup® products to California consumers. At all relevant times, Monsanto has conducted testing, research, and analyses on its Roundup® and other glyphosate-based formulations within California and manufactured said products in California, utilizing principal laboratories and manufacturing sites

throughout the State of California in locations such as San Ramon, Oxnard and Woodland. Monsanto expected or should have expected its acts to have consequences within the State of California because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of California's laws

21. Defendant Wilbur-Ellis Company LLC is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California. At all times relevant to this complaint, Wilbur-Ellis Company, LLC sold and distributed Monsanto products, including Roundup®, within the State of California.

22. Defendant CHEVRON CORPORATION (hereinafter "Chevron" or "Monsanto Chevron") is a Delaware corporation with its headquarters and principal place of business in San Ramon, California. Chevron, through its Ortho Consumer Products Division, investigated and prepared storage stability data, and conducted other testing, research and analyses, to support the EPA registration of Roundup® and other glyphosate-based formulations intended for the residential consumer market. The research was then submitted to the EPA by Monsanto in furtherance of continued registration of Roundup® products and other glyphosate-based formulations. Under the entity name "Monsanto Chevron," Chevron directly contributed to the continued registration of the carcinogenic Roundup® products and other glyphosate-based formulations that were tested, researched, analyzed, manufactured, registered, distributed, marketed and sold in California, aimed at a California consumer market, and purchased and used by Plaintiff. Moreover, upon information and belief, and at all times relevant to this complaint, Chevron manufactured, marketed and distributed glyphosate-based formulations in California.

23. At all relevant times alleged herein, one or more of the corporate Defendants was, and now is, a corporation with its principal place of business in the State of California and, therefore, is a citizen of the State of California.

24. Upon information and belief, WILBUR-ELLIS COMPANY, LLC was responsible for marketing Roundup® and related Monsanto products during the time period in question.

25. Upon information and belief, at all times relevant to this complaint, the CHEVRON CORPORATION, operating as "Monsanto Chevron," manufactured, marketed, registered, distributed, and sold Roundup® products and other glyphosate-based formulations, and investigated and prepared· storage stability data for submission to the EPA in furtherance of the continued registration of Roundup® products and other glyphosate-based formulations for use by consumers.

26. Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

27. The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 3 through 100, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when the same are ascertained.

28. Plaintiffs are informed and believe, and thereon allege, that at all times herein

mentioned, each of the named Defendants and each of the DOE Defendants was the agent,
servant, employee and/or joint venturer of the other co-Defendants and other DOE Defendants,
and each of them, and at all said times, each named Defendant and each DOE Defendant was
acting in the full course, scope and authority of said agency, service, employment and/or joint
venture.

29. Plaintiffs are informed and believe and allege that at all times mentioned herein,
Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly
known as and/or were the successors and/or predecessors in interest/business/product line/or a
portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or
partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable
trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding,
researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling,
distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing,
contracting others for marketing, warranting, rebranding, manufacturing for others, packaging
and advertising of Roundup® and/or other Monstano glyphosate-containing products.
Defendants and DOES 1 through 100, inclusive, and each of them, are liable for the acts,
omissions and tortious conduct of their successors and/or predecessors in
interest/business/product line/or a portion thereof, assigns, parents, subsidiaries, affiliates,
partners, co-venturers, merged companies, alter egos, agents, equitable trustees, fiduciaries
and/or their alternate entities in that Defendants and DOES 1 through 100, inclusive, and each of
them, enjoy the goodwill originally attached to each such alternate entity, acquired the assets or
product line (or portion thereof), and in that there has been a virtual destruction of Plaintiffs'
remedy against each such alternate entity, and that each such Defendant has the ability to assume
the risk spreading role of each such alternate entity.

30. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, Defendants and DOES 1 through 100, inclusive, and each of them, were and are corporations organized and existing under the laws of the State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are authorized to do and are doing business in the State of California and regularly conducted business in California, including in Los Angeles County.

31. Upon information and belief, at all relevant times, Defendants and DOES 1 through 100, and each of them, inclusive, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, labeling, selling, marketing, and/or introducing into interstate commerce and into the State of California, including in Los Angeles County, either directly or indirectly through third parties or related entities, Roundup® and/or other Monstano glyphosate-containing products.

32. At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, conducted regular and sustained business and engaged in substantial commerce and business activity in the State of California, which included but was not limited to selling, marketing and distributing Roundup® and/or other Monstano glyphosate-containing products in the State of California, including Los Angeles County. Specifically, Decedent purchased all of its Roundup® products for residential use from retailers in Los Angeles County.

33. At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within the United States of America including the State of California, including Los Angeles County, and said Defendants derived and derive substantial revenue therefrom.

**AGENCY**

34. Each of the Defendants named in this Complaint, including each of the DOE

Defendants, is, and at all relevant times herein mentioned was, the co-conspirator of each other Defendant in connection with the wrongful conduct described herein, and, therefore, each Defendant is jointly and severally liable to Plaintiffs for the damages sustained as a proximate result of each other Defendant.

35.     Each Defendant entered into an express or implied agreement, understanding, and/or concert of action with each of the other Defendants to commit the wrongs herein alleged. These affirmative wrongful acts included, but were not limited to, the conspiracy to defraud, deceive, and hide the dangers of glyphosate from the public, beginning in 1976, through Defendants' routine falsification of data for toxicity studies needed to register Roundup®. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

36.     The conspiracy was furthered in 1991 when Defendant Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

37.     The conspiracy was furthered through 2000 through present with  publication of studies through companies such as Intertek and Exponent, Inc., which minimize any safety concerns about the use of glyphosate

38.     The conspiracy was furthered when Monsanto held secret ex parte meetings and

conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

39. The conspiracy was furthered in 2011when Defendants co-opted studies which falsely proclaimed the safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

40. Plaintiffs are further informed and believe and thereon allege that at all times herein alleged, each of the Defendants, including, but not limited to DOES 1 through 100, was the agent, servant, partner, aider and abettor, co-conspirator, alter ego, and/or joint venturer of the other herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, alter ego, and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted a breach of duty owed to Plaintiffs.

41. Plaintiffs are informed and believe, and thereon allege, that there exists, and at all times herein alleged, there existed, a unity of interest in ownership between each of the aforesaid Defendants, including DOES 1 through 100, such that any individuality and separateness

between these Defendants has ceased and these Defendants each are the alter-ego of the others and exerted control over those Defendants. Adherence to the fiction of the separate existence of each of these Defendants as an entity distinct from the others will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

42. Each of these acts and failures to act is alleged against each defendant whether acting individually, jointly, or severally. Each of the defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

43. Defendants, and each of them, committed these acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiffs, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiffs' rights.

44. Defendants' conduct warrants the assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

45. Each of these acts and failures to act are alleged against each Defendant whether acting individually, jointly, or severally. Each of the Defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

## JURISDICTION AND VENUE

46. The California Superior Court has jurisdiction over this action pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "Original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

47. This Court has personal jurisdiction over defendants since they are and, were at all relevant times, residents of and/or authorized to conduct business in the State of California. Defendants conducted such business within the State, including the performance of acts that

caused or contributed to the harm giving rise to this action. Furthermore, defendants have sufficient minimum contacts in California, or principal place of business in California or, otherwise, intentionally avails itself of the California marker so as to render the exercise of jurisdiction over it by this State's courts, as is consistent with traditional notions of fair play and substantial justice.

48. Plaintiffs are informed and believes and, on that basis, alleges that defendants have purposefully availed themselves of the privileges and benefits of conducting activities and business within the forum State, and have invoked the benefits and protections of its laws.

**FACTUAL ALLEGATIONS**

49. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

50. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

51. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.

52. That is because when Monstano first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®--glyphosate--is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers

are, once again, victims of corporate greed. Monstano assured the public that Roundup® was harmless. In order to prove this, Monstano championed falsified data and attacked legitimate studies that revealed its dangers. Monstano led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

***The Discovery of Glyphosate and Development of Roundup®***

53. The herbicidal properties of glyphosate were discovered in 1970 by Monstano chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monstano marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monstano still markets Roundup® as safe today.

***Registration of Herbicides under Federal Law***

54. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

55. Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

56. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

57. The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California. The EPA's decision to register Roundup, however, was based on studies on the active chemical, glyphosate, and not the formulated Roundup product which contains a cocktail of other ingredients such as surfactants, adjuvants, and inert compounds, all of which, as discussed in greater detail below, contribute to the health risks associated with Roundup exposure.[1]

58. FIFRA generally requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

59. The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of an herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-I. In order to reevaluate these herbicides, the EPA is demanding the completion of additional tests

[1] Surfactants are compounds which contribute to the even and effective spread of glyphosate across the surface of a leaf and increase the rate of penetration through the plant. It has been shown that surfactants also greatly increase the amount and rate of Roundup® absorbed by human skin.

and the submission of data for the EPA's review and evaluation.

60. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment -in relation to the re-registration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings. "On September 12, 2016, the EPA's office of Pesticide Programs released an interim report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," ("2016 Issue Paper"") detailing the agency's review of a small portion of the existing literature on Roundup. The 2016 Issue Paper contains a review of studies submitted to the agency by Monsanto, as well as the general independent scientific literature on glyphosate carcinogenicity.

61. Immediately following the publication of the 2016 Issue Paper, the FIFRA Scientific Advisory Panel ("SAP") issued a report which reviewed the EPA's 2016 Issue Paper, and the conclusions therein. The SAP strongly criticized the EPA's conclusions and questioned the scientific approach of the agency, noting that that agency had failed to follow its own guidelines.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

62. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E). In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any

circumstances.

63.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

64.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

65.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

66.     Three top executives of IBT were convicted of fraud in 1983.

67.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

68.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

69.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc., from 2000 through the present which

minimize any safety concerns about the use of glyphosate. The studies are used to convince regulators to allow the sale of Roundup® and customers to use Roundup®. Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate. Through these means, Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, Monsanto paid these so-called "independent experts," and Monsanto failed to disclose the significant role Monsanto had in creating the manuscripts produced by the "independent" experts. Further, Monsanto has ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines for scientists such as Robert Tarone and Henry Miller. Monsanto has also ghostwritten letters by supposedly independent scientists which have been submitted to regulatory agencies who are reviewing the safety of glyphosate.

70.     Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

71.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany

began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study, becoming the sole providers of data and ultimately writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BfR. Defendants have used this self-serving report (which they, in fact, wrote) to falsely proclaim the safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

***The Importance of Roundup® to Monsanto's Market Dominance Profits***

72. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

73. In response, Monsanto began the development and sale of genetically engineered

74. Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide, and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing

strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide

75. Through a three-pronged strategy of increased production, decreased prices, and by coupling Roundup Ready® seeds with Roundup® herbicide, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

76. In 1996, the New York Attorney General ("NYAG") filed a lawsuit againstMonsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a. Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences...

b. And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup® biodegrades into naturally occurring elements.

d.   Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.   This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.   You can apply Accord (glyphosate-containing herbicide) with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

i.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

77.   On November 19, 1 996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.   its glyphosate-containing herbicide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b. its glyphosate-containing herbicide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c. its glyphosate-containing herbicide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. its glyphosate-containing herbicide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e. glyphosate-containing herbicide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

78. Monsanto did not alter its advertising in the same manner in any state other than New York, and, on information and belief, still has not done so today.

79. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

80. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group I (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

81.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

82.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed, and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

83.     In assessing a chemical agent, the IARC Working Group reviews the following information:

(a)  human, experimental, and mechanistic data;

(b)  all pertinent epidemiological studies and cancer bioassays; and

(c)  representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

84.     In March of 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent, that is, glyphosate is probably carcinogenic in humans.

85.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112.

For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from II countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered “reports that have been published or accepted for publication in the openly available scientific literature” as well as “data from governmental reports that are publicly available.”

86. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

87. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

88. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

89. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

90. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma (“NHL”) and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

91.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

92.     In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

93.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

94.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA, oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

95.     In addition to DNA damage and oxidative stress, scientists have suggested that Roundup®'s association with various serious health conditions is linked to the effect Roundup® has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup® toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup®, this exposure leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup®'s mechanism of action.

96.     Many Roundup® products bear a label which either reads: "glyphosate targets an

enzyme found in plants but not in people or pets" or "this Roundup formula targets an enzyme in plants but not in people or pets." These statements are false because it has been established that the human body is host to microorganisms which contain the enzyme Monsanto asserts is not found in humans.

97. Thus, glyphosate targets microbes within the human body which contain the enzyme affected by glyphosate, leading to a variety of adverse health effects. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

98. The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

***Other Earlier Findings about Glyphosate's Dangers to Human Health***

99. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

100. Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These

sites may be around water and in wetlands.

101. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

102. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

103. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

***Recent Worldwide Bans on Roundup®/Glyphosate***

104. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this assessment as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

105.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

106.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

107.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

108.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

109.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

110.    On information and belief, Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup®, Roundup-ready® crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

111.    Wilbur-Ellis had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and or marketing of Roundup® with any warnings or precautions for that grave danger. On information and belief, Wilbur-Ellis was one of the distributors providing Roundup® and other glyphosate-containing products used by the Plaintiff.

112.    On information and belief, Chevron and Monsanto Chevron were, at all relevant times, engaged in the testing, research, and analyses of Roundup and other glyphosate-based

formulations, including investigation and preparation of storage stability data for Roundup and other glyphosate-based formulations for submission to the EPA, and were, at all relevant times, involved in the manufacture, registration, marketing, distribution and sale of Roundup®, Roundup-ready® crops and other glyphosate-based formulations to retailers and residential users in California.

113. Monsanto and Monsanto Chevron had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its registration, sales, distribution and or marketing of Roundup® and other glyphosate-based formulations with any warnings or precautions for that grave danger. On information and belief, Chevron and Monsanto Chevron participated in the preparation of storage stability and other testing on Roundup® and other glyphosate-containing products which were used by the Plaintiff.

**LIMITATIONS ON ALLEGATIONS**

114. Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

115. The allegations in this pleading are made pursuant to California law. To the extent California law imposes a duty or obligation on Defendants that exceeds those required by federal law, Plaintiffs do not assert such claims. All claims asserted herein run parallel to federal law, *i.e.,* the Defendants' violations of California law were also violations of federal law. Had Defendants honestly complied with California law, they would also have complied with federal law.

116. Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims are brought under California law, notwithstanding that such claims run parallel to federal law.

117. As alleged herein, Defendants violated U.S.C. § 136j and 40 C.F.R. §

156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

**EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

118. Decedent has suffered an illness that has a latency period and does not arise until years after exposure. Decedent and plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until made aware that decedent's illnesses, including multiple myeloma, could be caused by use and/or exposure to Roundup®. The discovery rule applies, and the statute of limitations was tolled until the day plaintiffs knew or had reason to know that decedent's illnesses, including myeloma, were linked to decedent's use and/or exposure to Roundup®.

119. Within the time period of any applicable statute of limitations, plaintiffs could not have discovered through the exercise of reasonable diligence that exposure to Roundup® and glyphosate is injurious to human health.

120. Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation by plaintiffs have disclosed that Roundup® and glyphosate would cause decedent's illnesses.

121. The expiration of any applicable statute of limitations has been equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent conduct. Through affirmative misrepresentations and omissions, defendants actively concealed from plaintiffs and decedent the true risks associated with use of and/or exposure to Roundup®.

122. As a result of defendants' actions, plaintiffs could not reasonably have known or learned through reasonable diligence that decedent had been exposed to the risks alleged herein and that those risks were the direct and proximate result of defendants' acts and omissions.

123. Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®. Defendants had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which defendants continue to have exclusive control. Defendants knew that this information was not available to plaintiffs or decedent, decedent's medical providers and/or health facilities, yet defendants failed to disclose the information to the public, including plaintiffs and decedent.

124. Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs, decedent, and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on defendants' representations.

**FIRST CAUSE OF ACTION**

**(STRICT PRODUCTS LIABILITY--DESIGN DEFECT by All Plaintiffs as Against All Defendants, and DOES 1 Through 100, Inclusive)**

125. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

126. At all relevant times, defendants designed, developed, tested, manufactured, fabricated, assembled, distributed, bought, sold, inspected, serviced, repaired, maintained, marketed, warranted, supplied, modified, placed, and/or provided Roundup® products, which are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of defendants. At all relevant times, defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and

distributed the Roundup® products used by plaintiffs, as described herein.

127.   At all relevant times, defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including decedent.

128.   At all relevant times, defendants' Roundup® products were defectively designed, tested, developed, and manufactured when placed on the market by defendants, and was of such a nature that the defects would not be discovered in the normal course of inspection and operation by users thereof. Moreover, Roundup® products failed to provide adequate warnings or instructions concerning the dangerous characteristics of Roundup®. In particular, defendants failed to provide adequate warnings or instructions concerning the Roundup®'s active ingredient, glyphosate.

129.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including decedent, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

130.   At all relevant times, defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn decedent of dangers associated with Roundup use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

131.   At all relevant times, defendants' Roundup® products reached the intended

consumers, handlers, and users in California and throughout the United States, including decedent, without substantial change in the condition, as designed, manufactured, sold, distributed, labeled, and marketed by defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market. Chevron, in a joint effort with Monsanto, Monsanto Chevron, was involved in the testing, research, analyses of Roundup® and other glyphosate-based formulations, including investigation and preparation of storage stability data and other data submissions to the EPA for the continued registration of Roundup® and other glyphosate-based formulations for use by consumers, including Plaintiff, in California, and throughout the United States. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California.

132. Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by defendants were defective in design and formulation in that, when they left the hands of defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

133. At all relevant times, defendants knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by defendants.

134. Therefore, at all relevant times, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b. When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f. Defendants knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries; and

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

135. Defendants knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

136. Decedent was exposed to Defendants' Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

137. At the time of the Decedent's use of and exposure to Roundup, Roundup was

being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

138. Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Decedent.

139. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

140. Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

141. Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

142. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

143. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

144. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Decedent in particular, and Defendants are therefore strictly liable for the injuries sustained by the Decedent.

145. The Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

146. By reason of the foregoing, the Defendants have become strictly liable to the

Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

147. Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

148. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiffs, as successors in interest to decedent, Mike Esfahanian, seek all damages otherwise accruing to the decedent in a survival action brought pursuant to the California *Code of Civil Procedure* section 377.34.

149. As a result of the foregoing acts and omission, the Decedent developed multiple myeloma, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

150. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

151. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

152. WHEREFORE, Plaintiffs respectfully requests this Court to enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**SECOND CAUSE OF ACTION**

**(STRICT PRODUCTS LIABILITY--FAILURE TO WARN by All Plaintiffs as Against All Defendants, and DOES 1 Through 100, Inclusive)**

153. Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

154. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market. Chevron, in a joint effort with Monsanto, Monsanto Chevron, was involved in the testing, research, analyses of Roundup® and other glyphosate-based formulations, including investigation and preparation of storage stability data and other data submissions to the EPA for the continued registration of Roundup® and other glyphosate-based formulations for use by consumers, including Plaintiff, in California and throughout the United States. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California.

155. Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach--and Roundup did in fact

reach--consumers, including Decedent, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

156.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

157.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Decedent was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing multiple myeloma as a result of exposure and use.

158.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

159.    Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of California.

160.    Defendants could have amended the label of Roundup to provide additional warnings.

161.    This defect caused serious injury to Decedent, who used Roundup in its intended and foreseeable manner.

162.    At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain

supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

163. Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

164. Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of multiple myeloma.

165. Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing multiple myeloma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Decedent.

166. At the time of exposure, Decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

167. Defendants, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

168. Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

169. Had Defendants properly disclosed the risks associated with Roundup, Decedent would have avoided the risk of multiple myeloma by not using Roundup.

170. The information that Defendants did provide or communicate failed to contain

adequate warnings and precautions that would have enabled Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

171. To this day, Defendants have failed to adequately warn of the true risks of Decedent's injuries associated with the use of and exposure to Roundup.

172. As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Decedent.

173. As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiffs, as successors in interest to decedent, Mike Esfahanian, seek all damages otherwise accruing to the decedent in a survival action brought pursuant to the California *Code of Civil Procedure* section 377.34.

174. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

175. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

176. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION

**(NEGLIGENCE by All Plaintiffs as Against All Defendants and DOES 1 Through 100, Inclusive)**

177. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

178. Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

179. At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

180. At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

181. At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

182. Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiffs' injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

183. Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

184. As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

185. Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup in their promotional

efforts, outside of the context of labeling.

186. Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

187. Defendants' negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to

Roundup® products;

g. Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of their products with the knowledge that the

products were unreasonably unsafe and dangerous.

188.    Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

189.    Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

190.    Defendants' negligence was the proximate cause of decedent's injuries and untimely death, *i.e.,* absent defendants' negligence, decedent would not have developed cancer and plaintiffs' husband and father would still be here today.

191.    Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including decedent, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including decedent. Defendants' reckless conduct therefore warrants an award of punitive damages.

192.    As a result of the foregoing acts and omissions, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

193.    The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiffs,

as successors in interest to decedent, Mike Esfahanian, seek all damages otherwise accruing to the decedent in a survival action brought pursuant to the California *Code of Civil Procedure* section 377.34.

194. Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

195. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

196. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

197. WHEREFORE, plaintiffs respectfully request this Court to enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

**(BREACH OF EXPRESS WARRANTIES by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

198. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

199. At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including

Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

200.    Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

a.    ensure that its products did not cause the user unreasonably dangerous side effects;

b.    warn of dangerous and potentially fatal side effects; and

c.    disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiffs.

201.    As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

202.    At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

203.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to

Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiffs, and/or that they were safe and effective as agricultural herbicides.

204.   The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

205.   Defendant Monsanto placed Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

206.   Defendant Monsanto breached these warranties because, among other things, Roundup® products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant Monsanto breached the warranties in the following ways:

   a.   Defendant Monsanto represented through its labeling, advertising, and marketing materials that Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b. Defendant Monsanto represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

207. Decedent detrimentally relied on the express warranties and representations of defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Decedent reasonably relied upon defendant Monsanto to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Decedent would not have purchased or used Roundup® had defendant Monsanto properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

208. Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup® products, as expressly stated within their warnings and labels, and knew that consumers and users such as decedent could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

209. Decedent had no knowledge of the falsity or incompleteness of defendant Monsanto's statements and representations concerning Roundup.

210. Decedent used and/or was exposed to Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by defendant Monsanto.

211. Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including decedent's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Decedent could have avoided the

injuries complained of herein, including his untimely death.

212.    As a direct and proximate result of defendant Monsanto's breach of express warranty, plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

213.    As a direct and proximate result of the conduct of defendant Monsanto's breach of express warranty, Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

214.    The conduct of defendants was a substantial factor and proximate cause of the. serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiffs, as successors in interest to decedent, Mike Esfahanian, seek all damages otherwise accruing to the decedent in a survival action brought pursuant to the California *Code of Civil Procedure* section 377.34.

215.    Plaintiffs are-informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

216.    As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

217. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

218. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**FIFTH CAUSE OF ACTION**

**(BREACH OF IMPLIED WARRANTIES by All Plaintiffs as Against All Defendants, and DOES 1Through 100, Inclusive)**

219. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

220. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which were and are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce.

221. Before the time decedent was exposed to the aforementioned Roundup® products, Defendants impliedly warranted to its consumers, including decedent, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

222. But Defendants failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including decedent's injuries.

223. Decedent was an intended beneficiary of the implied warranties made by defendant Monsanto to purchasers of its herbicides.

224.    The Roundup® products were expected to reach and did in fact reach consumers and users, including decedent, without substantial change in the condition in which they were manufactured and sold by defendant Monsanto.

225.    At all relevant times, Defendants aware that consumers and users of its products, including decedent, would use Roundup® products as marketed by defendant Monsanto, which is to say that decedent was a foreseeable user of Roundup®.

226.    Defendants intended that Roundup® products be used in the manner in which decedent, in fact, used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

227.    In reliance upon Defendants' implied warranty, decedent used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by defendant Monsanto.

228.    Decedent could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

229.    Defendants breached its implied warranty to decedent in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

230.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

231.    As a direct and proximate result of Defendants' breach of implied warranty, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple

myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

232. As a direct and proximate result of Defendants' breach of implied warranty, plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

233. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

234. Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

235. As a result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

236. As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

237. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

/ / /

**SIXTH CAUSE OF ACTION**

**(FRAUD by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

238. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

239. Defendant Monsanto has defrauded the agricultural community in general and decedent Plaintiffs in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

240. Defendant Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with multiple myeloma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

241. Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

242. Decedent relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Decedent and/or plaintiffs did not know nor could they

reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

243. The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant Monsanto traditionally used to promote the product's efficacy and benefits.

244. When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

245. Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiffs and others which proximately caused the injuries as set forth herein.

246.    As a proximate result of defendant Monsanto's fraudulent and deceitful conduct and representations, plaintiffs have sustained damages and other losses in an amount to be proven at trial.

247.    As a direct and proximate result of the conduct of defendants, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

248.    The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiffs, as successors in interest to decedent, Mike Esfahanian, seek all damages otherwise accruing to the decedent in a survival action brought pursuant to the California *Code of Civil Procedure* section 377.34.

249.    Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

250.    As a direct and proximate result of the conduct of defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

251.    As a further result of the negligence of said Defendants, and each of them,

Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

252. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**SEVENTH CAUSE OF ACTION**

**(WRONGFUL DEATH by Plaintiffs Against All Defendants, and DOES 1 Through 100, Inclusive)**

253. Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

254. Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S[redacted] E[redacted], a minor, is the surviving daughter of decedent. Plaintiffs are the Decedent's only heirs and bring herein this wrongful death claim.

255. Decedent died as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

256. Defendants' wrongful conduct has proximately caused Decedent's heirs to suffer the loss of Decedent's companionship, services, society, marital association, love and consortium.

257. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiff

Joe Greer, Sr., as successor in interest to decedent Mike Esfahanian, seeks all damages otherwise accruing to the decedent in a survival action brought pursuant to the California *Code of Civil Procedure* section 377.34.

258. As a direct and proximate result of the conduct of defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

259. As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

260. WHEREFORE, Plaintiffs ANOUSHEH SABOURI and S[redacted] E[redacted], a minor, respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

**<u>EIGHTH CAUSE OF ACTION</u>**

**(EXEMPLARY DAMAGES by Plaintiffs Against All Defendants, and DOES 1 Through 100, Inclusive)**

261. Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

262. Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Roundup®. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

263. This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup

was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the amount of money Defendants would make selling Roundup® in California. Defendants' objection was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiffs were denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

264. There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiffs request punitive damages against the Defendants for the harms caused to Plaintiffs.

265. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ANOUSHEH SABOURI and Plaintiff S[redacted] E[redacted], a minor, hereby pray for judgment against Defendants, and each of them, jointly and severally as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

3. Awarding economic damages in the form of medical expenses, out of pocket

expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5. Pre-judgment interest;

6. Post-judgment interest;

7. Awarding Plaintiffs reasonable attorneys' fees;

8. Awarding Plaintiffs the costs of these proceedings; and

9. Such other and further relief as this Court deems just and proper.

DATED: September 21, 2021

**THE LAW OFFICES OF HAYTHAM FARAJ**

By:______________________________

HAYTHAM FARAJ, ESQ.
Attorneys for Plaintiffs, ANOUSHEH SABOURI and S[redacted] E[redacted], a minor

**DEMAND FOR JURY TRIAL**

Plaintiff ANOUSHEH SABOURI and Plaintiff S[redacted] E[redacted] a minor, hereby demand a trial by jury on all of the causes of action.

DATED: September 21, 2021 **THE LAW OFFICES OF HAYTHAM FARAJ**

By:______________________________

HAYTHAM FARAJ, ESQ.
Attorneys for Plaintiffs, ANOUSHEH SABOURI and S[redacted] E[redacted], a minor

# EXHIBIT 2

**CIV-010**

ATTORNEY *(Name, State Bar number, and address):*
Haytham Faraj SBN: 291416
The Law Offices of Haytham Faraj
8605 Santa Monica Blvd., Suite 44953
West Hollywood, CA 90069-4109
TELEPHONE NO.: (323) 463-9200 FAX NO. *(Optional):* (202) 280-1039
E-MAIL ADDRESS *(Optional):* service@farajlaw.com
ATTORNEY FOR *(Name):* Anousheh Sabouri

*FOR COURT USE ONLY*

**FILED**
Superior Court of California
County of Los Angeles
09/22/2021
Sherri R. Carter, Executive Officer / Clerk of Court
By: M. Valenzuela Deputy

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse

PLAINTIFF/PETITIONER: Anousheh Sabouri, S[redacted] E[redacted] through her GAL

DEFENDANT/RESPONDENT: Monsanto Company, et al.

**APPLICATION AND ORDER FOR APPOINTMENT OF GUARDIAN AD LITEM—CIVIL**
[X] **EX PARTE**

CASE NUMBER: 21STCV34775

***NOTE: This form is for use in civil proceedings in which a party is a minor, an incapacitated person, or a person for whom a conservator has been appointed. A party who seeks the appointment of a guardian ad litem in a family law or juvenile proceeding should use form FL-935. A party who seeks the appointment of a guardian ad litem in a probate proceeding should use form DE-350/GC-100. An individual cannot act as a guardian ad litem unless he or she is represented by an attorney or is an attorney.***

1. Applicant *(name):* Anousheh Sabouri is
   a. [X] the parent of *(name):* S[redacted] E[redacted]
   b. [ ] the guardian of *(name):*
   c. [ ] the conservator of *(name):*
   d. [ ] a party to the suit.
   e. [ ] the minor to be represented *(if the minor is 14 years of age or older).*
   f. [ ] another interested person *(specify capacity):*

2. This application seeks the appointment of the following person as guardian ad litem *(state name, address, and telephone number):*
   Shirin Sabouri ph: (818) 825-8942
   21800 Marylee Street, #51, Woodland Hills, CA 91367

3. The guardian ad litem is to represent the interests of the following person *(state name, address, and telephone number):*
   S[redacted] E[redacted] ph: (818) 481-7794
   [redacted], Topanga CA 90290

4. The person to be represented is:
   a. [X] a minor *(date of birth):* [redacted]
   b. [ ] an incompetent person.
   c. [ ] a person for whom a conservator has been appointed.

5. The court should appoint a guardian ad litem because:
   a. [X] the person named in item 3 has a cause or causes of action on which suit should be brought *(describe):*
   The minor has causes of action against defendants for the wrongful death of her father, Michael Esfahanian.

[ ] Continued on Attachment 5a.

Electronically Received 09/21/2021 01:31 PM

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CIV-010 [Rev. January 1, 2008]

APPLICATION AND ORDER FOR APPOINTMENT OF GUARDIAN AD LITEM—CIVIL

Code of Civil Procedure, § 372 et seq.
Westlaw Doc & Form Builder

2-002

CIV-010

| PLAINTIFF/PETITIONER: Anousheh Sabouri, S[redacted] E[redacted] through her GAL | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Monsanto Company, et al. | |

5\. b. [ ] more than 10 days have elapsed since the summons in the above-entitled matter was served on the person named in item 3, and no application for the appointment of a guardian ad litem has been made by the person identified in item 3 or any other person.

c. [ ] the person named in item 3 has no guardian or conservator of his or her estate.

d. [X] the appointment of a guardian ad litem is necessary for the following reasons *(specify):*
To represent the minor's interests in her wrongful death suit.

[ ] Continued on Attachment 5d.

6\. The proposed guardian ad litem's relationship to the person he or she will be representing is:

a. [X] related *(state relationship):* maternal aunt

b. [ ] not related *(specify capacity):*

7\. The proposed guardian ad litem is fully competent and qualified to understand and protect the rights of the person he or she will represent and has no interests adverse to the interests of that person. *(If there are any issues of competency or qualification or any possible adverse interests, describe and explain why the proposed guardian should nevertheless be appointed):*

[ ] Continued on Attachment 7.

Haytham Faraj
(TYPE OR PRINT NAME)

(SIGNATURE OF ATTORNEY)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: August 24, 2021

Anousheh Sabouri
(TYPE OR PRINT NAME)

ID guuzw17qkC3Z33zH3Sbdhpwm
(SIGNATURE OF APPLICANT)

## CONSENT TO ACT AS GUARDIAN AD LITEM

I consent to the appointment as guardian ad litem under the above petition.

Date: August 24, 2021

Shirin Sabouri
(TYPE OR PRINT NAME)

ID WvbGwEfhSnosCDMiy6wJZLnm
(SIGNATURE OF PROPOSED GUARDIAN AD LITEM)

## ORDER [X] EX PARTE

THE COURT FINDS that it is reasonable and necessary to appoint a guardian ad litem for the person named in item 3 of the application, as requested.

THE COURT ORDERS that *(name):* Shirin Sabouri
is hereby appointed as the guardian ad litem for *(name):* [redacted]
for the reasons set forth in item 5 of the application.

Date:

JUDICIAL OFFICER

[ ] SIGNATURE FOLLOWS LAST ATTACHMENT

# eSignature Details

**Signer ID:** **guuzw17qkC3Z33zH3Sbdhpwm**
Signed by: Anousheh Sabouri
Sent to email: asabouri@sabourilawgroup.com
IP Address: 172.58.20.196
Signed at: Sep 20 2021, 11:06 am PDT

# eSignature Details

**Signer ID:** **WvbGwEfhSnosCDMiy6wJZLnm**
Signed by: Shirin Sabouri
Sent to email: ssabouri143@gmail.com
IP Address: 104.35.151.59
Signed at: Sep 21 2021, 10:42 am PDT

# EXHIBIT 3

Electronically FILED by Superior Court of California, County of Los Angeles on 09/21/2021 01:31 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk
21STCV34775

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Haytham Faraj SBN: 291416
The Law Office of Haytham Faraj
8605 Santa Monica Blvd., Suite 44953, West Hollywood, CA 90069-4109
TELEPHONE NO.: (323) 463-9200 FAX NO.: (202) 280-1039
ATTORNEY FOR *(Name):* Anousheh Sabouri

*FOR COURT USE ONLY*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME: Anousheh Sabouri and S[redacted] E[redacted] by and through her GAL Shirin Sabouri v. Monsanto Company, et al.

## CIVIL CASE COVER SHEET

[X] **Unlimited** (Amount demanded exceeds $25,000)
[ ] **Limited** (Amount demanded is $25,000 or less)

**Complex Case Designation**
[ ] **Counter** [ ] **Joinder**
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 21STCV34775
JUDGE:
DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[X] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify):* EIGHT (8)
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 21, 2021

Haytham Faraj
(TYPE OR PRINT NAME)

[signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

3-032

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov
Westlaw Doc & Form Builder

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

| SHORT TITLE: Sabouri v. Monsanto Company | CASE NUMBER |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

**Applicable Reasons for Choosing Court Filing Location (Column C)**

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| Auto Tort | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| Other Personal Injury/ Property Damage/ Wrongful Death Tort | Asbestos (04) | ☐ A6070 Asbestos Property Damage<br>☐ A7221 Asbestos - Personal Injury/Wrongful Death | 1, 11<br>1, 11 |
| | Product Liability (24) | ☒ A7260 Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons<br>☐ A7240 Other Professional Health Care Malpractice | 1, 4, 11<br>1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall)<br>☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270 Intentional Infliction of Emotional Distress<br>☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11<br>1, 4, 11<br>1, 4, 11<br>1, 4, 11 |

| SHORT TITLE: Sabouri v. Monsanto Company | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Non-Personal Injury/ Property Damage/ Wrongful Death Tort | Business Tort (07) | ☐ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017 Legal Malpractice<br>☐ A6050 Other Professional Malpractice (not medical or legal) | 1, 2, 3<br>1, 2, 3 |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| Employment | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case<br>☐ A6109 Labor Commissioner Appeals | 1, 2, 3<br>10 |
| Contract | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019 Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 2, 5<br>2, 5<br>1, 2, 5<br>1, 2, 5 |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff<br>☐ A6012 Other Promissory Note/Collections Case<br>☐ A6034 Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11<br>5, 11<br>5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015 Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009 Contractual Fraud<br>☐ A6031 Tortious Interference<br>☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 5<br>1, 2, 3, 5<br>1, 2, 3, 8, 9 |
| Real Property | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation Number of parcels______ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018 Mortgage Foreclosure<br>☐ A6032 Quiet Title<br>☐ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6<br>2, 6<br>2, 6 |
| Unlawful Detainer | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2, 6, 11 |

| SHORT TITLE: Sabouri v. Monsanto Company | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| Judicial Review | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153 Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2, 8 |
| Provisionally Complex Litigation | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| Enforcement of Judgment | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160 Abstract of Judgment | 2, 6 |
| | | ☐ A6107 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112 Other Enforcement of Judgment Case | 2, 8, 9 |
| Miscellaneous Civil Complaints | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| Miscellaneous Civil Petitions | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123 Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124 Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190 Election Contest | 2 |
| | | ☐ A6110 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100 Other Civil Petition | 2, 9 |

| SHORT TITLE: Sabouri v. Monsanto Company | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address**: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: ☐ 1. ☐ 2. ☐ 3. ☒ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☒ 11. | | | ADDRESS: [redacted] |
|---|---|---|---|
| CITY: Topanga | STATE: CA | ZIP CODE: 90290 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: September 21, 2021

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet, Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).
5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.
6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

# EXHIBIT 4

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

Reserved for Clerk's File Stamp

FILED
Superior Court of California
County of Los Angeles
09/21/2021
Sherri R. Carter, Executive Officer / Clerk of Court
By: C. Monroe Deputy

COURTHOUSE ADDRESS:
Spring Street Courthouse
312 North Spring Street, Los Angeles, CA 90012

**NOTICE OF CASE ASSIGNMENT**

**UNLIMITED CIVIL CASE**

**Your case is assigned for all purposes to the judicial officer indicated below.**

CASE NUMBER:
21STCV34775

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | William A. Crowfoot | 27 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record on 09/21/2021 (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By C. Monroe, Deputy Clerk

# INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

**APPLICATION**
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

**PRIORITY OVER OTHER RULES**
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

**CHALLENGE TO ASSIGNED JUDGE**
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

**TIME STANDARDS**
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

**COMPLAINTS**
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

**CROSS-COMPLAINTS**
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

**STATUS CONFERENCE**
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

**FINAL STATUS CONFERENCE**
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

**SANCTIONS**
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

**Class Actions**
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

***Provisionally Complex Cases**
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

# EXHIBIT 5

CIV-010

ATTORNEY (Name, State Bar number, and address): Haytham Faraj SBN: 291416
The Law Offices of Haytham Faraj
8605 Santa Monica Blvd., Suite 44953
West Hollywood, CA 90069-4109
TELEPHONE NO.: (323) 463-9200 FAX NO. (Optional): (202) 280-1039
E-MAIL ADDRESS (Optional): service@farajlaw.com
ATTORNEY FOR (Name): Anousheh Sabouri

FOR COURT USE ONLY

FILED
Superior Court of California
County of Los Angeles
10/26/2021
Sherri R. Carter, Executive Officer / Clerk of Court
By: M. Valenzuela Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse

PLAINTIFF/PETITIONER: Anousheh Sabouri, S[redacted] E[redacted] through her GAL

DEFENDANT/RESPONDENT: Monsanto Company, et al.

**APPLICATION AND ORDER FOR APPOINTMENT OF GUARDIAN AD LITEM—CIVIL**
[X] **EX PARTE**

CASE NUMBER: 21STCV34775

***NOTE: This form is for use in civil proceedings in which a party is a minor, an incapacitated person, or a person for whom a conservator has been appointed. A party who seeks the appointment of a guardian ad litem in a family law or juvenile proceeding should use form FL-935. A party who seeks the appointment of a guardian ad litem in a probate proceeding should use form DE-350/GC-100. An individual cannot act as a guardian ad litem unless he or she is represented by an attorney or is an attorney.***

1. Applicant *(name):* Anousheh Sabouri is
   a. [X] the parent of *(name):* S[redacted] E[redacted]
   b. [ ] the guardian of *(name):*
   c. [ ] the conservator of *(name):*
   d. [ ] a party to the suit.
   e. [ ] the minor to be represented *(if the minor is 14 years of age or older).*
   f. [ ] another interested person *(specify capacity):*

2. This application seeks the appointment of the following person as guardian ad litem *(state name, address, and telephone number):*
   Anousheh Sabouri ph: (818) 481-7794
   [redacted], Topanga CA 90290

3. The guardian ad litem is to represent the interests of the following person *(state name, address, and telephone number):*
   S[redacted] E[redacted] ph: (818) 481-7794
   [redacted], Topanga CA 90290

4. The person to be represented is:
   a. [X] a minor *(date of birth):* [redacted]
   b. [ ] an incompetent person.
   c. [ ] a person for whom a conservator has been appointed.

5. The court should appoint a guardian ad litem because:
   a. [X] the person named in item 3 has a cause or causes of action on which suit should be brought *(describe):*
   The minor has causes of action against defendants for the wrongful death of her father, Michael Esfahanian.

[ ] Continued on Attachment 5a.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CIV-010 [Rev. January 1, 2008]

APPLICATION AND ORDER FOR APPOINTMENT OF GUARDIAN AD LITEM—CIVIL

Code of Civil Procedure, § 372 et seq.
Westlaw Doc & Form Builder

5-002

Electronically Received 10/18/2021 12:47 PM
Electronically Received 10/18/2021 12:47 PM

| PLAINTIFF/PETITIONER: Anousheh Sabouri, S[redacted] E[redacted] through her GAL | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Monsanto Company, et al. | 21STCV34775 |

5. b. [ ] more than 10 days have elapsed since the summons in the above-entitled matter was served on the person named in item 3, and no application for the appointment of a guardian ad litem has been made by the person identified in item 3 or any other person.

c. [ ] the person named in item 3 has no guardian or conservator of his or her estate.

d. [X] the appointment of a guardian ad litem is necessary for the following reasons *(specify)*:
To represent the minor's interests in her wrongful death suit.

[ ] Continued on Attachment 5d.

6. The proposed guardian ad litem's relationship to the person he or she will be representing is:
   a. [X] related *(state relationship)*: mother
   b. [ ] not related *(specify capacity)*:

7. The proposed guardian ad litem is fully competent and qualified to understand and protect the rights of the person he or she will represent and has no interests adverse to the interests of that person. *(If there are any issues of competency or qualification or any possible adverse interests, describe and explain why the proposed guardian should nevertheless be appointed)*:

[ ] Continued on Attachment 7.

Haytham Faraj
(TYPE OR PRINT NAME)

(SIGNATURE OF ATTORNEY)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: October 15, 2021

Anousheh Sabouri
(TYPE OR PRINT NAME)

ID EuHzur1DcZu8fvTq1c7sLky3
(SIGNATURE OF APPLICANT)

## CONSENT TO ACT AS GUARDIAN AD LITEM

I consent to the appointment as guardian ad litem under the above petition.

Date: October 15, 2021

Anousheh Sabouri
(TYPE OR PRINT NAME)

ID EuHzur1DcZu8fvTq1c7sLky3
(SIGNATURE OF PROPOSED GUARDIAN AD LITEM)

## ORDER [X] EX PARTE

THE COURT FINDS that it is reasonable and necessary to appoint a guardian ad litem for the person named in item 3 of the application, as requested.

THE COURT ORDERS that *(name)*: Anousheh Sabouri
is hereby appointed as the guardian ad litem for *(name)*: S[redacted] E[redacted]
for the reasons set forth in item 5 of the application.

Date: 10/26/2021

JUDICIAL OFFICER
Upinder S. Kalra / Judge

[ ] SIGNATURE FOLLOWS LAST ATTACHMENT

**APPLICATION AND ORDER FOR APPOINTMENT OF GUARDIAN AD LITEM—CIVIL**

# eSignature Details

---

**Signer ID:** **EuHzur1DcZu8fvTq1c7sLky3**
Signed by: Anousheh Sabouri
Sent to email: asabouri@sabourilawgroup.com
IP Address: 47.151.198.16
Signed at: Oct 16 2021, 8:04 am PDT

# EXHIBIT 6

2018-SJ-007-00

FILED
Superior Court of California
County of Los Angeles

APR 16 2018

Sherri R. Carter, Executive Officer/Clerk
By Stephanie Chung, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE PERSONAL INJURY COURT ("PI COURT") PROCEDURES, **CENTRAL DISTRICT** (EFFECTIVE APRIL 16, 2018)

CASE NO.: 21STCV34775

STANDING ORDER RE: PERSONAL INJURY PROCEDURES, CENTRAL DISTRICT

**DEPARTMENT:** 2☐ 3☐ 4☐ 5☐ 7☐

**FINAL STATUS CONFERENCE ("FSC"):**

- **DATE:** 03/07/2023 **AT 10:00 A.M.**

**TRIAL:**

- **DATE:** 03/21/2023 **AT 8:30 A.M.**

**OSC RE DISMISSAL (CODE CIV. PROC., § 583.210):**

- **DATE:** 09/17/2024 **AT 8:30 A.M.**

TO EACH PARTY AND TO THE ATTORNEY OF RECORD FOR EACH PARTY:

**Pursuant to the California Code of Civil Procedure ("C.C.P."), the California Rules of Court ("C.R.C.") and the Los Angeles County Court Rules ("Local Rules"), the Los Angeles Superior Court ("LASC" or "Court") HEREBY AMENDS AND SUPERSEDES THE AUGUST 10, 2017 SEVENTH AMENDED GENERAL ORDER AND, GENERALLY, ORDERS AS FOLLOWS IN THIS AND ALL OTHER GENERAL JURISDICTION PERSONAL INJURY ACTIONS FILED IN THE CENTRAL DISTRICT.**

1. To ensure proper assignment to a PI Court, Plaintiff(s) must carefully fill out the Civil Case Cover Sheet Addendum (form LACIV 109). The Court defines "personal injury" as:

> "an unlimited civil case described on the Civil Case Cover Sheet Addendum and Statement of Location (LACIV 109) as Motor Vehicle-Personal Injury/Property Damage/Wrongful Death; Personal Injury/Property Damage/Wrongful Death-Uninsured Motorist; Product Liability (other than asbestos or toxic/environmental); Medical Malpractice-Physicians & Surgeons; Other Professional Health Care Malpractice; Premises Liability; Intentional Bodily Injury/Property Damage/Wrongful Death; or Other Personal Injury/Property Damage/Wrongful Death. An action for intentional infliction of emotional distress, defamation, civil rights/discrimination, or malpractice (other than medical malpractice), is not included in this definition. An action for injury to real property is not included in this definition." (Local Rule 2.3(a)(1)(A).)

Consistent with Local Rule 2.3(a)(1)(A), the Court will assign a case to the PI Courts if plaintiff(s) check any of the following boxes in the Civil Case Cover Sheet Addendum:

A7100 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death

A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist

A7260 Product Liability (not asbestos or toxic/environmental)

A7210 Medical Malpractice – Physicians & Surgeons

A7240 Medical Malpractice – Other Professional Health Care Malpractice

A7250 Premises Liability (e.g., slip and fall)

A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism etc.)

A7220 Other Personal Injury/Property Damage/Wrongful Death

The Court will not assign cases to the PI Courts if plaintiff(s) check any boxes elsewhere in the Civil Case Cover Sheet Addendum (any boxes on pages two and three of that form).

///

The Court sets the above dates in this action in the PI Court circled above (Department 2, 3, 4, 5, or 7) at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA 90012. (C.R.C. Rules 3.714(b)(3), 3.729.)

**FILING OF DOCUMENTS**

2. Parties may file documents in person at the filing window on the first floor of the Stanley Mosk Courthouse (111 N. Hill Street, Los Angeles, CA 90012) or by U.S. Mail or e-Delivery, which is available online at *www.lacourt.org* (link on homepage). Please note that filings are no longer accepted via facsimile and must be filed either in person, via U.S. mail or via e-Delivery. Claims involving an attorney-client fee dispute, documents in which the filing party is a minor, legally incompetent person, or person for whom a conservator has been appointed, requests to waive court fees (FW-001) and requests for accommodations by persons with disabilities (MC-410), may not be filed via e-Delivery.

**SERVICE OF SUMMONS AND COMPLAINT**

3. Plaintiff(s) shall serve the summons and complaint in this action upon defendant(s) as soon as possible but no later than three years from the date when the complaint is filed. (C.C.P. § 583.210, subd.(a).) On the OSC re Dismissal date noted above, the PI Court will dismiss the action and/or all unserved parties unless the plaintiff(s) show cause why the action or the unserved parties should not be dismissed. (C.C.P. §§ 583.250; 581, subd. (b)(4).)

4. The Court sets the above trial and FSC dates on condition that plaintiff(s) effectuate service on defendant(s) of the summons and complaint within six months of filing the complaint.

5. The PI Court will dismiss the case without prejudice pursuant to C.C.P. § 581 when no party appears for trial.

**STIPULATIONS TO CONTINUE TRIAL**

6. Provided that all parties agree (and there is no violation of the "five-year rule," C.C.P. § 583.310), the parties may advance or continue any trial date in the PI Courts without showing good cause or articulating any reason or justification for the change. To continue or advance a trial date, the parties (or their counsel of record) should jointly execute and submit (at the filing window on the first floor of the Stanley Mosk Courthouse, via U.S. mail or via e-Delivery; fee

required) a Stipulation to Continue Trial, FSC and Related Motion/Discovery Dates (form LACIV CTRL-242, available on the court's website, Personal Injury Court link). The PI Courts schedule FSCs for 10:00 a.m., eight (8) court days before the trial date. Parties seeking to continue the trial and FSC dates shall file the Stipulation at least eight court days before the FSC date. Parties seeking to advance the trial and FSC dates shall file the Stipulation at least eight court days before the proposed advanced FSC date. (C.C.P. § 595.2; Govt. Code § 70617, subd. (c)(2).) In selecting a new trial date, parties should avoid setting on any Monday, or the Tuesday following a court holiday. Parties may submit a maximum of two stipulations to continue trial, for a total continuance of six months. Subsequent requests to continue trial will be granted upon a showing of good cause by noticed motion. This rule is retroactive so that any previously granted stipulation to continue trial will count toward the maximum number of allowed continuances.

**NO CASE MANAGEMENT CONFERENCES**

7. The PI Courts do not conduct Case Management Conferences. The parties need not file a Case Management Statement.

**LAW AND MOTION**

8. Any documents with declarations and/or exhibits must be tabbed. (C.R.C. Rule 3.1110(f).) All depositions excerpts referenced in briefs must be marked on the transcripts attached as exhibits. (C.R.C. Rule 3.1116(c).)

**CHAMBERS COPIES REQUIRED**

9. In addition to filing original motion papers at the filing window on the first floor of the Stanley Mosk Courthouse, via U.S. mail or via e-Delivery, the parties must deliver, directly to the PI Court courtrooms at the Spring Street Courthouse, an extra copy (marked "Chambers Copy") of reply briefs and all other motion papers filed less than seven (7) court days before a hearing calendared in the PI Courts. The PI Courts also strongly encourage the parties filing and opposing lengthy motions, such as motions for summary judgment/adjudication, to submit one or more three-ring binders organizing the chambers copy behind tabs.

///

**RESERVATION HEARING DATE**

10. Parties are directed to reserve hearing dates for motions in the PI Courts using the Court Reservation System (CRS) available online at *www.lacourt.org* (link on homepage). After reserving a motion hearing date, the reservation requestor must submit the papers for filing with the reservation receipt (CRS) number printed on the face page of the document under the caption and attach the reservation receipt as the last page. Parties or counsel who are unable to utilize the online CRS may reserve a motion hearing date by calling the PI Court courtroom, Monday through Friday, between 3:00 p.m. and 4:00 p.m.

**WITHDRAWAL OF MOTIONS**

11. California Rules of Court, Rule 3.1304(b) requires a moving party to notify the court immediately if a matter will not be heard on the scheduled date. In keeping with that rule, the PI Courts urge parties who amend pleadings in response to demurrers to file amended pleadings before the date when opposition to the demurrer is due so that the PI Courts do not needlessly prepare tentative rulings on demurrers.

**DISCOVERY MOTIONS**

12. The purpose of an Informal Discovery Conference ("IDC") is to assist the parties to resolve and/or narrow the scope of discovery disputes. Lead trial counsel on each side, or another attorney with full authority to make binding agreements, must attend in person. The PI judges have found that, in nearly every case, the parties amicably resolve disputes with the assistance of the Court.

13. Parties **must** participate in an IDC **before** a Motion to Compel Further Responses to Discovery will be heard unless the moving party submits evidence, by way of declaration, that the opposing party has failed or refused to participate in an IDC. Scheduling or participating in an IDC does not automatically extend any deadlines imposed by the Code of Civil Procedure for noticing and filing discovery motions. Ideally, the parties should participate in an IDC before a motion is filed because the IDC may avoid the necessity of a motion or reduce its scope. Because of that possibility, attorneys are encouraged to stipulate to extend the 45 (or 60) day deadline for filing a motion to compel further discovery responses in order to allow time to participate in an

IDC.

If parties do not stipulate to extend the deadlines, the moving party may file the motion to avoid it being deemed untimely. However, the IDC must take place before the motion is heard so it is suggested that the moving party reserve a date for the motion hearing that is at least 60 days after the date when the IDC reservation is made. Motions to Compel Further Discovery Responses are heard at 10:00 a.m. If the IDC is not productive, the moving party may advance the hearing on a Motion to Compel Further Discovery Responses on any available hearing date that complies with the notice requirements of the Code of Civil Procedure.

14. Parties are directed to reserve IDC dates in the PI Courts using CRS available online at www.lacourt.org (link on homepage). Parties are to meet and confer regarding the available dates in CRS prior to accessing the system. After reserving the IDC date, the reservation requestor must file in the appropriate department and serve an Informal Discovery Conference Form for Personal Injury Courts, from LACIV 239 (revised 12/14 or later), at least 15 court days prior to the conference and attach the CRS reservation receipt as the last page. The opposing party may file and serve a responsive IDC form, briefly setting forth that party's response, at least 10 court days prior to the IDC.

15. Time permitting, the PI Hub judges may be available to participate in IDCs to try to resolve other types of discovery disputes.

**EX PARTE APPLICATIONS**

16. Under the California Rules of Court, courts may only grant *ex parte* relief upon a showing, by admissible evidence, that the moving party will suffer "irreparable harm," "immediate danger," or where the moving party identifies "a statutory basis for granting relief ex parte." (C.R.C. Rule 3.1202(c).) The PI Courts have no capacity to hear multiple *ex parte* applications or to shorten time to add hearings to their fully booked motion calendars. The PI Courts do not regard the Court's unavailability for timely motion hearings as an "immediate danger" or threat of "irreparable harm" justifying *ex parte* relief. Instead of seeking *ex parte* relief, the moving party should reserve the earliest available motion hearing date (even if it is after the scheduled trial date) and should file a motion to continue trial. Parties should also check

the Court Reservation System from time to time because earlier hearing dates may become available as cases settle or hearings are taken off calendar.

**REQUEST FOR TRANSFER TO INDEPENDENT CALENDAR DEPARTMENT**

17. Parties seeking to transfer a case from a PI Court to an Independent Calendar ("I/C") Court shall file (at the filing window on the first floor of the Stanley Mosk Courthouse, via U.S. mail or via e-Delivery) and serve the Court's "Motion to Transfer Complicated Personal Injury Case to Independent Calendar Court" (form LACIV 238, available on the Court's website under the PI Courts link). The PI Courts will transfer a matter to an I/C Court if the case is not a "Personal Injury" case as defined in this Order, or if it is "complicated." In determining whether a personal injury case is "complicated" the PI Courts will consider, among other things, the number of pretrial hearings or the complexity of issues presented.

18. Parties opposing a motion to transfer have five court days to file (at the filing window on the first floor of the Stanley Mosk Courthouse, via U.S. mail or via e-Delivery) an Opposition (using the same LACIV 238 Motion to Transfer form).

19. The PI Courts will not conduct a hearing on any Motion to Transfer to I/C Court. Although the parties may stipulate to transfer a case to an Independent Calendar Department, the PI Courts will make an independent determination whether to transfer the case or not.

**FINAL STATUS CONFERENCE**

20. Parties shall comply with the requirements of the PI Courts' "First Amended Standing Order Re Final Status Conference," which shall be served with the summons and complaint.

**JURY FEES**

21. Parties must pay jury fees no later than 365 calendar days after the filing of the initial complaint. (C. C. P. § 631, subds. (b) and (c).)

**JURY TRIALS**

22. The PI Courts do not conduct jury trials. On the trial date, a PI Court will contact the Master Calendar Court, Department One, in the Stanley Mosk Courthouse. Department One will assign cases out for trial to dedicated Civil Trial Courtrooms and designated Criminal Courtrooms.

**SANCTIONS**

23. The Court has discretion to impose sanctions for any violation of this general order. (C.C.P. §§ 128.7, 187 and Gov. Code, § 68608, subd. (b).)

Dated: April 16, 2018

Debre K. Weintraub
Supervising Judge of Civil Courts
Los Angeles Superior Court

# EXHIBIT 7

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | FILED<br>Superior Court of California<br>County of Los Angeles<br>10/26/2021<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: A. Munoz Deputy |
| PLAINTIFF/PETITIONER:<br>ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian et al | |
| DEFENDANT/RESPONDENT:<br>MONSANTO COMPANY, a corporation et al | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>21STCV34775 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the PI General Order, Standing Order re PI Procedures and Hearing Dates upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Haytham Faraj
The Law Offices of Haytham Faraj
8605 Santa Monica Blvd., Suite 44953
West Hollywood, CA 90069

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 10/26/2021

By: A. Munoz
Deputy Clerk

# EXHIBIT 8

Electronically FILED by Superior Court of California, County of Los Angeles on 11/04/2021 03:36 PM Sherri R. Carter, Executive Officer/Clerk of Court, by V. Delgadillo,Deputy Clerk

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):*** MONSANTO COMPANY, a corporation; WILBUR-ELLIS COMPANY, LLC, a California limited liability corporation; CHEVRON CORPORATION, a corporation; and DOES 1 through 100, Inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):*** ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S[redacted] E[redacted], a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad
Additional Parties Attachment form is attached.

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California* (www.sucorte.ca.gov)*, en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services,* (www.lawhelpcalifornia.org)*, en el Centro de Ayuda de las Cortes de California,* (www.sucorte.ca.gov) *o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of Los Angeles
312 North Spring Street
Los Angeles, California 90012

CASE NUMBER: 21STCV34775
*(Número del Caso):*

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: Haytham Faraj
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
The Law Offices of Haytham Faraj
8605 Santa Monica Blvd., Suite 44953, West Hollywood, CA 90069-4109 (323) 463-9200

Sherri R. Carter Executive Officer / Clerk of Court

DATE: *(Fecha)* 11/04/2021 Clerk, by *(Secretario)* V. Delgadillo , Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

SUMMONS

8-002

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
Westlaw Doc & Form Builder

SUM-200(A)

| SHORT TITLE: SABOURI, et al. v. MONSANTO COMPANY, et al. | CASE NUMBER: 21STCV34775 |
|---|---|

**INSTRUCTIONS FOR USE**

- This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
- If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

[X] Plaintiff [ ] Defendant [ ] Cross-Complainant [ ] Cross-Defendant

Litem, SHIRIN SABOURI.

Page 2 of 2

# EXHIBIT 9

Electronically FILED by Superior Court of California, County of Los Angeles on 12/30/2021 12:11 PM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Blanco,Deputy Clerk

Haytham Faraj, Esq. (SBN 291416)
Katherine K. Melik-Stepanyan, Esq. (SBN 315015)
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
Telephone: (323) 463-9200
Facsimile: (202) 280-1039
Email: service@farajlaw.com

Attorneys for Plaintiffs, ANOUSHEH SABOURI and S[redacted] E[redacted], a minor by and through her GAL, ANOUSHEH SABOURI

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – SPRING STREET**

| | |
|---|---|
| ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S[redacted] E[redacted], a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, SHIRIN SABOURI,<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, a corporation; WILBUR-ELLIS COMPANY, LLC, a California limited liability corporation; CHEVRON CORPORATION, a corporation; and DOES 1 through 100, Inclusive,<br><br>Defendants. | CASE NO.: 21STCV34775<br><br>**NOTICE OF FILING NOTICE AND ACKNOWLEDGMENT OF RECEIPT**<br><br>Complaint Filed: September 21, 2021 |

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

Plaintiffs, ANOUSHEH SABOURI and S[redacted] E[redacted], a minor by and through her GAL, ANOUSHEH SABOURI ("Plaintiff"), by and through undersigned counsel, hereby give notice of filing the Notice and Acknowledgment of Receipt of Plaintiff's Summons and Complaint, which was served via electronic service onto Defendant MONSANTO COMPANY, by and through its counsel of record, on December 2, 2021 and signed on December 22, 2021.

The Notice and Acknowledgment of Receipt is attached hereto as Exhibit A.

DATED: December 30, 2021

**THE LAW OFFICES OF HAYTHAM FARAJ**

By: ______________________________

HAYTHAM FARAJ, ESQ.
Attorney for Plaintiff

- 2 -

9-003

NOTICE OF FILING NOTICE AND ACKNOWLEDGMENT OF RECEIPT

# EXHIBIT "A"

**POS-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 291416<br>NAME: Haytham Faraj<br>FIRM NAME: The Law Offices of Haytham Faraj<br>STREET ADDRESS: 8605 Santa Monica Blvd., Suite 44953<br>CITY: West Hollywood STATE: CA ZIP CODE: 90069<br>TELEPHONE NO.: (323) 463-9200 FAX NO.: (202) 280-1039<br>E-MAIL ADDRESS: service@farajlaw.com<br>ATTORNEY FOR (Name): Anousheh Sabouri, S[redacted], through her GAL | FOR COURT USE ONLY |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES<br>STREET ADDRESS: 312 N Spring St<br>MAILING ADDRESS: 312 N Spring St<br>CITY AND ZIP CODE: Los Angeles, 90012<br>BRANCH NAME: SPRING STREET COURTHOUSE | |
| Plaintiff/Petitioner: Anousheh Sabouri, S[redacted], through her GAL<br>Defendant/Respondent: Monsanto Company | |
| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>21STCV34775 |

TO *(insert name of party being served)*: MONSANTO COMPANY, a corporation

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: December 2, 2021

Stephanie Herrick
(TYPE OR PRINT NAME)

Stephanie Herrick
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of ***(to be completed by sender before mailing)***:

1. [x] A copy of the summons and of the complaint.
2. [ ] Other *(specify)*:

***(To be completed by recipient):***

Date this form is signed: December 22, 2021

Steven R. Platt,
Attorney for Defendant Monsanto Company
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)

[signature]
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure, §§ 415.30, 417.10
www.courtinfo.ca.gov

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
)
COUNTY OF LOS ANGELES )

I, the undersigned, declare that I am employed in the County Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 8605 Santa Monica Blvd., Suite 44953, West Hollywood, California 90069-4109.

On December 30, 2021, I served the document described as: **NOTICE OF FILING NOTICE AND ACKNOWLEDGMENT OF RECEIPT** on the interested parties by placing by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:

Steven R. Platt, Esq.
Parker, Milliken, Clark, O'Hara & Samuelian
555 South Flower Street, 30th Floor
Los Angeles, California 90071
Tel. (213) 683-6599
Fax. (213) 683-6669
Email: splatt@pmcos.com

*Attorneys for Defendant, Monsanto Company*

by means of:

☒ELECTRONIC SERVICE. By electronically serving the document(s) to the electronic mail address set forth below on this date before 11:59 p.m. consistent with Code of Civil Procedure section 1010.6(a)(2), (4) and (5).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. EXECUTED on the above-stated date, at Los Angeles, California.

Stephanie Herrick

# EXHIBIT 10

Electronically FILED by Superior Court of California, County of Los Angeles on 01/07/2022 01:05 PM Sherri R. Carter, Executive Officer/Clerk of Court, by S. Yong-Tim,Deputy Clerk

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*

Haytham Faraj, Esq. | SBN: 291416
Law Offices of Haytham Faraj
8605 Santa Monica Blvd., Suite 44953 West Hollywood, CA 90069

TELEPHONE NO.: (323) 463-9200 | FAX NO. (202) 280-1039
E-MAIL ADDRESS service@farajlaw.com
ATTORNEY FOR *(Name):* Plaintiff: Anousheh Sabouri, an individual and successor in interest to decedent Mike Esfahanian; et al.

FOR COURT USE ONLY

**Los Angeles County Superior Court - Spring Street Courthouse**

STREET ADDRESS: 312 North Spring Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

PLAINTIFF: **Anousheh Sabouri, an individual and successor in interest to decedent Mike Esfahanian; et al.**
DEFENDANT: **Monsanto Company, a corporation; et al.**

CASE NUMBER: **21STCV34775**

**PROOF OF SERVICE OF SUMMONS**

Ref. No. or File No.: **Sabouri (Monsanto)**

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☐ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-complaint
   f. ☑ other *(specify documents):* **Civil Case Cover Sheet Addendum and Statement of Location.**
3. a. Party served *(specify name of party as shown on documents served):*
   **Chevron Corporation, a corporation**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CSC - Lawyers Incorporating Service c/o Trudy Desbiens - Registered Agent for Service of Process**
   **Age: 45 Weight: 140 Hair: Black Sex: Female Height: 5'6' Eyes: Brown Race: Asian**
4. Address where the party was served: **CSC - Lawyers Incorporating Service**
   **2710 Gateway Oaks Dr Ste 150N**
   **Sacramento, CA 95833-3502**
5. I served the party *(check proper box)*
   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **1/4/2022** (2) at *(time):* **2:46 PM**

   b. ☐ **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):* **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

PETITIONER: Anousheh Sabouri, an individual and successor in interest to decedent Mike Esfahanian; et al. | CASE NUMBER: 21STCV34775

RESPONDENT: Monsanto Company, a corporation; et al.

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):* (2) from *(city):*

(3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

(4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.
b. ☐ as the person sued under the fictitious name of *(specify):*
c. ☐ as occupant.
d. ☑ On behalf of *(specify):* **Chevron Corporation, a corporation**
under the following Code of Civil Procedure section:

☑ 416.10 (corporation)
☐ 416.20 (defunct corporation)
☐ 416.30 (joint stock company/association)
☐ 416.40 (association or partnership)
☐ 416.50 (public entity)
☐ 415.95 (business organization, form unknown)
☐ 416.60 (minor)
☐ 416.70 (ward or conservatee)
☐ 416.90 (authorized person)
☐ 415.46 (occupant)
☐ other:

7. **Person who served papers**
a. Name: **Krystalyn Souza - ON-CALL LEGAL**
b. Address: **2476 Overland Avenue, Third Floor Los Angeles, CA 90064**
c. Telephone number: **(310) 858-9800**
d. **The fee** for service was: **$ 167.93**
e. I am:

(1) ☐ not a registered California process server.
(2) ☑ exempt from registration under Business and Professions Code section 22350(b).
(3) ☑ registered California process server:
(i) ☐ owner ☐ employee ☐ independent contractor.
(ii) Registration No.: **PS-047**
(iii) County: **Yuba**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **1/6/2022**

**ON-CALL LEGAL**
**2476 Overland Avenue, Third Floor**
**Los Angeles, CA 90064**
**(310) 858-9800**
**www.OnCallLegal.com**

**Krystalyn Souza**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

K Souza [signature]

POS-010 [Rev January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Page 2 of 2

**POS-010/245405B**

10-003

# EXHIBIT 11

Electronically FILED by Superior Court of California, County of Los Angeles on 01/07/2022 01:16 PM Sherri R. Carter, Executive Officer/Clerk of Court, by S. Yong-Tim,Deputy Clerk

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*
Haytham Faraj, Esq. | SBN: 291416
Law Offices of Haytham Faraj
8605 Santa Monica Blvd., Suite 44953 West Hollywood, CA 90069

TELEPHONE NO.: (323) 463-9200 | FAX NO. (202) 280-1039
E-MAIL ADDRESS service@farajlaw.com
ATTORNEY FOR *(Name)*: Plaintiff: Anousheh Sabouri, an individual and successor in interest to decedent Mike Esfahanian; et al.

FOR COURT USE ONLY

**Los Angeles County Superior Court - Spring Street Courthouse**

STREET ADDRESS: 312 North Spring Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

PLAINTIFF: **Anousheh Sabouri, an individual and successor in interest to decedent Mike Esfahanian; et al.**
DEFENDANT: **Monsanto Company, a corporation; et al.**

CASE NUMBER: **21STCV34775**

**PROOF OF SERVICE OF SUMMONS**

Ref. No. or File No.: **Sabouri (Monsanto)**

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☐ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-complaint
   f. ☑ other *(specify documents)*: **Civil Case Cover Sheet Addendum and Statement of Location.**
3. a. Party served *(specify name of party as shown on documents served)*:
   **Wilbur-Ellis Company, LLC, a California limited liability corporation**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
   **Registered Agent Solutions, Inc. c/o Jorge C - Registered Agent for Service of Process**
   **Age: 30 Weight: 180 Hair: Black Sex: Male Height: 6'0" Eyes: Brown Race: Hispanic**
4. Address where the party was served: **Registered Agent Solutions, Inc.**
   **720 14th St**
   **Sacramento, CA 95814-1905**
5. I served the party *(check proper box)*
   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: **1/4/2022** (2) at *(time)*: **3:10 PM**

   b. ☐ **by substituted service.** On *(date)*: at *(time)*: I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b)*:

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date)*: from *(city)*: **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10
**POS010-1/245405A**

11-002

| PETITIONER: Aroushen Sabouri, an individual and successor in interest to decedent Mike Esfahanian; et al. RESPONDENT: Monsanto Company, a corporation; et al. | CASE NUMBER: 21STCV34775 |
|---|---|

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):* (2) from *(city):*

(3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

(4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.
b. ☐ as the person sued under the fictitious name of *(specify):*
c. ☐ as occupant.
d. ☑ On behalf of *(specify):* **Wilbur-Ellis Company, LLC, a California limited liability corporation**
under the following Code of Civil Procedure section:

☐ 416.10 (corporation)
☐ 416.20 (defunct corporation)
☐ 416.30 (joint stock company/association)
☑ 416.40 (association or partnership)
☐ 416.50 (public entity)
☐ 415.95 (business organization, form unknown)
☐ 416.60 (minor)
☐ 416.70 (ward or conservatee)
☐ 416.90 (authorized person)
☐ 415.46 (occupant)
☐ other:

7. **Person who served papers**
a. Name: **Krystalyn Souza - ON-CALL LEGAL**
b. Address: **2476 Overland Avenue, Third Floor Los Angeles, CA 90064**
c. Telephone number: **(310) 858-9800**
d. **The fee** for service was: **$ 167.93**
e. I am:

(1) ☐ not a registered California process server.
(2) ☐ exempt from registration under Business and Professions Code section 22350(b).
(3) ☑ registered California process server:
(i) ☐ owner ☐ employee ☐ independent contractor.
(ii) Registration No.: **PS-047**
(iii) County: **Yuba**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **1/6/2022**

**ON-CALL LEGAL**
**2476 Overland Avenue, Third Floor**
**Los Angeles, CA 90064**
**(310) 858-9800**
**www.OnCallLegal.com**

**Krystalyn Souza**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

# EXHIBIT 12

Electronically FILED by Superior Court of California, County of Los Angeles on 01/21/2022 08:20 PM Sherri R. Carter, Executive Officer/Clerk of Court, by A. Love,Deputy Clerk

Joshua D. Cools (SBN 319531)
Craig J. Erickson (SBN 316557)
EVANS FEARS & SCHUTTERT LLP
4440 Von Karman Avenue, Suite 250
Newport Beach, California 92660
Telephone: (949) 301-9463
Facsimile: (949) 966-0706
Email: jcools@efstriallaw.com
Email: cerickson@efstriallaw.com

Steven R. Platt (SBN 245510)
PARKER, MILLIKEN, CLARK,
O'HARA & SAMUELIAN, P.C.
555 S. Flower St., 30th Floor
Los Angeles, CA 90071-2440
Telephone: (213) 683-6500
Facsimile: (213) 683-6669
Email: splatt@pmcos.com

Attorneys for Defendant MONSANTO COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

ANOUSHEH SABOURI, *et al.*,

Plaintiffs,

v.

MONSANTO COMPANY, *et al.*,

Defendants.

Case No. 21STCV34775

**ANSWER OF MONSANTO COMPANY TO UNVERIFIED COMPLAINT; DEMAND FOR JURY TRIAL**

Complaint Filed: September 21, 2021
Trial Date: March 21, 2023

Comes now Defendant MONSANTO COMPANY ("Monsanto") and answers the Complaint of Plaintiffs:

1. Pursuant to Code of Civil Procedure Section 431.30(d), Monsanto files its general denial to said Complaint and denies, generally and specifically, each and every allegation of said Complaint, and the whole thereof, and denies that Plaintiffs have sustained or will sustain damage in the sum or sums alleged, or in any sum or amount whatsoever or at all.

2. Further answering the Complaint, Monsanto denies that Plaintiffs and/or Mike Esfahanian ("Decedent") sustained or will sustain any injury, damage or loss by reason of any act or omission of Monsanto.

Monsanto is informed and believes, and therefore alleges the following separate and affirmative defenses:

FIRST DEFENSE

(FAILURE TO STATE A CAUSE OF ACTION – ALL CAUSES OF ACTION)

3. The Complaint, in whole or part, fails to state a claim or cause of action against Monsanto upon which relief can be granted.

SECOND DEFENSE

(PRODUCT NOT DEFECTIVE OR UNREASONABLY DANGEROUS – ALL CAUSES OF ACTION)

4. Plaintiffs' claims against Monsanto are barred in whole because Plaintiffs cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

THIRD DEFENSE

(LACK OF PROXIMATE CAUSE – ALL CAUSES OF ACTION)

5. Any alleged negligent or culpable conduct of Monsanto, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of any injuries allegedly experienced by Plaintiffs and/or Decedent.

FOURTH DEFENSE

(ADEQUATE WARNINGS – ALL CAUSES OF ACTION)

6. Plaintiffs' claims against Monsanto are barred, in whole or in part, because the products at issue were designed, manufactured, marketed, and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

FIFTH DEFENSE

(STATUTORY AND REGULATORY COMPLIANCE – ALL CAUSES OF ACTION)

7. Plaintiffs' claims against Monsanto are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

SIXTH DEFENSE

(FIFRA STATUTORY PREEMPTION – ALL CAUSES OF ACTION)

8. Plaintiffs' claims against Monsanto are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

SEVENTH DEFENSE

(PREEMPTION – CONTINUED EPA APPROVAL – ALL CAUSES OF ACTION)

9. Plaintiffs' claims against Monsanto are preempted, in whole or in part, because of findings by the United States Environmental Protection Agency ("U.S. EPA") that glyphosate does not cause cancer in humans and/or because of U.S. EPA-approved product labeling.

EIGHTH DEFENSE

(PRIMARY JURISDICTION – ALL CAUSES OF ACTION)

10. Plaintiffs' claims against Monsanto are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

NINTH DEFENSE

(INDEPENDENT/INTERVENING/SUPERSEDING CAUSES – ALL CAUSES OF ACTION)

11.     Plaintiffs' claims against Monsanto are barred, in whole or in part, because Decedent's and/or Plaintiffs' injuries, if any, were the result of conduct of Decedent, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to pre-existing medical conditions.

TENTH DEFENSE

(RESTATEMENT (SECOND) OF TORTS § 402A, COMMENTS J AND K – ALL CAUSES OF ACTION)

12.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar Plaintiffs' claims against Monsanto in whole or in part.

ELEVENTH DEFENSE

(STATUTE OF LIMITATIONS AND/OR REPOSE – ALL CAUSES OF ACTION)

13.     Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations including, but not limited to, Code of Civil Procedure sections 335.1, 338(d), and 340.8.

TWELFTH DEFENSE

(MISUSE OR FAILURE TO FOLLOW INSTRUCTIONS – ALL CAUSES OF ACTION)

14.     The misuse or abnormal use of the product or failure to follow instructions bar Plaintiffs' claims against Monsanto in whole or in part.

THIRTEENTH DEFENSE

(ALTERNATIVE CAUSES – ALL CAUSES OF ACTION)

15.     If Plaintiffs and/or Decedent suffered injury or damages as alleged, which is denied, such injury or damages resulted from: (a) acts or omissions of persons or entities for which Monsanto is neither liable nor responsible or, in the alternative, Monsanto is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from

diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Monsanto. Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of Plaintiffs' alleged injury or damages.

FOURTEENTH DEFENSE

(LACK OF PRIVITY; NO DUTY – ALL CAUSES OF ACTION)

16. Monsanto had no legal relationship or privity with Decedent and owed no duty to Decedent by which liability could be attributed to it.

FIFTEENTH DEFENSE

(NO WARRANTIES – ALL CAUSES OF ACTION)

17. Monsanto made no warranties of any kind or any representations of any nature whatsoever to Decedent. If any such warranties were made, which Monsanto specifically denies, then Plaintiffs and/or Decedent failed to give notice of any breach thereof.

SIXTEENTH DEFENSE

(COMMERCIAL FREE SPEECH – ALL CAUSES OF ACTION)

18. Plaintiffs' claims against Monsanto are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution and Article I, Section 2 of the California Constitution.

SEVENTEENTH DEFENSE

(PUNITIVE DAMAGES UNCONSTITUTIONAL – ALL CAUSES OF ACTION)

19. Plaintiffs' claims against Monsanto for punitive damages are barred because such an award would violate Monsanto's due process, equal protection and other rights under the United States Constitution, the California Constitution, and/or other applicable state constitutions – and would be improper under the common law and public policies of the United States, the laws of California and/or other states' laws.

EIGHTEENTH DEFENSE

(CONDUCT DOES NOT WARRANT PUNITIVE DAMAGES – ALL CAUSES OF ACTION)

20.    Plaintiffs' claims against Monsanto for punitive damages are barred because Plaintiffs have failed to allege conduct warranting imposition of punitive damages under California and/or other applicable state laws.

NINETEENTH DEFENSE

(PUNITIVE DAMAGES BARRED OR LIMITED BY OPERATION OF LAW– ALL CAUSES OF ACTION)

21.    Plaintiffs' claims against Monsanto for punitive damages are barred and/or limited by operation of state and/or federal law.

TWENTIETH DEFENSE

(CONTRIBUTORY/COMPARATIVE NEGLIGENCE – ALL CAUSES OF ACTION)

22.    Plaintiffs' claims against Monsanto are barred in whole or in part by Decedent's contributory/comparative negligence.

TWENTY-FIRST DEFENSE

(FAILURE TO MITIGATE DAMAGES – ALL CAUSES OF ACTION)

23.    Plaintiffs' claims against Monsanto are barred in whole or in part by Decedent's failure to mitigate damages.

TWENTY-SECOND DEFENSE

(SOPHISTICATED USER DOCTRINE – ALL CAUSES OF ACTION)

24.    Plaintiffs' claims against Monsanto are barred in whole or in part by the sophisticated user doctrine.

TWENTY-THIRD DEFENSE

(COLLATERAL SOURCE – ALL CAUSES OF ACTION)

25.    To the extent that Decedent and/or Plaintiffs recovered payments for any alleged injuries from any collateral source(s) or other source(s), Plaintiffs' recovery in this lawsuit, if any, shall be reduced to the extent allowed by applicable law.

TWENTY-FOURTH DEFENSE

(ALLEGED INJURIES NOT CAUSED BY MONSANTO PRODUCT – ALL CAUSES OF ACTION)

26. If Plaintiffs and/or Decedent have been injured or damaged, no injury or damages being admitted, such injuries or damages were not caused by a Monsanto product.

TWENTY-FIFTH DEFENSE

(MISJOINDER OF PARTIES – ALL CAUSES OF ACTION)

27. Plaintiffs' claims are barred, in whole or in part, because some or all of the parties have been improperly joined in this action.

TWENTY-SIXTH DEFENSE

(INCONVENIENT VENUE – ALL CAUSES OF ACTION)

28. Venue is or may be inconvenient for some or all of Plaintiffs' claims.

TWENTY-SEVENTH DEFENSE

(FRAUD ON FEDERAL AGENCY PREEMPTION – ALL CAUSES OF ACTION)

29. Any claims based on allegations that Monsanto misled, defrauded, made misrepresentations to, or withheld information from the U.S. EPA are preempted by federal law. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001); *Nathan Kimmel, Inc. v. Dowelanco*, 275 F.3d 1199 (9th Cir. 2002).

TWENTY-EIGHTH DEFENSE

(RELIEF SOUGHT BASED ON OTHER STATES' LAWS – ALL CAUSES OF ACTION)

30. Plaintiffs' claims against Monsanto are barred to the extent that Plaintiffs seek relief under the laws of states that do not govern Plaintiffs' claims.

TWENTY-NINTH DEFENSE

(PUNITIVE DAMAGES BARRED – WRONGFUL DEATH CAUSE OF ACTION)

31. To the extent Plaintiffs assert a wrongful death cause of action, Plaintiffs' request for punitive damages is barred because punitive damages are not available under California law for a wrongful death cause of action

THIRTIETH DEFENSE

(RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES – ALL CAUSES OF ACTION)

32.     Monsanto hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

WHEREFORE, Monsanto prays as follows:

1.     That Plaintiffs take nothing by way of the Complaint;

2.     That the Complaint be dismissed, in its entirety with prejudice;

3.     That Monsanto be awarded judgment in this action;

4.     That Monsanto be awarded costs of suit;

5.     That Monsanto be awarded such other and further relief as the Court deems just and proper.

Dated:  January 21, 2022

Joshua D. Cools (SBN 319531)
Craig J. Erickson (SBN 316557)
EVANS FEARS & SCHUTTERT LLP
4440 Von Karman Avenue, Suite 250
Newport Beach, California 92660
Telephone:  (949) 301-9463
Facsimile:  (949) 966-0706
Email: jcools@efstriallaw.com
Email: cerickson@efstriallaw.com

Steven R. Platt (SBN 245510)
PARKER, MILLIKEN, CLARK,
O'HARA & SAMUELIAN, P.C.
555 S. Flower St., 30th Floor
Los Angeles, CA 90071-2440
Telephone: (213) 683-6500
Facsimile: (213) 683-6669
Email:  splatt@pmcos.com

Attorneys for Defendant MONSANTO COMPANY

**DEMAND FOR JURY TRIAL**

Defendant MONSANTO COMPANY hereby demands a jury trial in the above-entitled action.

Dated: January 21, 2022

Joshua D. Cools (SBN 319531)
Craig J. Erickson (SBN 316557)
EVANS FEARS & SCHUTTERT LLP
4440 Von Karman Avenue, Suite 250
Newport Beach, California 92660
Telephone: (949) 301-9463
Facsimile: (949) 966-0706
Email: jcools@efstriallaw.com
Email: cerickson@efstriallaw.com

Steven R. Platt (SBN 245510)
PARKER, MILLIKEN, CLARK, O'HARA & SAMUELIAN, P.C.
555 S. Flower St., 30th Floor
Los Angeles, CA 90071-2440
Telephone: (213) 683-6500
Facsimile: (213) 683-6669
Email: splatt@pmcos.com

Attorneys for Defendant MONSANTO COMPANY

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 4440 Von Karman Avenue, Suite 250, Newport Beach, CA, 92660.

On January 21, 2022, I served a true and correct copy of the document described as ANSWER OF MONSANTO COMPANY TO UNVERIFIED COMPLAINT; DEMAND FOR JURY TRIAL on the interested parties, as follows:

☐ By submitting an electronic version of the document via FTP upload to the Court's Electronic Filing and Service Provider, One Legal

☒ By Email Pursuant to C.R.C. 2060, I caused the foregoing document(s) to be served via email to each electronic mail addresses listed below and the transmission was reported as complete without error.

☐ By placing a true copy in envelope(s) addressed as referenced below. The envelope(s) were then sealed and deposited for collection and mailing in accordance with my employer's normal procedures. I am readily familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service, with all postage prepaid, at Los Angeles, California, on the same day in the ordinary course of business.

Haytham Faraj, Esq.
Katherine K. Melik-Stepanyan, Esq.
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
haytham@farajlaw.com
katie@farajlaw.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Proof of Service was executed on January 21, 2022 at Newport Beach, California.

*Aubrie Hewatt*
Aubrie Hewatt

# EXHIBIT 13

Electronically FILED by Superior Court of California, County of Los Angeles on 01/31/2022 03:20 PM Sherri R. Carter, Executive Officer/Clerk of Court, by A. Love, Deputy Clerk

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Joshua D. Cools (SBN 319531); Craig J. Erickson (SBN 316557)
Evans Fears & Schuttert LLP
4440 Von Karman Avenue, Suite 250, Newport Beach, CA 92660
TELEPHONE NO.: (949) 301-9463 FAX NO. *(Optional)*: (949) 966-0706
E-MAIL ADDRESS: jcools@efstriallaw.com; cerickson@efstriallaw.com
ATTORNEY FOR *(Name)*: Defendant Monsanto Company

***FOR COURT USE ONLY***

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

STREET ADDRESS: 312 North Spring Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Spring Street Courthouse

CASE NAME:
Anousheh Sabouri v. Monsanto Company, et al.

## CIVIL CASE COVER SHEET

[X] **Unlimited** (Amount demanded exceeds $25,000)
[ ] **Limited** (Amount demanded is $25,000 or less)

**Complex Case Designation**

[X] Counter [ ] Joinder

Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 21STCV34775

JUDGE: William A. Crowfoot
DEPT.: 27

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[X] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [X] Large number of witnesses
   e. [X] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify)*: Seven (7)
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: January 21, 2022

Joshua Cools
(TYPE OR PRINT NAME)

[signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

13-002

*LexisNexis® Automated California Judicial Council Forms*

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
- Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
- Confession of Judgment *(non-domestic relations)*
- Sister State Judgment
- Administrative Agency Award *(not unpaid taxes)*
- Petition/Certification of Entry of Judgment on Unpaid Taxes
- Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 4440 Von Karman Avenue, Suite 250, Newport Beach, CA, 92660.

On January 21, 2022, I served a true and correct copy of the document described as CIVIL CASE COVER SHEET on the interested parties, as follows:

☐ By submitting an electronic version of the document via FTP upload to the Court's Electronic Filing and Service Provider, One Legal

☒ By Email Pursuant to C.R.C. 2060, I caused the foregoing document(s) to be served via email to each electronic mail addresses listed below and the transmission was reported as complete without error.

☐ By placing a true copy in envelope(s) addressed as referenced below. The envelope(s) were then sealed and deposited for collection and mailing in accordance with my employer's normal procedures. I am readily familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service, with all postage prepaid, at Los Angeles, California, on the same day in the ordinary course of business.

Haytham Faraj, Esq.
Katherine K. Melik-Stepanyan, Esq.
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
haytham@farajlaw.com
katie@farajlaw.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Proof of Service was executed on January 21, 2022 at Newport Beach, California.

Aubrie Hewatt
Aubrie Hewatt

# EXHIBIT 14

Electronically FILED by Superior Court of California, County of Los Angeles on 02/03/2022 04:44 PM Sherri R. Carter, Executive Officer/Clerk of Court, by V. Delgadillo,Deputy Clerk

Joshua D. Cools (SBN 319531)
Craig J. Erickson (SBN 316557)
EVANS FEARS & SCHUTTERT LLP
4440 Von Karman Avenue, Suite 250
Newport Beach, California 92660
Telephone: (949) 301-9463
Facsimile: (949) 966-0706
Email: jcools@efstriallaw.com
Email: cerickson@efstriallaw.com

Steven R. Platt (SBN 245510)
PARKER, MILLIKEN, CLARK, O'HARA & SAMUELIAN, P.C.
555 S. Flower St., 30th Floor
Los Angeles, CA 90071-2440
Telephone: (213) 683-6500
Facsimile: (213) 683-6669
Email: splatt@pmcos.com

Attorneys for Defendant WILBUR-ELLIS COMPANY LLC

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

ANOUSHEH SABOURI, *et al.*,

Plaintiffs,

v.

MONSANTO COMPANY, *et al.*,

Defendants.

Case No. 21STCV34775

**ANSWER OF WILBUR-ELLIS COMPANY LLC TO UNVERIFIED COMPLAINT; DEMAND FOR JURY TRIAL**

Complaint Filed: September 21, 2021
Trial Date: March 21, 2023

Comes now Defendant WILBUR-ELLIS COMPANY LLC ("Wilbur-Ellis Company") and answers the Complaint of Plaintiffs:

1. Pursuant to Code of Civil Procedure Section 431.30(d), Wilbur-Ellis Company files its general denial to said Complaint and denies, generally and specifically, each and every allegation of said Complaint, and the whole thereof, and denies that Plaintiffs have sustained or will sustain damage in the sum or sums alleged, or in any sum or amount whatsoever or at all.

2. Further answering the Complaint, Wilbur-Ellis Company denies that Plaintiffs and/or Mike Esfahanian ("Decedent") sustained or will sustain any injury, damage or loss by reason of any act or omission of Wilbur-Ellis Company.

Wilbur-Ellis Company is informed and believes, and therefore alleges the following separate and affirmative defenses:

FIRST DEFENSE

(FAILURE TO STATE A CAUSE OF ACTION – ALL CAUSES OF ACTION)

3. The Complaint, in whole or part, fails to state a claim or cause of action against Wilbur-Ellis Company upon which relief can be granted.

SECOND DEFENSE

(PRODUCT NOT DEFECTIVE OR UNREASONABLY DANGEROUS – ALL CAUSES OF ACTION)

4. Plaintiffs' claims against Wilbur-Ellis Company are barred in whole because Plaintiffs cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

THIRD DEFENSE

(LACK OF PROXIMATE CAUSE – ALL CAUSES OF ACTION)

5. Any alleged negligent or culpable conduct of Wilbur-Ellis Company, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of any injuries allegedly experienced by Plaintiffs and/or Decedent.

FOURTH DEFENSE

(ADEQUATE WARNINGS – ALL CAUSES OF ACTION)

6. Plaintiffs' claims against Wilbur-Ellis Company are barred, in whole or in part, because the products at issue were designed, manufactured, marketed, and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

FIFTH DEFENSE

(STATUTORY AND REGULATORY COMPLIANCE – ALL CAUSES OF ACTION)

7. Plaintiffs' claims against Wilbur-Ellis Company are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

SIXTH DEFENSE

(FIFRA STATUTORY PREEMPTION – ALL CAUSES OF ACTION)

8. Plaintiffs' claims against Wilbur-Ellis Company are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

SEVENTH DEFENSE

(PREEMPTION – CONTINUED EPA APPROVAL – ALL CAUSES OF ACTION)

9. Plaintiffs' claims against Wilbur-Ellis Company are preempted, in whole or in part, because of findings by the United States Environmental Protection Agency ("U.S. EPA") that glyphosate does not cause cancer in humans and/or because of U.S. EPA-approved product labeling.

EIGHTH DEFENSE

(PRIMARY JURISDICTION – ALL CAUSES OF ACTION)

10. Plaintiffs' claims against Wilbur-Ellis Company are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

NINTH DEFENSE

(INDEPENDENT/INTERVENING/SUPERSEDING CAUSES – ALL CAUSES OF ACTION)

11.     Plaintiffs' claims against Wilbur-Ellis Company are barred, in whole or in part, because Decedent's and/or Plaintiffs' injuries, if any, were the result of conduct of Decedent, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to pre-existing medical conditions.

TENTH DEFENSE

(RESTATEMENT (SECOND) OF TORTS § 402A, COMMENTS J AND K – ALL CAUSES OF ACTION)

12.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar Plaintiffs' claims against Wilbur-Ellis Company in whole or in part.

ELEVENTH DEFENSE

(STATUTE OF LIMITATIONS AND/OR REPOSE – ALL CAUSES OF ACTION)

13.     Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations including, but not limited to, Code of Civil Procedure sections 335.1 and 340.8.

TWELFTH DEFENSE

(MISUSE OR FAILURE TO FOLLOW INSTRUCTIONS – ALL CAUSES OF ACTION)

14.     The misuse or abnormal use of the product or failure to follow instructions bar Plaintiffs' claims against Wilbur-Ellis Company in whole or in part.

THIRTEENTH DEFENSE

(ALTERNATIVE CAUSES – ALL CAUSES OF ACTION)

15.     If Plaintiffs and/or Decedent suffered injury or damages as alleged, which is denied, such injury or damages resulted from: (a) acts or omissions of persons or entities for which Wilbur-Ellis Company is neither liable nor responsible or, in the alternative, Wilbur-Ellis Company is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any

product sold, distributed, or manufactured by Wilbur-Ellis Company. Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of Plaintiffs' alleged injury or damages.

FOURTEENTH DEFENSE

(LACK OF PRIVITY; NO DUTY – ALL CAUSES OF ACTION)

16. Wilbur-Ellis Company had no legal relationship or privity with Decedent and owed no duty to Decedent by which liability could be attributed to it.

FIFTEENTH DEFENSE

(NO WARRANTIES – ALL CAUSES OF ACTION)

17. Wilbur-Ellis Company made no warranties of any kind or any representations of any nature whatsoever to Decedent. If any such warranties were made, which Wilbur-Ellis Company specifically denies, then Plaintiffs and/or Decedent failed to give notice of any breach thereof.

SIXTEENTH DEFENSE

(COMMERCIAL FREE SPEECH – ALL CAUSES OF ACTION)

18. Plaintiffs' claims against Wilbur-Ellis Company are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution and Article I, Section 2 of the California Constitution.

SEVENTEENTH DEFENSE

(PUNITIVE DAMAGES UNCONSTITUTIONAL – ALL CAUSES OF ACTION)

19. Plaintiffs' claims against Wilbur-Ellis Company for punitive damages are barred because such an award would violate Wilbur-Ellis Company's due process, equal protection and other rights under the United States Constitution, the California Constitution, and/or other applicable state constitutions – and would be improper under the common law and public policies of the United States, the laws of California and/or other states' laws.

EIGHTEENTH DEFENSE

(CONDUCT DOES NOT WARRANT PUNITIVE DAMAGES – ALL CAUSES OF ACTION)

20. Plaintiffs' claims against Wilbur-Ellis Company for punitive damages are barred because Plaintiffs have failed to allege conduct warranting imposition of punitive damages under California and/or other applicable state laws.

NINETEENTH DEFENSE

(PUNITIVE DAMAGES BARRED OR LIMITED BY OPERATION OF LAW– ALL CAUSES OF ACTION)

21. Plaintiffs' claims against Wilbur-Ellis Company for punitive damages are barred and/or limited by operation of state and/or federal law.

TWENTIETH DEFENSE

(CONTRIBUTORY/COMPARATIVE NEGLIGENCE – ALL CAUSES OF ACTION)

22. Plaintiffs' claims against Wilbur-Ellis Company are barred in whole or in part by Decedent's contributory/comparative negligence.

TWENTY-FIRST DEFENSE

(FAILURE TO MITIGATE DAMAGES – ALL CAUSES OF ACTION)

23. Plaintiffs' claims against Wilbur-Ellis Company are barred in whole or in part by Decedent's failure to mitigate damages.

TWENTY-SECOND DEFENSE

(SOPHISTICATED USER DOCTRINE – ALL CAUSES OF ACTION)

24. Plaintiffs' claims against Wilbur-Ellis Company are barred in whole or in part by the sophisticated user doctrine.

TWENTY-THIRD DEFENSE

(COLLATERAL SOURCE – ALL CAUSES OF ACTION)

25. To the extent that Decedent and/or Plaintiffs recovered payments for any alleged injuries from any collateral source(s) or other source(s), Plaintiffs' recovery in this lawsuit, if any, shall be reduced to the extent allowed by applicable law.

TWENTY-FOURTH DEFENSE

(ALLEGED INJURIES NOT CAUSED BY WILBUR-ELLIS COMPANY PRODUCT – ALL CAUSES OF ACTION)

26. If Plaintiffs and/or Decedent have been injured or damaged, no injury or damages being admitted, such injuries or damages were not caused by a Wilbur-Ellis Company product.

TWENTY-FIFTH DEFENSE

(MISJOINDER OF PARTIES – ALL CAUSES OF ACTION)

27. Plaintiffs' claims are barred, in whole or in part, because some or all of the parties have been improperly joined in this action.

TWENTY-SIXTH DEFENSE

(INCONVENIENT VENUE – ALL CAUSES OF ACTION)

28. Venue is or may be inconvenient for some or all of Plaintiffs' claims.

TWENTY-SEVENTH DEFENSE

(FRAUD ON FEDERAL AGENCY PREEMPTION – ALL CAUSES OF ACTION)

29. Any claims based on allegations that Wilbur-Ellis Company misled, defrauded, made misrepresentations to, or withheld information from the U.S. EPA are preempted by federal law. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001); *Nathan Kimmel, Inc. v. Dowelanco*, 275 F.3d 1199 (9th Cir. 2002).

TWENTY-EIGHTH DEFENSE

(RELIEF SOUGHT BASED ON OTHER STATES' LAWS – ALL CAUSES OF ACTION)

30. Plaintiffs' claims against Wilbur-Ellis Company are barred to the extent that Plaintiffs seek relief under the laws of states that do not govern Plaintiffs' claims.

TWENTY-NINTH DEFENSE

(PUNITIVE DAMAGES BARRED – WRONGFUL DEATH CAUSE OF ACTION)

31. To the extent Plaintiffs assert a wrongful death cause of action, Plaintiffs' request for punitive damages is barred because punitive damages are not available under California law for a wrongful death cause of action

THIRTIETH DEFENSE

(RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES – ALL CAUSES OF ACTION)

32.     Wilbur-Ellis Company hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

WHEREFORE, Wilbur-Ellis Company prays as follows:

1.     That Plaintiffs take nothing by way of the Complaint;

2.     That the Complaint be dismissed, in its entirety with prejudice;

3.     That Wilbur-Ellis Company be awarded judgment in this action;

4.     That Wilbur-Ellis Company be awarded costs of suit;

5.     That Wilbur-Ellis Company be awarded such other and further relief as the Court deems just and proper.

Dated:  February 3, 2022

Joshua D. Cools (SBN 319531)
Craig J. Erickson (SBN 316557)
EVANS FEARS & SCHUTTERT LLP
4440 Von Karman Avenue, Suite 250
Newport Beach, California 92660
Telephone:  (949) 301-9463
Facsimile:  (949) 966-0706
Email: jcools@efstriallaw.com
Email: cerickson@efstriallaw.com

Steven R. Platt (SBN 245510)
PARKER, MILLIKEN, CLARK,
O'HARA & SAMUELIAN, P.C.
555 S. Flower St., 30th Floor
Los Angeles, CA 90071-2440
Telephone: (213) 683-6500
Facsimile: (213) 683-6669
Email:  splatt@pmcos.com

Attorneys for Defendant WILBUR-ELLIS COMPANY LLC

**DEMAND FOR JURY TRIAL**

Defendant WILBUR-ELLIS COMPANY LLC hereby demands a jury trial in the above-entitled action.

Dated: February 3, 2022

Joshua D. Cools (SBN 319531)
Craig J. Erickson (SBN 316557)
EVANS FEARS & SCHUTTERT LLP
4440 Von Karman Avenue, Suite 250
Newport Beach, California 92660
Telephone: (949) 301-9463
Facsimile: (949) 966-0706
Email: jcools@efstriallaw.com
Email: cerickson@efstriallaw.com

Steven R. Platt (SBN 245510)
PARKER, MILLIKEN, CLARK, O'HARA & SAMUELIAN, P.C.
555 S. Flower St., 30th Floor
Los Angeles, CA 90071-2440
Telephone: (213) 683-6500
Facsimile: (213) 683-6669
Email: splatt@pmcos.com

Attorneys for Defendant WILBUR-ELLIS COMPANY LLC

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 4440 Von Karman Avenue, Suite 250, Newport Beach, CA 92660.

On February 3, 2022, I served a true and correct copy of the document described as ANSWER OF WILBUR-ELLIS COMPANY LLC TO UNVERIFIED COMPLAINT; DEMAND FOR JURY TRIAL on the interested parties, as follows:

☐ By submitting an electronic version of the document via FTP upload to the Court's Electronic Filing and Service Provider, One Legal

☒ By Email Pursuant to C.R.C. 2060, I caused the foregoing document(s) to be served via email to each electronic mail addresses listed below and the transmission was reported as complete without error.

☐ By placing a true copy in envelope(s) addressed as referenced below. The envelope(s) were then sealed and deposited for collection and mailing in accordance with my employer's normal procedures. I am readily familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service, with all postage prepaid, at Los Angeles, California, on the same day in the ordinary course of business.

Haytham Faraj, Esq.
Katherine K. Melik-Stepanyan, Esq.
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Proof of Service was executed on February 3, 2022 at Newport Beach, California.

Aubrie Hewatt

Aubrie Hewatt

# EXHIBIT 15

Electronically FILED by Superior Court of California, County of Los Angeles on 02/03/2022 04:44 PM Sherri R. Carter, Executive Officer/Clerk of Court, by V. Delgadillo,Deputy Clerk

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): 21STCV34775
Joshua D. Cools (SBN 319531); Craig J. Erickson (SBN 316557)
Evans Fears & Schuttert LLP
4440 Von Karman Avenue, Suite 250, Newport Beach, CA 92660
TELEPHONE NO.: (949) 301-9463 FAX NO. *(Optional):* (949) 966-0706
E-MAIL ADDRESS: jcools@efstriallaw.com; cerickson@efstriallaw.com
ATTORNEY FOR *(Name):* Defendant Wilbur-Ellis Company LLC

FOR COURT USE ONLY

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

STREET ADDRESS: 312 North Spring Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Spring Street Courthouse

CASE NAME:
Anousheh Sabouri, et al. v. Monsanto Company, et al.

**CIVIL CASE COVER SHEET**

[X] **Unlimited** (Amount demanded exceeds $25,000)
[ ] **Limited** (Amount demanded is $25,000 or less)

**Complex Case Designation**

[X] Counter [ ] Joinder

Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 21STCV34775

JUDGE: William A. Crowfoot
DEPT.: 27

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[X] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [X] Large number of witnesses
   e. [X] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify):* Seven (7)
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: February 3, 2022

(TYPE OR PRINT NAME) ▶ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

15-002

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev.September 1, 2021]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

*LexisNexis® Automated California Judicial Council Forms*

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
- Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
- Confession of Judgment *(non-domestic relations)*
- Sister State Judgment
- Administrative Agency Award *(not unpaid taxes)*
- Petition/Certification of Entry of Judgment on Unpaid Taxes
- Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 4440 Von Karman Avenue, Suite 250, Newport Beach, CA, 92660.

On February 3, 2022, I served a true and correct copy of the document described as CIVIL CASE COVER SHEET on the interested parties, as follows:

☐ By submitting an electronic version of the document via FTP upload to the Court's Electronic Filing and Service Provider, One Legal

☒ By Email Pursuant to C.R.C. 2060, I caused the foregoing document(s) to be served via email to each electronic mail addresses listed below and the transmission was reported as complete without error.

☐ By placing a true copy in envelope(s) addressed as referenced below. The envelope(s) were then sealed and deposited for collection and mailing in accordance with my employer's normal procedures. I am readily familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service, with all postage prepaid, at Los Angeles, California, on the same day in the ordinary course of business.

Haytham Faraj, Esq.
Katherine K. Melik-Stepanyan, Esq.
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
haytham@farajlaw.com
katie@farajlaw.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Proof of Service was executed on February 3, 2022 at Newport Beach, California.

Aubrie Hewatt
Aubrie Hewatt

# EXHIBIT 16

CIV-110

Electronically Received 03/15/2022 02:57 PM

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:
Haytham Faraj SBN: 291416
The Law Offices of Haytham Faraj
8605 Santa Monica Blvd, Suite 44953, West Hollywood, CA 90069
TELEPHONE NO.: 323-463-9200 FAX NO. *(Optional)*: 202-280-1039
E-MAIL ADDRESS *(Optional)*: service@farajlaw.com
ATTORNEY FOR *(Name)*: Anousheh Sabouri

FOR COURT USE ONLY

**FILED**
Superior Court of California
County of Los Angeles
03/15/2022
Sherri R. Carter, Executive Officer / Clerk of Court
By: M. Guzman Deputy

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
STREET ADDRESS: 312 North Spring Street
MAILING ADDRESS: 312 North Spring Street
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Spring Street Courthouse

PLAINTIFF/PETITIONER: Anousheh Sabouri

DEFENDANT/RESPONDENT: Monsanto Company, et al.

**REQUEST FOR DISMISSAL**

CASE NUMBER: 21STCV34775

**A conformed copy will not be returned by the clerk unless a method of return is provided with the document.**

**This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)**

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) [ ] With prejudice (2) [X] Without prejudice
   b. (1) [X] Complaint (2) [ ] Petition
   (3) [ ] Cross-complaint filed by *(name)*: on *(date)*:
   (4) [ ] Cross-complaint filed by *(name)*: on *(date)*:
   (5) [ ] Entire action of all parties and all causes of action
   (6) [X] Other *(specify)*:* ***as to CHEVRON CORPORATION ONLY***

2. *(Complete in all cases except family law cases.)*
   The court [ ] did [X] did not waive court fees and costs for a party in this case. *(This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).*

Date: 3/15/2022
Haytham Faraj
(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY) (SIGNATURE)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
[X] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross–Complainant

3. **TO THE CLERK:** Consent to the above dismissal is hereby given.**
   Date:

(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY) (SIGNATURE)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross–Complainant

*(To be completed by clerk)*

4. [ ] Dismissal entered as requested on *(date)*:
5. [✓] Dismissal entered on *(date)*: 03/21/2022 as to only *(name)*: CHEVRON CORPORATION
6. [ ] Dismissal **not entered** as requested for the following reasons *(specify)*:
7. a. [✓] Attorney or party without attorney notified on *(date)*: 03/21/2022
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
   [ ] a copy to be conformed [ ] means to return conformed copy

Sherri R. Carter, Executive Officer / Clerk of Court

Date: 03/21/2022 Clerk, by M. Guzman, Deputy

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. Jan. 1, 2013]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.;
Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390
www.courts.ca.gov
Westlaw Doc & Form Builder

| PLAINTIFF/PETITIONER: Anousheh Sabouri | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Monsanto Company, et al. | 21STCV34775 |

**COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS**

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name):*
2. The person named in item 1 is (*check one below):*
   a. ☐ not recovering anything of value by this action.
   b. ☐ recovering less than $10,000 in value by this action.
   c. ☐ recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*
3. ☐ All court fees and court costs that were waived in this action have been paid to the court *(check one):* ☐ Yes ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: ______________________

______________________________ ▶ ______________________________

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION) (SIGNATURE)

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
)
COUNTY OF LOS ANGELES )

I, the undersigned, declare that I am employed in the County Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 8605 Santa Monica Blvd., Suite 44953, West Hollywood, California 90069-4109.

On March 15, 2022, I served the document described as: **REQUEST FOR DISMISSAL AS TO CHEVRON ONLY** on the interested parties as follows:

Matthew J. Blaschke
King & Spalding LLP
50 California Street
Suite 3300
San Francisco, CA 94111
Tel. (415) 318 1212
Email: mblaschke@kslaw.com

*Attorneys for Defendant, Chevron Corporation*

Steven R. Platt, Esq.
Parker, Milliken, Clark, O'Hara & Samuelian
555 South Flower Street, 30th Floor
Los Angeles, California 90071
Tel. (213) 683-6599
Fax. (213) 683-6669
Email: splatt@pmcos.com

*Attorneys for Defendant, Monsanto Company*

by means of:

☒ELECTRONIC SERVICE. By electronically serving the document(s) to the electronic mail address set forth below on this date before 11:59 p.m. consistent with Code of Civil Procedure section 1010.6(a)(2), (4) and (5).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. EXECUTED on the above-stated date, at Los Angeles, California.

Stephanie Herrick

# EXHIBIT 17

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S.E., a minor and successor in interest by and through her Guardian Ad Litem ANOUSHEH SABOURI

*Plaintiff(s)*

v.

MONSANTO COMPANY, a corporation; and DOES 1 through 100, Inclusive

*Defendant(s)*

Civil Action No. 2:21-CV-05524 DSF (GJSX)

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* MONSANTO COMPANY
c/o CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive Suite 150N
Sacramento, CA 95833

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Haytham Faraj, Esq.
The Law Offices of Haytham Faraj
8605 Santa Monica Blvd., Suite 44953
West Hollywood, CA 90069-4109
Tel: (323) 463-9200
Email: service@farajlaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Kiry Gray
*CLERK OF COURT*

Date: 07/08/2021

/s/ Jennylam
*Signature of Clerk or Deputy Clerk*

Civil Action No. 2:21-CV-05524 DSF (GJSX)

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________
was received by me on *(date)* ______________ .

☐ I personally served the summons on the individual at *(place)* ______________________
______________________ on *(date)* ______________ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* ______________
______________________ , a person of suitable age and discretion who resides there,
on *(date)* ______________ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* ______________________ , who is
designated by law to accept service of process on behalf of *(name of organization)* ______________
______________________ on *(date)* ______________ ; or

☐ I returned the summons unexecuted because ______________________ ; or

☐ Other *(specify)*:

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc:

Haytham Faraj, Esq. (SBN 291416)
Katherine K. Melik-Stepanyan, Esq. (SBN 315015)
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
Telephone: (323) 463-9200
Facsimile: (202) 280-1039
Email: service@farajlaw.com

Attorneys for Plaintiffs, ANOUSHEH SABOURI and S. E., a minor by and through her GAL, ANOUSHEH SABOURI

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S. E., a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, ANOUSHEH SABOURI,

Plaintiff,

v.

MONSANTO COMPANY, a corporation; and DOES 1 through 100, Inclusive,

Defendants.

CASE NO.: 2-21-cv-05524 DSF

**COMPLAINT FOR DAMAGES:**

1. **STRICT PRODUCTS LIABILITY - DESIGN DEFECT;**
2. **STRICT PRODUCTS LIABILITY – FAILURE TO WARN;**
3. **NEGLIGENCE;**
4. **BREACH OF EXPRESS WARRANTIES;**
5. **BREACH OF IMPLIED WARRANTIES;**
6. **FRAUD;**
7. **WRONGFUL DEATH; AND**
8. **EXEMPLARY DAMAGES.**

****DEMAND FOR JURY TRIAL****

COME NOW Plaintiffs, ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S. E., a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, ANOUSHEH SABOURI (collectively hereinafter "Plaintiffs"), who for causes of action against the Defendants, MONSANTO COMPANY, a corporation (hereinafter "Monsanto") and DOES 1 through 100, Inclusive, and each of them (collectively hereinafter "DEFENDANTS") complain and allege the following causes of action:

## SUMMARY

1. This case arises out of Monsanto's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular multiple myeloma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use.

2. On information and belief, Decedent MIKE ESFAHANIAN (herein referred to as "DECEDENT"), who was exposed to Roundup extensively while using Roundup residentially for his personal use, was diagnosed with multiple

myeloma in April 2018 and died as a result of his cancer in February 2019. Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S. E., a minor, is the surviving daughter of decedent.

## STATEMENT OF THE CASE

3. In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of com and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

5.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural  workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

7.      On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including multiple myeloma.

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## THE PARTIES

8. At all times relevant and mentioned herein, Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S. E., a minor, is the surviving daughter of Decedent. Plaintiffs were, and are now, residents of the City of Topanga, County of Los Angeles, California. Pursuant to the operation of *Code of Civil Procedure* section 377.60, Plaintiffs are the heirs, successors in interest and persons lawfully entitled to assert a cause of action of the wrongful death of Decedent. No other persons have any claim, right or interest in the cause of action for wrongful death that is superior to the claims by the Plaintiffs.

9. As a result of decedent MIKE ESFAHANIAN'S exposure to Roundup® and/or other Monsanto and/or Monsanto glyphosate containing products in the state of California from approximately the mid-1990s to around 2018, Decedent was diagnosed with multiple myeloma, which ultimately resulted

in his untimely death on February 9, 2019. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' Decedent, MIKE ESFAHANIAN.

10. Plaintiffs are informed and believe and based thereon allege that as a direct and proximate result of Decedent's use of Roundup® and/or other Monsanto and/or Monsanto glyphosate-containing products ("Roundup"), supplied, marketed, and/or distributed by defendants herein, decedent suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, multiple myeloma and other cancers, other permanent physical deficits, permanent bodily impairment and other injury sequelae. Decedent's injuries required medical intervention to address the adverse physical effects and damage caused by decedent's use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup"). These injuries ultimately resulted in Decedent's untimely death.

11. As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES 1 through 100, inclusive, Decedent used and/or was exposed to Roundup® and was diagnosed with serious health injuries including to multiple myeloma and/or other cancers.

12. As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of

Defendants, Decedent suffered severe mental and physical pain and have and will sustain permanent injuries and emotional distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

13.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Decedent required medical intervention in efforts to maintain and/or save Decedent.

14.     Plaintiffs are individuals who suffered damages as a result of injuries resulting from Decedent's use and/or exposure to Roundup® and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs resulting from Decedent's use of Roundup®. Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 1 through 100, inclusive.

15.     The product warnings for Roundup® in effect during the time period Decedent used and/or was exposed to Roundup® were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

16.     The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Decedent and

the general public about the increased risk of the serious adverse events described herein.

17. Had decedent and/or plaintiffs been adequately warned by the Defendants and DOES I through 100, and each of them, inclusive, of the potential life-threatening side effects of Roundup®, Decedent would not have purchased, used, or been exposed to Roundup®.

18. By reason of the foregoing, Decedent developed serious and dangerous side effects including multiple myeloma and other cancers, related injury sequelae, physical pain and suffering, mental anguish, loss of enjoyment of life, and death. By reason of the foregoing, Plaintiffs suffered damages and losses, as alleged herein. Plaintiffs' general and special damages exceed the jurisdictional limits of this Court.

## DEFENDANTS

19. Plaintiffs are informed and believe, and thereupon allege, that defendant Monsanto Company (hereinafter "Monsanto" or "defendant Monsanto"), is, and at all times relevant was, a Delaware corporation, with its headquarters in St. Louis, Missouri and multiple principal places of business throughout the world, including in St. Louis, Missouri, Oxnard, California, Woodland, and, at all relevant times to this complaint, San Ramon, California. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and

conducted business within the State of California and has derived substantial

revenue from goods and products, including Roundup®, used in the State of

California and employs sales representatives in the State of California.

Specifically, Monsanto operated a residential products division known as the

Solaris Group of Monsanto Company (hereinafter "Solaris Group"), headquartered

in San Ramon, California. Moreover, upon information and belief, Solaris Group

manufactured, registered, distributed, marketed, advertised, and sold Roundup®

products to California consumers. At all relevant times, Monsanto has conducted

testing, research, and analyses on its Roundup® and other glyphosate-based

formulations within California and manufactured said products in California,

utilizing principal laboratories and manufacturing sites throughout the State of

California in locations such as San Ramon, Oxnard and Woodland. Monsanto

expected or should have expected its acts to have consequences within the State of

California because it derived substantial revenue from interstate commerce and

invoked the benefits and protection of the State of California's laws.

      20.     Plaintiffs are informed and believe, and based thereon allege, that in

committing the acts alleged herein, each and every managing agent, agent,

representative and/or employee of the Defendants was working within the course

and scope of said agency, representation and/or employment with the knowledge,

consent, ratification, and authorization of the Defendants and their directors,

officers and/or managing agents.

21. The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when the same are ascertained.

22. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the named Defendants and each of the DOE Defendants was the agent, servant, employee and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of them, and at all said times, each named Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment and/or joint venture.

23. Plaintiffs are informed and believe and allege that at all times mentioned herein, Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly known as and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a

parent, a subsidiary (wholly or partially owned by, or the whole or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding, researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling, distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting others for marketing, warranting, rebranding, manufacturing for others, packaging and advertising of Roundup® and/or other Monstano glyphosate-containing products. Defendants and DOES 1 through 100, inclusive, and each of them, are liable for the acts, omissions and tortious conduct of their successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, parents, subsidiaries, affiliates, partners, co-venturers, merged companies, alter egos, agents, equitable trustees, fiduciaries and/or their alternate entities in that Defendants and DOES 1 through 100, inclusive, and each of them, enjoy the goodwill originally attached to each such alternate entity, acquired the assets or product line (or portion thereof), and in that there has been a virtual destruction of Plaintiffs' remedy against each such alternate entity, and that each such Defendant has the ability to assume the risk spreading role of each such alternate entity.

24. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, Defendants and DOES 1 through 100, inclusive, and each of them, were and are corporations organized and existing under the laws of the

State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are authorized to do and are doing business in the State of California and regularly conducted business in California, including in Los Angeles County.

25. Upon information and belief, at all relevant times, Defendants and DOES 1 through 100, and each of them, inclusive, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, labeling, selling, marketing, and/or introducing into interstate commerce and into the State of California, including in Los Angeles County, either directly or indirectly through third parties or related entities, Roundup® and/or other Monstano glyphosate-containing products.

26. At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, conducted regular and sustained business and engaged in substantial commerce and business activity in the State of California, which included but was not limited to selling, marketing and distributing Roundup® and/or other Monstano glyphosate-containing products in the State of California, including Los Angeles County. Specifically, Decedent purchased all of its Roundup® products for residential use from retailers in Los Angeles County.

27. At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within the United States of America including the State of

California, including Los Angeles County, and said Defendants derived and derive substantial revenue therefrom.

**AGENCY**

28. Each of the Defendants named in this Complaint, including each of the DOE Defendants, is, and at all relevant times herein mentioned was, the co-conspirator of each other Defendant in connection with the wrongful conduct described herein, and, therefore, each Defendant is jointly and severally liable to Plaintiffs for the damages sustained as a proximate result of each other Defendant.

29. Each Defendant entered into an express or implied agreement, understanding, and/or concert of action with each of the other Defendants to commit the wrongs herein alleged. These affirmative wrongful acts included, but were not limited to, the conspiracy to defraud, deceive, and hide the dangers of glyphosate from the public, beginning in 1976, through Defendants' routine falsification of data for toxicity studies needed to register Roundup®. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male

rabbits."

30.     The conspiracy was furthered in 1991 when Defendant Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

31.     The conspiracy was furthered through 2000 through present with publication of studies through companies such as Intertek and Exponent, Inc., which minimize any safety concerns about the use of glyphosate

32.     The conspiracy was furthered when Monsanto held secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

33.     The conspiracy was furthered in 2011when Defendants co-opted studies which falsely proclaimed the safety of glyphosate. In October 2015, the

Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

34.     Plaintiffs are further informed and believe and thereon allege that at all times herein alleged, each of the Defendants, including, but not limited to DOES 1 through 100, was the agent, servant, partner, aider and abettor, co-conspirator, alter ego, and/or joint venturer of the other herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, alter ego, and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted a breach of duty owed to Plaintiffs.

35.     Plaintiffs are informed and believe, and thereon allege, that there exists, and at all times herein alleged, there existed, a unity of interest in ownership between each of the aforesaid Defendants, including DOES 1 through 100, such that any individuality and separateness between these Defendants has ceased and these Defendants each are the alter-ego of the others and exerted control over those Defendants. Adherence to the fiction of the separate existence of each of these Defendants as an entity distinct from the others will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

36. Each of these acts and failures to act is alleged against each defendant whether acting individually, jointly, or severally. Each of the defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

37. Defendants, and each of them, committed these acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiffs, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiffs' rights.

38. Defendants' conduct warrants the assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

39. Each of these acts and failures to act are alleged against each Defendant whether acting individually, jointly, or severally. Each of the Defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

## JURISDICTION AND VENUE

40. This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside.

41. The amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost.

42. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

43. Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup ® within the Central District of California. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## FACTUAL ALLEGATIONS

44. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

45. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

46. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.

47. That is because when Monstano first introduced Roundup®, it touted

glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®--glyphosate--is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monstano assured the public that Roundup® was harmless. In order to prove this, Monstano championed falsified data and attacked legitimate studies that revealed its dangers. Monstano led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

***The Discovery of Glyphosate and Development of Roundup®***

48. The herbicidal properties of glyphosate were discovered in 1970 by Monstano chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monstano marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monstano still markets Roundup® as safe today.

***Registration of Herbicides under Federal Law***

49. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and

Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

50. Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

51. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus *5* requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

52. The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California. The EPA's decision to

register Roundup, however, was based on studies on the active chemical, glyphosate, and not the formulated Roundup product which contains a cocktail of other ingredients such as surfactants, adjuvants, and inert compounds, all of which, as discussed in greater detail below, contribute to the health risks associated with Roundup exposure.[1]

53. FIFRA generally requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

54. The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of an herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-I. In order to reevaluate these herbicides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

---

[1] Surfactants are compounds which contribute to the even and effective spread of glyphosate across the surface of a leaf and increase the rate of penetration through the plant. It has been shown that surfactants also greatly increase the amount and rate of Roundup® absorbed by human skin.

55. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment -in relation to the re-registration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings. "On September 12, 2016, the EPA's office of Pesticide Programs released an interim report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," ("2016 Issue Paper"") detailing the agency's review of a small portion of the existing literature on Roundup. The 2016 Issue Paper contains a review of studies submitted to the agency by Monsanto, as well as the general independent scientific literature on glyphosate carcinogenicity.

56. Immediately following the publication of the 2016 Issue Paper, the FIFRA Scientific Advisory Panel ("SAP") issued a report which reviewed the EPA's 2016 Issue Paper, and the conclusions therein. The SAP strongly criticized the EPA's conclusions and questioned the scientific approach of the agency, noting that that agency had failed to follow its own guidelines.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

57. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly*

*carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E). In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances.

58. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

59. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

60. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA

reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

61. Three top executives of IBT were convicted of fraud in 1983.

62. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

63. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

64. Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc., from 2000 through the present which minimize any safety concerns about the use of glyphosate. The studies are used to convince regulators to allow the sale of Roundup® and customers to use Roundup®. Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate. Through these means, Monsanto has fraudulently represented that independent scientists have concluded that

Glyphosate is safe. In fact, Monsanto paid these so-called "independent experts," and Monsanto failed to disclose the significant role Monsanto had in creating the manuscripts produced by the "independent" experts. Further, Monsanto has ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines for scientists such as Robert Tarone and Henry Miller. Monsanto has also ghostwritten letters by supposedly independent scientists which have been submitted to regulatory agencies who are reviewing the safety of glyphosate.

65. Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

66. Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the

Glyphosate Task Force, Defendants were able to co-opt this study, becoming the sole providers of data and ultimately writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BfR. Defendants have used this self-serving report (which they, in fact, wrote) to falsely proclaim the safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

***The Importance of Roundup® to Monsanto's Market Dominance Profits***

67. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

68. In response, Monsanto began the development and sale of genetically engineered

69. Roundup Ready® seeds in 1996. Since Roundup Ready® crops are

resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide, and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide

70. Through a three-pronged strategy of increased production, decreased prices, and by coupling Roundup Ready® seeds with Roundup® herbicide, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

71. In 1996, the New York Attorney General ("NYAG") filed a lawsuit againstMonsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including

Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a. Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences...

b. And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup® biodegrades into naturally occurring elements.

d. Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f. You can apply Accord (glyphosate-containing herbicide) with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

72. On November 19, 1 996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing herbicide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b. its glyphosate-containing herbicide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c. its glyphosate-containing herbicide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. its glyphosate-containing herbicide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e. glyphosate-containing herbicide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

73. Monsanto did not alter its advertising in the same manner in any state other than New York, and, on information and belief, still has not done so today.

74. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

75. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has

determined 116 agents to be Group I (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

76.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

77.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed, and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

78.     In assessing a chemical agent, the IARC Working Group reviews the following information:

(a) human, experimental, and mechanistic data;

(b) all pertinent epidemiological studies and cancer bioassays; and

(c) representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

79. In March of 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent, that is, glyphosate is probably carcinogenic in humans.

80. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from II countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

81. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United

Kingdom; and para-occupational exposure in farming families.

82.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

83.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

84.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

85.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

86.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

87.     In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic

islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

88. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

89. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA, oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

90. In addition to DNA damage and oxidative stress, scientists have suggested that Roundup®'s association with various serious health conditions is linked to the effect Roundup® has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup® toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup®, this exposure leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup®'s mechanism of action.

91. Many Roundup® products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula targets an enzyme in plants but not in people or pets." These

statements are false because it has been established that the human body is host to microorganisms which contain the enzyme Monsanto asserts is not found in humans.

92.     Thus, glyphosate targets microbes within the human body which contain the enzyme affected by glyphosate, leading to a variety of adverse health effects. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

93.     The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

***Other Earlier Findings about Glyphosate's Dangers to Human Health***

94.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

95. Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

96. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

97. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

98. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

***Recent Worldwide Bans on Roundup®/Glyphosate***

99. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more

countries undoubtedly will follow suit in light of this assessment as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

100.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

101.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

102.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

103.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

104.    The government of Columbia announced its ban on using Roundup®

and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

**EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

105. Decedent has suffered an illness that has a latency period and does not arise until years after exposure. Decedent and plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until made aware that decedent's illnesses, including multiple myeloma, could be caused by use and/or exposure to Roundup®. The discovery rule applies, and the statute of limitations was tolled until the day plaintiffs knew or had reason to know that decedent's illnesses, including myeloma, were linked to decedent's use and/or exposure to Roundup®.

106. Within the time period of any applicable statute of limitations, plaintiffs could not have discovered through the exercise of reasonable diligence that exposure to Roundup® and glyphosate is injurious to human health.

107. Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation by plaintiffs have disclosed that Roundup® and glyphosate would cause decedent's illnesses.

108. The expiration of any applicable statute of limitations has been equitably tolled by reason of Monsanto's fraudulent misrepresentations and

fraudulent concealment and fraudulent conduct. Through affirmative misrepresentations and omissions, defendants actively concealed from plaintiffs and decedent the true risks associated with use of and/or exposure to Roundup®.

109. As a result of defendants' actions, plaintiffs could not reasonably have known or learned through reasonable diligence that decedent had been exposed to the risks alleged herein and that those risks were the direct and proximate result of defendants' acts and omissions.

110. Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®. Defendants had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which defendants continue to have exclusive control. Defendants knew that this information was not available to plaintiffs or decedent, decedent's medical providers and/or health facilities, yet defendants failed to disclose the information to the public, including plaintiffs and decedent.

111. Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs, decedent, and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on defendants' representations.

## FIRST CAUSE OF ACTION

**(STRICT PRODUCTS LIABILITY--DESIGN DEFECT by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

112. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

113. At all relevant times, defendants designed, developed, tested, manufactured, fabricated, assembled, distributed, bought, sold, inspected, serviced, repaired, maintained, marketed, warranted, supplied, modified, placed, and/or provided Roundup® products, which are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of defendants. At all relevant times, defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by plaintiffs, as described herein.

114. At all relevant times, defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including decedent.

115. At all relevant times, defendants' Roundup® products were

defectively designed, tested, developed, and manufactured when placed on the market by defendants, and was of such a nature that the defects would not be discovered in the normal course of inspection and operation by users thereof. Moreover, Roundup® products failed to provide adequate warnings or instructions concerning the dangerous characteristics of Roundup®. In particular, defendants failed to provide adequate warnings or instructions concerning the Roundup®'s active ingredient, glyphosate.

116.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including decedent, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

117.   At all relevant times, defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn decedent of dangers associated with Roundup use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

118. At all relevant times, defendants' Roundup® products reached the intended consumers, handlers, and users in California and throughout the United States, including decedent, without substantial change in the condition, as designed, manufactured, sold, distributed, labeled, and marketed by defendants. Defendants registered, researched, manufactured, distributed, marketed, and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market.

119. Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by defendants were defective in design and formulation in that, when they left the hands of defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

120. At all relevant times, defendants knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by defendants.

121. Therefore, at all relevant times, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently,

dangerous to an extent beyond that which an ordinary consumer would contemplate;

b. When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f. Defendants knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries; and

g. Defendants did not conduct adequate post-marketing surveillance of

its Roundup® products.

122. Defendants knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

123. Decedent was exposed to Defendants' Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

124. At the time of the Decedent's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

125. Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Decedent.

126. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

127. Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

128. Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

129. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition

and was unreasonably dangerous to its intended users.

130.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

131.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Decedent in particular, and Defendants are therefore strictly liable for the injuries sustained by the Decedent.

132.   The Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

133.   By reason of the foregoing, the Defendants have become strictly liable to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

134.   Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

135.   Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

136.   As a result of the foregoing acts and omission, the Decedent developed multiple myeloma, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including

diminished enjoyment of life, and financial expenses for hospitalization and medical care.

137. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

138. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

139. WHEREFORE, Plaintiffs respectfully requests this Court to enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

**(STRICT PRODUCTS LIABILITY--FAILURE TO WARN by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

140. Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

141.   Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Decedent who are exposed to it through ordinary and reasonably foreseeable uses.

142.   Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach--and Roundup did in fact reach--consumers, including Decedent, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

143.   At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

144.   At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Decedent was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its

carcinogenic qualities and possible side effects, including, but not limited to, developing multiple myeloma as a result of exposure and use.

145. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

146. Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of California.

147. Defendants could have amended the label of Roundup to provide additional warnings.

148. This defect caused serious injury to Decedent, who used Roundup in its intended and foreseeable manner.

149. At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

150. Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

151. Defendants failed to warn of the nature and scope of the side effects

associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of multiple myeloma.

152.   Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing multiple myeloma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Decedent.

153.   At the time of exposure, Decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

154.   Defendants, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

155.   Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

156.   Had Defendants properly disclosed the risks associated with Roundup, Decedent would have avoided the risk of multiple myeloma by not using Roundup.

157. The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

158. To this day, Defendants have failed to adequately warn of the true risks of Decedent's injuries associated with the use of and exposure to Roundup.

159. As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Decedent.

160. As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Decedent to sustain injuries as herein alleged.

161. As a result of the foregoing acts and omissions, Plaintiffs, and each of

them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

162. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

163. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION

**(NEGLIGENCE by All Plaintiffs as Against Defendants Monsanto Company, and DOES 1 Through 100, Inclusive)**

164. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

165. Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

166. At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the

duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

167. At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

168. At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

169. Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiffs' injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

170. Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup®

and glyphosate-containing products.

171. As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

172. Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup in their promotional efforts, outside of the context of labeling.

173. Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so.

Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

174. Defendants' negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to Roundup® products;

g. Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers

and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

175. Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

176. Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

177. Defendants' negligence was the proximate cause of decedent's injuries and untimely death, *i.e.*, absent defendants' negligence, decedent would not have developed cancer and plaintiffs' husband and father would still be here today.

178.   Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including decedent, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including decedent. Defendants' reckless conduct therefore warrants an award of punitive damages.

179.   As a result of the foregoing acts and omissions, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

180.   The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

181.   Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

182.   As a result of the foregoing acts and omissions, Plaintiffs, and each of

them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

183. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

184. WHEREFORE, plaintiffs respectfully request this Court to enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**FOURTH CAUSE OF ACTION**

**(BREACH OF EXPRESS WARRANTIES by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

185. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

186. At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the

stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

187. Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

a. ensure that its products did not cause the user unreasonably dangerous side effects;

b. warn of dangerous and potentially fatal side effects; and

c. disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiffs.

188. As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

189. At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted

Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

190.   These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiffs, and/or that they were safe and effective as agricultural herbicides.

191.   The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

192.   Defendant Monsanto placed Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

193.   Defendant Monsanto breached these warranties because, among other

things, Roundup® products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant Monsanto breached the warranties in the following ways:

a. Defendant Monsanto represented through its labeling, advertising, and marketing materials that Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b. Defendant Monsanto represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

194. Decedent detrimentally relied on the express warranties and representations of defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Decedent reasonably relied upon defendant Monsanto to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Decedent would not have purchased or used

Roundup® had defendant Monsanto properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

195. Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup® products, as expressly stated within their warnings and labels, and knew that consumers and users such as decedent could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

196. Decedent had no knowledge of the falsity or incompleteness of defendant Monsanto's statements and representations concerning Roundup.

197. Decedent used and/or was exposed to Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by defendant Monsanto.

198. Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including decedent's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Decedent could have avoided the injuries complained of herein, including his untimely death.

199. As a direct and proximate result of defendant Monsanto's breach of express warranty, plaintiffs have sustained pecuniary loss and general damages in a

sum exceeding the jurisdictional minimum of this Court.

200. As a direct and proximate result of the conduct of defendant Monsanto's breach of express warranty, Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

201. The conduct of defendants was a substantial factor and proximate cause of the. serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

202. Plaintiffs are-informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

203. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

204. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

205. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**FIFTH CAUSE OF ACTION**

**(BREACH OF IMPLIED WARRANTIES by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

206. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

207. At all relevant times, defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which were and are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce.

208. Before the time decedent was exposed to the aforementioned Roundup® products, defendant Monsanto impliedly warranted to its consumers, including decedent, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural

herbicides.

209. But defendant Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including decedent's injuries.

210. Decedent was an intended beneficiary of the implied warranties made by defendant Monsanto to purchasers of its herbicides.

211. The Roundup® products were expected to reach and did in fact reach consumers and users, including decedent, without substantial change in the condition in which they were manufactured and sold by defendant Monsanto.

212. At all relevant times, defendant Monsanto was aware that consumers and users of its products, including decedent, would use Roundup® products as marketed by defendant Monsanto, which is to say that decedent was a foreseeable user of Roundup®.

213. Defendant Monsanto intended that Roundup® products be used in the manner in which decedent, in fact, used them and which defendant Monsanto impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

214. In reliance upon defendant Monsanto's implied warranty, decedent used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by defendant Monsanto.

215.  Decedent could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

216.  Defendant Monsanto breached its implied warranty to decedent in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

217.  The harm caused by defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

218.   As a direct and proximate result of defendant's breach of implied warranty, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

219.  As a direct and proximate result of Defendant's breach of implied warranty, plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

220. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

221. Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

222. As a result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

223. As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

224. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION

**(FRAUD by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

225.  Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

226.  Defendant Monsanto has defrauded the agricultural community in general and decedent Plaintiffs in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

227.  Defendant Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with multiple myeloma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

228.  Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

229.  Decedent relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in

deciding whether to purchase and/or use the product. Decedent and/or plaintiffs did not know nor could they reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

230. The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant Monsanto traditionally used to promote the product's efficacy and benefits.

231. When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

232. Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold,

distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiffs and others which proximately caused the injuries as set forth herein.

233.  As a proximate result of defendant Monsanto's fraudulent and deceitful conduct and representations, plaintiffs have sustained damages and other losses in an amount to be proven at trial.

234.   As a direct and proximate result of the conduct of defendants, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

235.  The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

236. Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

237. As a direct and proximate result of the conduct of defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

238. As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

239. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**SEVENTH CAUSE OF ACTION**

**(WRONGFUL DEATH by Plaintiffs Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

240. Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

241.  Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S. E., a minor, is the surviving daughter of decedent. Plaintiffs are the Decedent's only heirs and bring herein this wrongful death claim.

242.  Decedent died as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

243.  Defendants' wrongful conduct has proximately caused Decedent's heirs to suffer the loss of Decedent's companionship, services, society, marital association, love and consortium.

244.  As a direct and proximate result of the conduct of defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

245.  As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

246. WHEREFORE, Plaintiffs Anousheh Sabouri and S. E. respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## EIGHTH CAUSE OF ACTION

**(EXEMPLARY DAMAGES by Plaintiffs Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

247. Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

248. Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Roundup®. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

249. This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the amount of money Defendants would make selling Roundup® in California. Defendants' objection was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiffs were denied the right to

make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

250. There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiffs request punitive damages against the Defendants for the harms caused to Plaintiffs.

251. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ANOUSHEH SABOURI and Plaintiff S. E., hereby prays for judgment against Defendants, and each of them, jointly and severally as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs

and economic loss;

3. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5. Pre-judgment interest;

6. Post-judgment interest;

7. Awarding Plaintiffs reasonable attorneys' fees;

8. Awarding Plaintiffs the costs of these proceedings; and

9. Such other and further relief as this Court deems just and proper.

DATED: July 7, 2021

**THE LAW OFFICES OF HAYTHAM FARAJ**

By:______________________________
HAYTHAM FARAJ, ESQ.
Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiff ANOUSHEH SABOURI and Plaintiff S. E. hereby demand a trial by jury on all of the causes of action.

DATED: July 7, 2021 **THE LAW OFFICES OF HAYTHAM FARAJ**

By:__________________________
HAYTHAM FARAJ, ESQ.
Attorneys for Plaintiffs, ANOUSHEH SABOURI and S. E.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| | |
|---|---|
| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )<br>Anousheh Sabouri and S[redacted] E[redacted], a minor by and through her Guardian Ad Litem, Anousheh Sabouri | **DEFENDANTS** ( Check box if you are representing yourself ☐ )<br>Monsanto Company, a corporation, and DOES 1 through 100 |
| (b) County of Residence of First Listed Plaintiff Los Angeles<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant<br>*(IN U.S. PLAINTIFF CASES ONLY)* |
| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.<br>The Law Offices of Haytham Faraj<br>8605 Santa Monica Blvd., Suite 44953<br>West Hollywood, CA 90069-4109 - (323) 463-9200 | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- ☐ 1. U.S. Government Plaintiff
- ☐ 3. Federal Question (U.S. Government Not a Party)
- ☐ 2. U.S. Government Defendant
- ☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding ☐ 2. Removed from State Court ☐ 3. Remanded from Appellate Court ☐ 4. Reinstated or Reopened ☐ 5. Transferred from Another District (Specify) ☐ 6. Multidistrict Litigation - Transfer ☐ 8. Multidistrict Litigation - Direct File

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT:** $ TBD

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Strict Products Liability - Design Defect; Strict Products Liability - Failure to Warn; Negligence; Breach of Express Warranties; Breach of Implied Warranties; Fraud; Wrongful Death; Exemplary Damages. Monsanto product RoundUp caused Decedent's cancer.

**VII. NATURE OF SUIT** (Place an X in one box only).

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/Etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Org.
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Info. Act
- ☐ 896 Arbitration
- ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.)
- ☐ 153 Recovery of Overpayment of Vet. Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment

**REAL PROPERTY CONT.**
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Fed. Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury-Med Malpratice
- ☒ 365 Personal Injury-Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**TORTS PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 445 American with Disabilities-Employment
- ☐ 446 American with Disabilities-Other
- ☐ 448 Education

**PRISONER PETITIONS**

**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus/Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Ret. Inc. Security Act

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016 (DTSA)

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405 (g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405 (g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**FOR OFFICE USE ONLY:** Case Number:

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| **QUESTION A: Was this case removed from state court?** ☐ Yes ☒ No<br>If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| | | |
|---|---|---|
| **QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action?** ☐ Yes ☒ No<br>If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.?<br>*check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.<br>☐ NO. Continue to Question B.2. |
| | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br>*check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.<br>☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |
| **QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action?** ☐ Yes ☒ No<br>If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?<br>*check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.<br>☐ NO. Continue to Question C.2. |
| | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br>*check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.<br>☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| **QUESTION D: Location of plaintiffs and defendants?** | **A.** Orange County | **B.** Riverside or San Bernardino County | **C.** Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |

| **D.1. Is there at least one answer in Column A?** | **D.2. Is there at least one answer in Column B?** |
|---|---|
| ☐ Yes ☒ No<br>If "yes," your case will initially be assigned to the SOUTHERN DIVISION.<br>Enter "Southern" in response to Question E, below, and continue from there.<br>If "no," go to question D2 to the right. → | ☐ Yes ☒ No<br>If "yes," your case will initially be assigned to the EASTERN DIVISION.<br>Enter "Eastern" in response to Question E, below.<br>If "no," your case will be assigned to the WESTERN DIVISION.<br>Enter "Western" in response to Question E, below. ↓ |

| **QUESTION E: Initial Division?** | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: → | Western Division - Los Angeles County |

**QUESTION F: Northern Counties?**

Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? ☐ Yes ☒ No

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court?** [X] NO [ ] YES

If yes, list case number(s): ______

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court?** [X] NO [ ] YES

If yes, list case number(s): ______

**Civil cases** are related when they (check all that apply):

- [ ] A. Arise from the same or a closely related transaction, happening, or event;
- [ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or
- [ ] C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

- [ ] A. Arise from the same or a closely related transaction, happening, or event;
- [ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or
- [ ] C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** ______ DATE: July 7, 2021

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

Haytham Faraj, Esq. (SBN 291416)
Katherine K. Melik-Stepanyan, Esq. (SBN 315015)
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
Telephone:(323) 463-9200
Facsimile: (202) 280-1039
Email: service@farajlaw.com

Attorneys for Plaintiffs, ANOUSHEH SABOURI and S[redacted] E[redacted], a minor by and through her GAL, ANOUSHEH SABOURI

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S[redacted] E[redacted], an minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, ANOUSHEH SABOURI,

Plaintiff,

v.

MONSANTO COMPANY, a corporation; and DOES 1 through 100, Inclusive,

Defendants.

CASE NO.: 2:21-cv-05524

**PETITION FOR GUARDIAN AD LITEM; AND ORDER**

PETITIONER herein is S[redacted] E[redacted], a minor child, individually and as successor in interest to decedent MIKE ESFAHANIAN, by and through his mother, ANOUSHEH SABOURI, respectfully presents:

1. Petitioner S[redacted] E[redacted] is a minor.

2. Petitioner S[redacted] E[redacted] is the daughter of ANOUSHEH

SABOURI. ANOUSHEH SABOURI has custody of Petitioner.

3. The minor has a cause of action against the above-named Defendants on which suit is being filed simultaneously with this Petition. This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside. The amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost.

4. ANOUSHEH SABOURI is willing to serve as guardian ad litem of the Petitioner, S[redacted] E[redacted], and is fully competent to understand and protect the rights of the minor and to have no interest adverse tothat of the minor.

5. Petitioner S[redacted] E[redacted] has retained The Law Offices of Haytham Faraj located at 8605 Santa Monica Blvd., Suite 44953, West Hollywood, California 90069 to prosecute the cause of action for the minor.

///

///

///

///

///

///

///

WHEREFORE, Petitioner S███ E███████ prays that ANOUSHEH SABOURI or some other proper person can be appointed as guardian ad litem for S███ E███████ to prosecute the above described cause of action on behalf of S███ E███████.

DATED: July 7, 2021

ID hP3ATeJGUfEM1ZknqJDueNa

_____
ANOUSHEH SABOURI

RESPECTFULLY SUBMITTED,

DATED:                    **THE LAW OFFICES OF HAYTHAM FARAJ**

By: _____
HAYTHAM FARAJ, ESQ.
Attorneys for Plaintiffs

PETITION FOR GUARDIAN AD LITEM
17-084

**VERIFICATION**

I, ANOUSHEH SABOURI, am the mother of the Petitioner S[redacted] E[redacted] in the above-entitled proceeding. I have read the foregoing petition and know the contents thereof. Said petition is true of my knowledge, except as to those matters which are presented on information and belief, and as to those matters, I believe them, to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:

ID bP3ATeJSfJfEM1ZknqJDueNa

ANOUSHEH SABOURI

**CONSENT TO APPOINTMENT**

I hereby consent to act as guardian ad litem for the minor S[redacted] E[redacted].

DATED:

ID bP3ATeJSfJfEM1ZknqJDueNa

ANOUSHEH SABOURI

**ORDER APPOINTING GUARDIAN AD LITEM**

The Court, having considered the petition of S[redacted] E[redacted] for the appointment of ANOUSHEH SABOURI as guardian ad litem for S[redacted] E[redacted] who is a minor and good cause appearing therefore.

IT IS HEREBY ORDERED that ANOUSHEH SABOURI be, and he is, hereby appointed as guardian ad litem for S[redacted] E[redacted], Plaintiff in the above-entitled action, and she is authorized to institute and prosecute the action mentioned in the Complaint.

DATED:

______________________________
United States District Judge

# eSignature Details

| | |
|---|---|
| **Signer ID:** | **bP3ATeJSfJfEM1ZknqJDueNa** |
| Signed by: | Anousheh Sabouri |
| Sent to email: | asabouri@sabourilawgroup.com |
| IP Address: | 67.2.181.194 |
| Signed at: | Jul 7 2021, 10:50 am PDT |

Haytham Faraj, Esq. (SBN 291416)
Katherine K. Melik-Stepanyan, Esq. (SBN 315015)
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
Telephone:(323) 463-9200
Facsimile: (202) 280-1039
Email: service@farajlaw.com

Attorneys for Plaintiffs, ANOUSHEH SABOURI and S[redacted] E[redacted], a minor by and through her GAL, ANOUSHEH SABOURI

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S[redacted] E[redacted], an minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, ANOUSHEH SABOURI,

Plaintiff,

v.

MONSANTO COMPANY, a corporation; and DOES 1 through 100, Inclusive,

Defendants.

CASE NO.:

**DECLARATION OF ANOUSHEH SABOURI PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 377.32**

*(Filed concurrently with Plaintiffs' Complaint for Damages and Demand for Jury Trial)*

I, ANOUSHEH SABOURI, declare:

1. I am over the age of 18 years and am a Plaintiff in the above-titled action.

2. I have personal knowledge of the facts contained herein, and if called as a witness, could and would competently testify to the truth of the facts stated herein.

3. I am the Successor-in-Interest of MICHAEL ESFAHANIAN (hereinafter "DECEDENT").

4. DECEDENT died on FEBRUARY 9, 2019.

5. Attached hereto is a copy of DECEDENT'S Death Certificate.

6. No proceeding is now pending in California for administration of the DECEDENT'S death.

7. I am one of the decedent's Successor-In-Interest, as defined in section 377.11 of the California *Code of Civil Procedure*, and succeeds to the decedent's interest in the proceeding in that as a surviving spouse to the decedent, I am a beneficiary of the decedent's estate.

8. I am guardian ad litem for the other Plaintiff, S[REDACTED] E[REDACTED], in this matter.

9. S[REDACTED] E[REDACTED] is under the age of 18, and is the biological daughter of DECEDENT.

10. S[REDACTED] E[REDACTED] is one of the decedent's Successor-In-Interest, as defined in Section 377.11 of the *California Code of Civil Procedure*, and succeeds to the decedent's interest in the proceeding as the surviving daughter of the decedent.

11. I am authorized by the other Successor-In-Interest, S[redacted] E[redacted], to act on her behalf with respect to the above-titled action.

12. No other person has a superior right to commence the above-titled action.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 7 th day in July 2021, at Topanga, California.

ID ECyZkmLQ8NymxeoSLSTP2nrk

ANOUSHEH SABOURI,
Declarant

# eSignature Details

| | |
|---|---|
| **Signer ID:** | **ECyZkmLQ8NymxeoSLSTP2nrk** |
| Signed by: | Anousheh Sabouri |
| Sent to email: | asabouri@sabourilawgroup.com |
| IP Address: | 67.2.181.194 |
| Signed at: | Jul 7 2021, 9:09 am PDT |

# EXHIBIT 18

Haytham Faraj, Esq. (SBN 291416)
Katherine K. Melik-Stepanyan, Esq. (SBN 315015)
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
Telephone: (323) 463-9200
Facsimile: (202) 280-1039
Email: service@farajlaw.com

Attorneys for Plaintiffs, ANOUSHEH SABOURI and S. E., a minor by and through her GAL, ANOUSHEH SABOURI

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S. E., a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, ANOUSHEH SABOURI,

Plaintiff,

v.

MONSANTO COMPANY, a corporation; and DOES 1 through 100, Inclusive,

Defendants.

CASE NO.: 2:21-cv-05524

**FIRST AMENDED COMPLAINT FOR DAMAGES:**

1. **STRICT PRODUCTS LIABILITY - DESIGN DEFECT;**
2. **STRICT PRODUCTS LIABILITY – FALURE TO WARN;**
3. **NEGLIGENCE;**
4. **BREACH OF EXPRESS WARRANTIES;**
5. **BREACH OF IMPLIED WARRANTIES;**
6. **FRAUD;**
7. **WRONGFUL DEATH; AND**
8. **EXEMPLARY DAMAGES.**

****DEMAND FOR JURY TRIAL****

COME NOW Plaintiffs, ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S.E., a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, SHIRIN SABOURI (collectively hereinafter "Plaintiffs"), who for causes of action against the Defendants, MONSANTO COMPANY, a corporation (hereinafter "Monsanto"), WILBUR-ELLIS COMPANY, LLC, a California limited liability corporation (hereinafter "Wilbur-Ellis"), CHEVRON CORPORATION, a corporation (hereinafter "Chevron"), and DOES 3 through 100, Inclusive, and each of them (collectively hereinafter "DEFENDANTS") complain and allege the following causes of action:

**SUMMARY**

1. This case arises out of Monsanto's and Wilbur-Ellis' wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular multiple myeloma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use.

2. On information and belief, Decedent MIKE ESFAHANIAN (herein referred to as "DECEDENT"), who was exposed to Roundup extensively while using Roundup residentially for his personal use, was diagnosed with multiple myeloma in April 2018 and died as a result of his cancer in February 2019. Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S.E., a minor, is the surviving daughter of decedent.

## STATEMENT OF THE CASE

3. In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an

estimated 70% of com and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

5. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

7. On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate

exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including multiple myeloma.

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

**THE PARTIES**

8. At all times relevant and mentioned herein, Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S.E., a minor, is the surviving daughter of Decedent. Plaintiffs were, and are now, residents of the City of Topanga, County of Los Angeles, California. Pursuant to the operation of *Code of Civil Procedure* section 377.60, Plaintiffs are the heirs, successors in interest and persons lawfully entitled to assert a cause of action of the wrongful death of Decedent. No other persons have any claim, right or interest in the cause of action for wrongful death that is superior to the claims by the Plaintiffs.

9. As a result of decedent MIKE ESFAHANIAN'S exposure to Roundup® and/or other Monsanto and/or Monsanto glyphosate containing products in the state of California from approximately the mid-1990s to around

2018, Decedent was diagnosed with multiple myeloma, which ultimately resulted in his untimely death on February 9, 2019. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' Decedent, MIKE ESFAHANIAN.

10. Plaintiffs are informed and believe and based thereon allege that as a direct and proximate result of Decedent's use of Roundup® and/or other Monsanto and/or Monsanto Chevron glyphosate-containing products ("Roundup"), supplied, marketed, and/or distributed by defendants herein, decedent suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, multiple myeloma and other cancers, other permanent physical deficits, permanent bodily impairment and other injury sequelae. Decedent's injuries required medical intervention to address the adverse physical effects and damage caused by decedent's use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup"). These injuries ultimately resulted in Decedent's untimely death.

11. As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES 3 through 100, inclusive, Decedent used and/or was exposed to Roundup® and was diagnosed with serious health injuries including to multiple myeloma and/or other cancers.

12. As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Decedent suffered severe mental and physical pain and have and will sustain permanent injuries and emotional distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

13. As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Decedent required medical intervention in efforts to maintain and/or save Decedent.

14. Plaintiffs are individuals who suffered damages as a result of injuries resulting from Decedent's use and/or exposure to Roundup® and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs resulting from Decedent's use of Roundup®. Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 3 through 100, inclusive.

15. The product warnings for Roundup® in effect during the time period Decedent used and/or was exposed to Roundup® were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

16.     The Defendants and DOES 3 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Decedent and the general public about the increased risk of the serious adverse events described herein.

17.     Had Decedent and/or Plaintiffs been adequately warned by the Defendants and DOES 3 through 100, and each of them, inclusive, of the potential life-threatening side effects of Roundup®, Decedent would not have purchased, used, or been exposed to Roundup®.

18.     By reason of the foregoing, Decedent developed serious and dangerous side effects including multiple myeloma and other cancers, related injury sequelae, physical pain and suffering, mental anguish, loss of enjoyment of life, and death. By reason of the foregoing, Plaintiffs suffered damages and losses, as alleged herein. Plaintiffs' general and special damages exceed the jurisdictional limits of this Court.

## DEFENDANTS

19.     Plaintiffs are informed and believe, and thereupon allege, that defendant Monsanto Company (hereinafter "Monsanto" or "defendant Monsanto"), is, and at all times relevant was, a Delaware corporation, with its headquarters in St. Louis, Missouri and multiple principal places of business throughout the world, including in St. Louis, Missouri, Oxnard, California, Woodland, and, at all relevant times to this complaint, San Ramon, California. At all times relevant to this

complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and conducted business within the State of California and has derived substantial revenue from goods and products, including Roundup®, used in the State of California and employs sales representatives in the State of California. Specifically, Monsanto operated a residential products division known as the Solaris Group of Monsanto Company (hereinafter "Solaris Group"), headquartered in San Ramon, California. Moreover, upon information and belief, Solaris Group manufactured, registered, distributed, marketed, advertised, and sold Roundup® products to California consumers. At all relevant times, Monsanto has conducted testing, research, and analyses on its Roundup® and other glyphosate-based formulations within California and manufactured said products in California, utilizing principal laboratories and manufacturing sites throughout the State of California in locations such as San Ramon, Oxnard and Woodland. Monsanto expected or should have expected its acts to have consequences within the State of California because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of California's laws

20. Defendant Wilbur-Ellis Company LLC is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California. At all times relevant to this complaint, Wilbur-Ellis Company, LLC sold and distributed Monsanto products, including Roundup®, within the State of

Case 2:22-cv-05198-DSF-AFM Document 21-1 Filed 08/03/22 Page 10 of 79 Page ID #:139

California.

21. Defendant Chevron Corporation (hereinafter "Chevron" or "Monsanto Chevron") is a Delaware corporation with its headquarters and principal place of business in San Ramon, California. Chevron, through its Ortho Consumer Products Division, investigated and prepared storage stability data, and conducted other testing, research and analyses, to support the EPA registration of Roundup® and other glyphosate-based formulations intended for the residential consumer market. The research was then submitted to the EPA by Monsanto in furtherance of continued registration of Roundup® products and other glyphosate-based formulations. Under the entity name "Monsanto Chevron," Chevron directly contributed to the continued registration of the carcinogenic Roundup® products and other glyphosate-based formulations that were tested, researched, analyzed, manufactured, registered, distributed, marketed and sold in California, aimed at a California consumer market, and purchased and used by Plaintiff. Moreover, upon information and belief, and at all times relevant to this complaint, Chevron manufactured, marketed and distributed glyphosate-based formulations in California.

22. Upon information and belief, WILBUR-ELLIS COMPANY, LLC was responsible for marketing Roundup® and related Monsanto products during the time period in question.

23. Upon information and belief, at all times relevant to this

complaint, the CHEVRON CORPORATION, operating as "Monsanto Chevron," manufactured, marketed, registered, distributed, and sold Roundup® products and other glyphosate-based formulations, and investigated and prepared· storage stability data for submission to the EPA in furtherance of the continued registration of Roundup® products and other glyphosate-based formulations for use by consumers.

24.     Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

25.     The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 3 through 100, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege

the true names and capacities of said DOE Defendants when the same are ascertained.

26. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the named Defendants and each of the DOE Defendants was the agent, servant, employee and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of them, and at all said times, each named Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment and/or joint venture.

27. Plaintiffs are informed and believe and allege that at all times mentioned herein, Defendants and DOES 3 through 100, inclusive, and each of them, were also known as, formerly known as and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding, researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling, distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting others for marketing, warranting, rebranding, manufacturing for others, packaging and advertising of Roundup® and/or other Monstano glyphosate-containing products. Defendants and DOES 3 through 100, inclusive, and each of them, are liable for the acts, omissions and

tortious conduct of their successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, parents, subsidiaries, affiliates, partners, co-venturers, merged companies, alter egos, agents, equitable trustees, fiduciaries and/or their alternate entities in that Defendants and DOES 3 through 100, inclusive, and each of them, enjoy the goodwill originally attached to each such alternate entity, acquired the assets or product line (or portion thereof), and in that there has been a virtual destruction of Plaintiffs' remedy against each such alternate entity, and that each such Defendant has the ability to assume the risk spreading role of each such alternate entity.

28.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, Defendants and DOES 3 through 100, inclusive, and each of them, were and are corporations organized and existing under the laws of the State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are authorized to do and are doing business in the State of California and regularly conducted business in California, including in Los Angeles County.

29.     Upon information and belief, at all relevant times, Defendants and DOES 3 through 100, and each of them, inclusive, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, labeling, selling, marketing, and/or introducing into interstate commerce and into the State of California, including in Los Angeles County, either directly or

indirectly through third parties or related entities, Roundup® and/or other Monstano glyphosate-containing products.

30. At all relevant times, Defendants and DOES 3 through 100, inclusive, and each of them, conducted regular and sustained business and engaged in substantial commerce and business activity in the State of California, which included but was not limited to selling, marketing and distributing Roundup® and/or other Monstano glyphosate-containing products in the State of California, including Los Angeles County. Specifically, Decedent purchased all of its Roundup® products for residential use from retailers in Los Angeles County.

31. At all relevant times, Defendants and DOES 3 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within the United States of America including the State of California, including Los Angeles County, and said Defendants derived and derive substantial revenue therefrom.

**AGENCY**

32. Each of the Defendants named in this Complaint, including each of the DOE Defendants, is, and at all relevant times herein mentioned was, the co-conspirator of each other Defendant in connection with the wrongful conduct described herein, and, therefore, each Defendant is jointly and severally liable to Plaintiffs for the damages sustained as a proximate result of each other Defendant.

33. Each Defendant entered into an express or implied agreement,

understanding, and/or concert of action with each of the other Defendants to commit the wrongs herein alleged. These affirmative wrongful acts included, but were not limited to, the conspiracy to defraud, deceive, and hide the dangers of glyphosate from the public, beginning in 1976, through Defendants' routine falsification of data for toxicity studies needed to register Roundup®. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

34. The conspiracy was furthered in 1991 when Defendant Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

35. The conspiracy was furthered through 2000 through present with publication of studies through companies such as Intertek and Exponent, Inc., which minimize any safety concerns about the use of glyphosate

36. The conspiracy was furthered when Monsanto held secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

37. The conspiracy was furthered in 2011when Defendants co-opted studies which falsely proclaimed the safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

38. Plaintiffs are further informed and believe and thereon allege that at all times herein alleged, each of the Defendants, including, but not limited to DOES 3 through 100, was the agent, servant, partner, aider and abettor, co-conspirator, alter ego, and/or joint venturer of the other herein and were at all times

operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, alter ego, and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted a breach of duty owed to Plaintiffs.

39.     Plaintiffs are informed and believe, and thereon allege, that there exists, and at all times herein alleged, there existed, a unity of interest in ownership between each of the aforesaid Defendants, including DOES 3 through 100, such that any individuality and separateness between these Defendants has ceased and these Defendants each are the alter-ego of the others and exerted control over those Defendants. Adherence to the fiction of the separate existence of each of these Defendants as an entity distinct from the others will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

40.     Each of these acts and failures to act is alleged against each defendant whether acting individually, jointly, or severally. Each of the defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

41.     Defendants, and each of them, committed these acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiffs, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiffs' rights.

42.     Defendants' conduct warrants the assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

43.     Each of these acts and failures to act are alleged against each Defendant whether acting individually, jointly, or severally. Each of the Defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

## JURISDICTION AND VENUE

44.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside.

45.     The amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost.

46.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

47.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup ® within the Central District of California. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## FACTUAL ALLEGATIONS

48. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

49. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

50. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.

51. That is because when Monstano first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®--glyphosate--is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monstano assured the public that Roundup® was harmless. In order to prove this, Monstano championed falsified data and attacked legitimate studies that revealed its dangers. Monstano led a

prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

***The Discovery of Glyphosate and Development of Roundup®***

52. The herbicidal properties of glyphosate were discovered in 1970 by Monstano chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monstano marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monstano still markets Roundup® as safe today.

***Registration of Herbicides under Federal Law***

53. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

54. Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance

or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

55. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus *5* requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

56. The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California. The EPA's decision to register Roundup, however, was based on studies on the active chemical, glyphosate, and not the formulated Roundup product which contains a cocktail of other ingredients such as surfactants, adjuvants, and inert compounds, all of which, as discussed in greater detail below, contribute to the health risks associated with Roundup exposure.[1]

57. FIFRA generally requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA

[1] Surfactants are compounds which contribute to the even and effective spread of glyphosate across the surface of a leaf and increase the rate of penetration through the plant. It has been shown that surfactants also greatly increase the amount and rate of Roundup® absorbed by human skin.

has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

58. The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of an herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-I. In order to reevaluate these herbicides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

59. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment -in relation to the re-registration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings. "On September 12, 2016, the EPA's office of Pesticide Programs released an interim report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," ("2016 Issue Paper"") detailing the agency's review of a small portion of the existing literature on Roundup. The 2016 Issue Paper contains a review

of studies submitted to the agency by Monsanto, as well as the general independent scientific literature on glyphosate carcinogenicity.

60. Immediately following the publication of the 2016 Issue Paper, the FIFRA Scientific Advisory Panel ("SAP") issued a report which reviewed the EPA's 2016 Issue Paper, and the conclusions therein. The SAP strongly criticized the EPA's conclusions and questioned the scientific approach of the agency, noting that that agency had failed to follow its own guidelines.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

61. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E). In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances.

62. On two occasions, the EPA found that the laboratories hired by

Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

63.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

64.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

65.    Three top executives of IBT were convicted of fraud in 1983.

66.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

67. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

68. Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc., from 2000 through the present which minimize any safety concerns about the use of glyphosate. The studies are used to convince regulators to allow the sale of Roundup® and customers to use Roundup®. Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate. Through these means, Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, Monsanto paid these so-called "independent experts," and Monsanto failed to disclose the significant role Monsanto had in creating the manuscripts produced by the "independent" experts. Further, Monsanto has ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines for scientists such as Robert Tarone and Henry Miller. Monsanto has also ghostwritten letters by supposedly independent scientists which have been submitted to regulatory agencies who are reviewing the safety of glyphosate.

69. Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a

strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

70. Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study, becoming the sole providers of data and ultimately writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BfR. Defendants have used this self-serving report (which they, in fact, wrote) to falsely proclaim the safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop

California from warning the public about the carcinogenicity of glyphosate.

***The Importance of Roundup® to Monsanto's Market Dominance Profits***

71. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

72. In response, Monsanto began the development and sale of genetically engineered

73. Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide, and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide

74. Through a three-pronged strategy of increased production,

decreased prices, and by coupling Roundup Ready® seeds with Roundup® herbicide, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

75. In 1996, the New York Attorney General ("NYAG") filed a lawsuit againstMonsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a. Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences...

b. And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to

use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup® biodegrades into naturally occurring elements.

d. Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f. You can apply Accord (glyphosate-containing herbicide) with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

76. On November 19, 1 996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing herbicide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b. its glyphosate-containing herbicide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c. its glyphosate-containing herbicide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. its glyphosate-containing herbicide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e. glyphosate-containing herbicide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

77. Monsanto did not alter its advertising in the same manner in any state other than New York, and, on information and belief, still has not done so today.

78. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

79. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group I (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

80. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by

panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

81. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed, and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

82. In assessing a chemical agent, the IARC Working Group reviews the following information:

(a) human, experimental, and mechanistic data;

(b) all pertinent epidemiological studies and cancer bioassays; and

(c) representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

83. In March of 2015, IARC reassessed glyphosate. The summary

published in The Lancet Oncology reported that glyphosate is a Group 2A agent, that is, glyphosate is probably carcinogenic in humans.

84. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from II countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

85. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

86. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

87. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in

soil, air, surface water, and groundwater, as well as in food.

88. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

89. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

90. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

91. In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

92. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

Case 2:22-cv-05124-DSF-AFM Document 21-1 Filed 08/03/22 Page 52 of 79 Page ID #:164

93. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA, oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

94. In addition to DNA damage and oxidative stress, scientists have suggested that Roundup®'s association with various serious health conditions is linked to the effect Roundup® has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup® toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup®, this exposure leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup®'s mechanism of action.

95. Many Roundup® products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula targets an enzyme in plants but not in people or pets." These statements are false because it has been established that the human body is host to microorganisms which contain the enzyme Monsanto asserts is not found in humans.

96. Thus, glyphosate targets microbes within the human body which contain the enzyme affected by glyphosate, leading to a variety of adverse health effects. The IARC Working Group also noted genotoxic, hormonal, and enzymatic

Case 2:22-cv-05298-DSF-AFM Document 21-1 Filed 08/31/22 Page 62 of 143 Page ID #:1065

effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

97. The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

***Other Earlier Findings about Glyphosate's Dangers to Human Health***

98. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

99. Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

100. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since

glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

101.   Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

102.   In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

***Recent Worldwide Bans on Roundup®/Glyphosate***

103.   Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this assessment as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers,

Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

104.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

105.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

106.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

107.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

108.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

109.    On information and belief, Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup®, Roundup-ready® crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

110.   Wilbur-Ellis had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and or marketing of Roundup® with any warnings or precautions for that grave danger. On information and belief, Wilbur-Ellis was one of the distributors providing Roundup® and other glyphosate-containing products used by the Plaintiff.

111.   On information and belief, Chevron and Monsanto Chevron were, at all relevant times, engaged in the testing, research, and analyses of Roundup and other glyphosate-based formulations, including investigation and preparation of storage stability data for Roundup and other glyphosate-based formulations for submission to the EPA, and were, at all relevant times, involved in the manufacture, registration, marketing, distribution and sale of Roundup®, Roundup-ready® crops and other glyphosate-based formulations to retailers and residential users in California.

112.   Monsanto and Monsanto Chevron had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its registration, sales, distribution and or marketing of Roundup® and other glyphosate-based formulations with any warnings or precautions for that grave danger. On information and belief, Chevron and Monsanto Chevron participated in the preparation  of storage stability and other testing on Roundup® and other glyphosate-containing products which were

used by the Plaintiff.

**EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

113. Decedent has suffered an illness that has a latency period and does not arise until years after exposure. Decedent and plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until made aware that decedent's illnesses, including multiple myeloma, could be caused by use and/or exposure to Roundup®. The discovery rule applies, and the statute of limitations was tolled until the day plaintiffs knew or had reason to know that decedent's illnesses, including myeloma, were linked to decedent's use and/or exposure to Roundup®.

114. Within the time period of any applicable statute of limitations, plaintiffs could not have discovered through the exercise of reasonable diligence that exposure to Roundup® and glyphosate is injurious to human health.

115. Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation by plaintiffs have disclosed that Roundup® and glyphosate would cause decedent's illnesses.

116. The expiration of any applicable statute of limitations has been equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent conduct. Through affirmative

misrepresentations and omissions, defendants actively concealed from plaintiffs and decedent the true risks associated with use of and/or exposure to Roundup®.

117. As a result of defendants' actions, plaintiffs could not reasonably have known or learned through reasonable diligence that decedent had been exposed to the risks alleged herein and that those risks were the direct and proximate result of defendants' acts and omissions.

118. Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®. Defendants had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which defendants continue to have exclusive control. Defendants knew that this information was not available to plaintiffs or decedent, decedent's medical providers and/or health facilities, yet defendants failed to disclose the information to the public, including plaintiffs and decedent.

119. Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs, decedent, and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on defendants' representations.

**FIRST CAUSE OF ACTION**

**(STRICT PRODUCTS LIABILITY--DESIGN DEFECT by All Plaintiffs as Against All Defendants, and DOES 3 Through 100, Inclusive)**

120.   Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

121.   At all relevant times, defendants designed, developed, tested, manufactured, fabricated, assembled, distributed, bought, sold, inspected, serviced, repaired, maintained, marketed, warranted, supplied, modified, placed, and/or provided Roundup® products, which are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of defendants. At all relevant times, defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by plaintiffs, as described herein.

122.   At all relevant times, defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including decedent.

123.   At all relevant times, defendants' Roundup® products were defectively designed, tested, developed, and manufactured when placed on the market by defendants, and was of such a nature that the defects would not be

discovered in the normal course of inspection and operation by users thereof. Moreover, Roundup® products failed to provide adequate warnings or instructions concerning the dangerous characteristics of Roundup®. In particular, defendants failed to provide adequate warnings or instructions concerning the Roundup®'s active ingredient, glyphosate.

124.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including decedent, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

125.   At all relevant times, defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn decedent of dangers associated with Roundup use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

126.   At all relevant times, defendants' Roundup® products reached the intended consumers, handlers, and users in California and throughout the United

States, including decedent, without substantial change in the condition, as designed, manufactured, sold, distributed, labeled, and marketed by defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market. Chevron, in a joint effort with Monsanto, Monsanto Chevron, was involved in the testing, research, analyses of Roundup® and other glyphosate-based formulations, including investigation and preparation of storage stability data and other data submissions to the EPA for the continued registration of Roundup® and other glyphosate-based formulations for use by consumers, including Plaintiff, in California, and throughout the United States. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California.

127.   Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by defendants were defective in design and formulation in that, when they left the hands of defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

128.   At all relevant times, defendants knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe

when used in the manner instructed and provided by defendants.

129. Therefore, at all relevant times, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b. When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup® and glyphosate-containing products presents a

risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f. Defendants knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries; and

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

130. Defendants knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

131. Decedent was exposed to Defendants' Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

132. At the time of the Decedent's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

133. Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Decedent.

134. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

135. Defendants created a product that was and is unreasonably dangerous

for its normal, intended use.

136. Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

137. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

138. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

139. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Decedent in particular, and Defendants are therefore strictly liable for the injuries sustained by the Decedent.

140. The Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

141. By reason of the foregoing, the Defendants have become strictly liable to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

142.   Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

143.   Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

144.   As a result of the foregoing acts and omission, the Decedent developed multiple myeloma, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

145.   As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

146.   As a result of the foregoing acts and omissions, Plaintiffs, and each of them, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

147.   WHEREFORE, Plaintiffs respectfully requests this Court to enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

**(STRICT PRODUCTS LIABILITY--FAILURE TO WARN by All Plaintiffs as Against All Defendants, and DOES 3 Through 100, Inclusive)**

148. Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

149. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market. Chevron, in a joint effort with Monsanto, Monsanto Chevron, was involved in the testing, research, analyses of Roundup® and other glyphosate-based formulations, including investigation and preparation of storage stability data and other data submissions to the EPA for the continued registration of Roundup® and other glyphosate-based formulations for use by consumers, including Plaintiff, in California and throughout the United

States. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California.

150.    Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach--and Roundup did in fact reach--consumers, including Decedent, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

151.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

152.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Decedent was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing multiple myeloma as a result of exposure and use.

153.   Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

154.   Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of California.

155.   Defendants could have amended the label of Roundup to provide additional warnings.

156.   This defect caused serious injury to Decedent, who used Roundup in its intended and foreseeable manner.

157.   At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

158.   Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

159.   Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of multiple

myeloma.

160. Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing multiple myeloma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Decedent.

161. At the time of exposure, Decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

162. Defendants, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

163. Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

164. Had Defendants properly disclosed the risks associated with Roundup, Decedent would have avoided the risk of multiple myeloma by not using Roundup.

165. The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Decedent,

and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

166. To this day, Defendants have failed to adequately warn of the true risks of Decedent's injuries associated with the use of and exposure to Roundup.

167. As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Decedent.

168. As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Decedent to sustain injuries as herein alleged.

169. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum

within the unlimited jurisdiction of this Court and will be established at trial according to proof.

170. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

171. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

**THIRD CAUSE OF ACTION**

**(NEGLIGENCE by All Plaintiffs as Against All Defendants and DOES 3 Through 100, Inclusive)**

172. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

173. Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

174. At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the

product.

175.   At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

176.   At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

177.   Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiffs' injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

178.   Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

179.   As such, Defendants breached their duty of reasonable care and failed

Case 2:22-cv-05124-DSF-AFM Document 21-1 Filed 08/03/22 Page 56 of 79 Page ID #:135

to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

180. Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup in their promotional efforts, outside of the context of labeling.

181. Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to

Roundup and glyphosate.

182.    Defendants' negligence included:

    a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

    b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

    c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

    d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

    e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the

market;

f.  Failing to provide adequate instructions, guidelines, and safety
    precautions to those persons Defendants could reasonably foresee
    would use and be exposed to Roundup® products;

g.  Failing to disclose to Plaintiffs, users/consumers, and the general
    public that use of and exposure to Roundup® presented severe risks of
    cancer and other grave illnesses;

h.  Failing to warn Plaintiffs, consumers, and the general public that the
    product's risk of harm was unreasonable and that there were safer and
    effective alternative herbicides available to Plaintiffs and other
    consumers;

i.  Systematically suppressing or downplaying contrary evidence about
    the risks, incidence, and prevalence of the side effects of Roundup®
    and glyphosate-containing products;

j.  Representing that their Roundup® products were safe for their
    intended use when, in fact, Defendants knew or should have known
    the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup® products'
    labeling or other promotional materials that would alert consumers
    and the general public of the risks of Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup®

products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

183. Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

184. Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

185. Defendants' negligence was the proximate cause of decedent's injuries and untimely death, *i.e.,* absent defendants' negligence, decedent would not have developed cancer and plaintiffs' husband and father would still be here today.

186. Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including

decedent, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including decedent. Defendants' reckless conduct therefore warrants an award of punitive damages.

187.  As a result of the foregoing acts and omissions, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

188.  The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

189.  Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

190.  As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum

within the unlimited jurisdiction of this Court and will be established at trial according to proof.

191. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

192. WHEREFORE, plaintiffs respectfully request this Court to enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

**(BREACH OF EXPRESS WARRANTIES by All Plaintiffs as Against Defendant Monsanto Company, and DOES 3 Through 100, Inclusive)**

193. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

194. At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

195. Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

a. ensure that its products did not cause the user unreasonably dangerous side effects;

b. warn of dangerous and potentially fatal side effects; and

c. disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiffs.

196. As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

197. At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that

Roundup® products would conform to the representations.

198. These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiffs, and/or that they were safe and effective as agricultural herbicides.

199. The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

200. Defendant Monsanto placed Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

201. Defendant Monsanto breached these warranties because, among other things, Roundup® products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with

their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant Monsanto breached the warranties in the following ways:

a. Defendant Monsanto represented through its labeling, advertising, and marketing materials that Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b. Defendant Monsanto represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

202. Decedent detrimentally relied on the express warranties and representations of defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Decedent reasonably relied upon defendant Monsanto to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Decedent would not have purchased or used Roundup® had defendant Monsanto properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

203.  Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup® products, as expressly stated within their warnings and labels, and knew that consumers and users such as decedent could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

204.  Decedent had no knowledge of the falsity or incompleteness of defendant Monsanto's statements and representations concerning Roundup.

205.  Decedent used and/or was exposed to Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by defendant Monsanto.

206.  Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including decedent's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Decedent could have avoided the injuries complained of herein, including his untimely death.

207.  As a direct and proximate result of defendant Monsanto's breach of express warranty, plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

208.  As a direct and proximate result of the conduct of defendant

Monsanto's breach of express warranty, Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

209. The conduct of defendants was a substantial factor and proximate cause of the. serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

210. Plaintiffs are-informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

211. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

212. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully

ascertained but according to proof at the time of trial.

213. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION

## (BREACH OF IMPLIED WARRANTIES by All Plaintiffs as Against All Defendants, and DOES 3 Through 100, Inclusive)

214. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

215. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which were and are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce.

216. Before the time decedent was exposed to the aforementioned Roundup® products, Defendants impliedly warranted to its consumers, including decedent, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

217. But Defendants failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup®

and glyphosate-containing products carries an increased risk of developing severe injuries, including decedent's injuries.

218. Decedent was an intended beneficiary of the implied warranties made by defendant Monsanto to purchasers of its herbicides.

219. The Roundup® products were expected to reach and did in fact reach consumers and users, including decedent, without substantial change in the condition in which they were manufactured and sold by defendant Monsanto.

220. At all relevant times, Defendants aware that consumers and users of its products, including decedent, would use Roundup® products as marketed by defendant Monsanto, which is to say that decedent was a foreseeable user of Roundup®.

221. Defendants intended that Roundup® products be used in the manner in which decedent, in fact, used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

222. In reliance upon Defendants' implied warranty, decedent used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by defendant Monsanto.

223. Decedent could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

224. Defendants breached its implied warranty to decedent in that

Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

225. The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

226. As a direct and proximate result of Defendants' breach of implied warranty, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

227. As a direct and proximate result of Defendants' breach of implied warranty, plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

228. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

229. Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

230. As a result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

231. As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

232. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**SIXTH CAUSE OF ACTION**

**(FRAUD by All Plaintiffs as Against Defendant Monsanto Company, and DOES 3 Through 100, Inclusive)**

233. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

234. Defendant Monsanto has defrauded the agricultural community in

general and decedent Plaintiffs in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

235.  Defendant Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with multiple myeloma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

236.  Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

237.  Decedent relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Decedent and/or plaintiffs did not know nor could they reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient

Case 2:22-cv-05298-DSF-AFM Document 21-1 Filed 08/03/22 Page 72 of 79 Page ID #:201

glyphosate.

238. The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant Monsanto traditionally used to promote the product's efficacy and benefits.

239. When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

240. Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason

Case 2:22-cv-05194-DSF-AFM Document 21-1 Filed 08/03/22 Page 73 of 79 Page ID #:202

thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiffs and others which proximately caused the injuries as set forth herein.

241. As a proximate result of defendant Monsanto's fraudulent and deceitful conduct and representations, plaintiffs have sustained damages and other losses in an amount to be proven at trial.

242. As a direct and proximate result of the conduct of defendants, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

243. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

244. Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

245. As a direct and proximate result of the conduct of defendants, and

each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

246. As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

247. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SEVENTH CAUSE OF ACTION

**(WRONGFUL DEATH by Plaintiffs Against All Defendants, and DOES 3 Through 100, Inclusive)**

248. Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

249. Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S.E., a minor, is the surviving daughter of decedent. Plaintiffs are the Decedent's only heirs and bring herein this wrongful death claim.

250.  Decedent died as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

251.  Defendants' wrongful conduct has proximately caused Decedent's heirs to suffer the loss of Decedent's companionship, services, society, marital association, love and consortium.

252.  As a direct and proximate result of the conduct of defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

253.  As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

254.  WHEREFORE, Plaintiffs ANOUSHEH SABOURI and S.E., a minor, respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## EIGHTH CAUSE OF ACTION

**(EXEMPLARY DAMAGES by Plaintiffs Against All Defendants, and DOES 3 Through 100, Inclusive)**

255.  Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

256.  Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Roundup®. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

257.  This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the amount of money Defendants would make selling Roundup® in California. Defendants' objection was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiffs were denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

258.  There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly,

Plaintiffs request punitive damages against the Defendants for the harms caused to Plaintiffs.

259. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ANOUSHEH SABOURI and Plaintiff S.E., a minor, hereby pray for judgment against Defendants, and each of them, jointly and severally as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

3. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4. Punitive and/or exemplary damages for the wanton, willful, fraudulent,

and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5.      Pre-judgment interest;

6.      Post-judgment interest;

7.      Awarding Plaintiffs reasonable attorneys' fees;

8.      Awarding Plaintiffs the costs of these proceedings; and

9.      Such other and further relief as this Court deems just and proper.


DATED: August 2, 2021            **THE LAW OFFICES OF HAYTHAM FARAJ**




                                 By:    /s/ Haytham Faraj
                                 HAYTHAM FARAJ, ESQ.
                                 Attorneys for Plaintiffs, ANOUSHEH
                                 SABOURI and S.E., a minor

Case 2:22-cv-05294-DSF-AFM Document 1-1 Filed 07/29/22 Page 314 of 349 Page ID #:208

**DEMAND FOR JURY TRIAL**

Plaintiff ANOUSHEH SABOURI and Plaintiff S.E., a minor, hereby demand a trial by jury on all of the causes of action.

DATED: August 2, 2021 **THE LAW OFFICES OF HAYTHAM FARAJ**

By: /s/ Haytham Faraj
HAYTHAM FARAJ, ESQ.
Attorneys for Plaintiffs, ANOUSHEH SABOURI and S.E., a minor

# EXHIBIT 19

Haytham Faraj, Esq. (SBN 291416)
Katherine K. Melik-Stepanyan, Esq. (SBN 315015)
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
Telephone: (323) 463-9200
Facsimile: (202) 280-1039
Email: service@farajlaw.com

Attorneys for Plaintiffs, ANOUSHEH SABOURI and S.E., a minor by and through her GAL, SHIRIN SABOURI

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S. E., a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, ANOUSHEH SABOURI,

Plaintiff,

v.

MONSANTO COMPANY et al.,

Defendants.

CASE NO.: 2:21-cv-05524

**NOTICE OF DISMISSAL**

Pursuant to Rule 41(A)(1)(a)(i) of the Federal Rules of Civil Procedure, Plaintiff, ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian and Plaintiff, S.E., a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, SHIRIN SABOURI (collectively hereinafter “Plaintiffs”), by and through counsel, hereby

give notice that all claims asserted against all defendants in the above-captioned action are voluntarily dismissed without prejudice.

The basis for Plaintiffs' voluntarily dismissed without prejudice is that on August 3, 2021, Plaintiffs filed their First Amended Complaint pursuant to Federal Rules of Civil Procedure Rule 15 (a)(1)(B), naming WILBUR-ELLIS COMPANY, LLC, a California limited liability corporation (hereinafter "Wilbur-Ellis") and CHEVRON CORPORATION, a corporation (hereinafter "Chevron") as Defendants.

Both Wilbur-Ellis and Chevron are California corporate defendants. Thus, Plaintiffs' First Amended Complaint defeats this Court's diversity jurisdiction and the district court lacks subject matter jurisdiction.

Plaintiffs will file their complaint in Los Angeles County Superior Court.

DATED: August 16, 2021 **THE LAW OFFICES OF HAYTHAM FARAJ**

By: /s/ Haytham Faraj
HAYTHAM FARAJ, ESQ.
Attorneys for Plaintiffs, ANOUSHEH SABOURI and S.E., a minor

# EXHIBIT 20

## Possible People Information

### Person Overview

| ANOUSHEH SABOURI | |
|---|---|
| [redacted]<br>TOPANGA, CA 90290-4395 \| LOS ANGELES County<br>**Phone Number(s):**<br>818-481-7794<br>818-223-8607<br>818-481-7794<br>**SSN:**<br>[redacted] - issued in CA in 1988<br>**DOB:**<br>09/XX/1974 (Age: 47)<br>**Spouse/Close Association:**<br>MOJTABA |  |

### Date of Birth Summary

| Date of Birth | Source |
|---|---|
| 09/XX/1971 (Age: 50) | People Find |
| 09/XX/1974 (Age: 47) | Bank Account Header Records \| Experian Credit Header \| Experian Credit Header Real Time |
| 09/XX/1975 (Age: 46) | Experian Credit Header |
| 06/1974 | People Household #1 \| People Household #2 |

### SSN Summary

| SSN | Source |
|---|---|
| [redacted] - issued in CA in 1988 | Bank Account Header Records \| Equifax Credit Header \| Experian Credit Header \| Experian Credit Header Real Time \| People Find \| People Historical |
| [redacted] - issued in CA in 1988 | Experian Credit Header \| Experian Credit Header Real Time |

### Name Variations

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| Name | Source |
|---|---|
| ANOUSHEH N SABOURI | Experian Credit Header \| Experian Credit Header Real Time \| People Find |
| ANOUSHEH M SABOURI | People Find |
| SABOURI ANOUSHEH | Experian Credit Header \| Experian Credit Header Real Time \| People Find \| People Household |
| ANDUSHEN SABOURI | Equifax Credit Header \| Experian Credit Header \| Experian Credit Header Real Time |
| ANOUSHED SABOURI | Experian Credit Header Real Time |
| ANOUSHUH SABOURI | Experian Credit Header Real Time |
| ANOUSHEH SABOUNI | Experian Credit Header Real Time |
| SABOURI ANDUSHEH | Experian Credit Header Real Time |
| ANOUSHAH SABOURI | Experian Credit Header Real Time |
| ANOUSHEH SABOURI | Experian Credit Header Real Time |

## Addresses

| Address | |
|---|---|
| **[REDACTED] TOPANGA, CA 90290-4395 \| LOS ANGELES County** | |
| *Reported 02/15/2009 - 10/22/2021* | |
| By Phone Records 02/15/2009 - 08/01/2021 | Phone Records #1 \| Phone Records #2 |
| By Bank Account Header Records 10/05/2020 - 10/05/2020 | Bank Account Header Records |
| By Experian Credit Header Real Time 03/28/2013 - 09/30/2020 | Experian Credit Header Real Time |
| By Experian Credit Header 03/28/2013 - 07/02/2013 | Experian Credit Header |
| By New Movers 06/23/2013 - 06/23/2013 | New Movers |
| By Equifax Credit Header 04/01/2013 - 04/30/2013 | Equifax Credit Header |
| By People Find 04/01/2013 - 04/01/2013 | People Find |
| By People Household 01/01/2013 - 03/31/2013 | People Household |
| **[REDACTED], WOODLAND HILLS, CA 91364-3007 \| LOS ANGELES County** | |
| *Reported 05/01/1999 - 05/24/2021* | |
| By Phone Records 01/23/2021 - 05/24/2021 | Phone Records #1 \| Phone Records #2 |
| By People Household 01/01/2012 - 06/30/2012 | People Household #1 \| People Household #2 |
| By Experian Credit Header 12/01/2001 - 03/08/2012 | Experian Credit Header |
| By Experian Credit Header Real Time 12/01/2001 - 03/08/2012 | Experian Credit Header Real Time |
| By People Find 05/10/2004 - 05/10/2004 | People Find |
| By Equifax Credit Header 05/01/1999 - 05/31/1999 | Equifax Credit Header |
| By Real Property Deeds | Real Property Deeds |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

**[redacted], WOODLAND HILLS, CA 91367-8053 | LOS ANGELES County**

*Reported 03/13/2010 - 01/04/2021*

By Phone Records 01/04/2021 - 01/04/2021 — Phone Records
By Equifax Credit Header 08/01/2016 - 08/31/2016 — Equifax Credit Header
By Experian Credit Header 03/13/2010 - 02/11/2013 — Experian Credit Header
By Experian Credit Header Real Time 03/13/2010 - 02/11/2013 — Experian Credit Header Real Time

**[redacted], ENCINO, CA 91436 | LOS ANGELES County**

*Reported 10/14/2010 - 10/14/2010*

By Experian Credit Header 10/14/2010 - 10/14/2010 — Experian Credit Header

**[redacted], THOUSAND OAKS, CA 91361-1282 | VENTURA County**

*Reported 05/01/2007 - 08/13/2010*

By Experian Credit Header Real Time 05/07/2007 - 08/13/2010 — Experian Credit Header Real Time
By Experian Credit Header 05/07/2007 - 10/14/2007 — Experian Credit Header
By Equifax Credit Header 05/01/2007 - 05/31/2007 — Equifax Credit Header

**[redacted], THOUSAND OAKS, CA 91361-1275 | VENTURA County**

*Reported 05/07/2007 - 08/13/2010*

By Experian Credit Header Real Time 05/07/2007 - 08/13/2010 — Experian Credit Header Real Time

**[redacted], OXNARD, CA 93036-0511 | VENTURA County**

*Reported 02/21/2010 - 05/31/2010*

By Equifax Credit Header 05/01/2010 - 05/31/2010 — Equifax Credit Header
By Experian Credit Header 02/21/2010 - 02/21/2010 — Experian Credit Header
By Experian Credit Header Real Time 02/21/2010 - 02/21/2010 — Experian Credit Header Real Time

**[redacted], NORTHRIDGE, CA 91325-3736 | LOS ANGELES County**

*Reported 12/01/1999 - 11/21/2003*

By Experian Credit Header 12/07/1999 - 11/21/2003 — Experian Credit Header
By Experian Credit Header Real Time 12/07/1999 - 11/21/2003 — Experian Credit Header Real Time
By People Find 01/23/2003 - 01/23/2003 — People Find
By Equifax Credit Header 06/01/2000 - 06/30/2000 — Equifax Credit Header

**[redacted], CANOGA PARK, CA 91306-4113 | LOS ANGELES County**

*Reported 03/23/1992 - 04/07/2003*

By Experian Credit Header 03/23/1992 - 04/07/2003 — Experian Credit Header
By Experian Credit Header Real Time 03/23/1992 - 04/07/2003 — Experian Credit Header Real Time
By Equifax Credit Header 09/01/1994 - 09/30/1994 — Equifax Credit Header
By People Historical 01/01/1993 - 12/31/1993 — People Historical

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| | |
|---|---|
| By People Find 03/01/1993 - 03/01/1993 | People Find |
| **[REDACTED], NORTHRIDGE, CA 91325 \| LOS ANGELES County** | |
| *Reported 11/03/2001 - 02/06/2002* | |
| By Experian Credit Header 11/03/2001 - 02/06/2002 | Experian Credit Header |
| **[REDACTED], ENCINO, CA 91436-1941 \| LOS ANGELES County** | |
| *Reported N/A* | |
| By Professional License | Professional License |
| **[REDACTED] ENCINO, CA 91436-1941 \| LOS ANGELES County** | |
| *Reported N/A* | |
| By Professional License | Professional License |
| **[REDACTED], ENCINO, CA 91436-4488 \| LOS ANGELES County** | |
| *Reported N/A* | |
| By Professional License | Professional License |
| **[REDACTED], ENCINO, CA 91436 \| LOS ANGELES County** | |
| *Reported N/A* | |
| By Professional License | Professional License |
| **[REDACTED], TOPANGA, CA 90290-3938** | |
| *Reported N/A* | |
| By Real Property Deeds | Real Property Deeds |

**Email Addresses**

| Email | Source |
|---|---|
| asabouri@gmklaw.com | Work Affiliations #1 \| Work Affiliations #2 \| Work Affiliations #3 |
| a.sabouri@sgvblaw.com | Business Profile |

**Phone Numbers**

| Phone | Source |
|---|---|
| 818-481-7794 | Experian Credit Header Real Time \| Phone Records |
| 818-223-8607 | Experian Credit Header Real Time |
| 818-481-7794 | Experian Credit Header Real Time |
| 310-455-4444 | Experian Credit Header |
| 818-227-9730 | People Find \| Phone Records |
| 818-465-6870 | D&B Market Identifiers (DMI) \| Executive Profile #1 \| Executive Profile #2 \| Executive Profile #3 \| Executive Profile #4 |
| 818-240-7990 | Executive Profile #1 \| Executive Profile #2 |
| 818-208-9022 | D&B Market Identifiers (DMI) |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| 805-777-7008 | Work Affiliations #1 \| Work Affiliations #2 \| Work Affiliations #3 |
|---|---|

**Bank Account Header Records**

| City | State | Last Activity Date | Confidence Score | View Full Text |
|---|---|---|---|---|
| TOPANGA | CA | 10/22/2021 | 99% | Full-Text |

## Possible Asset Information

**Real Property Transactions**

| Property Address | Sale Price | Mortgage Amount | Recording Date | Confidence Score | View Full Text |
|---|---|---|---|---|---|
| [redacted] [redacted] [redacted] TOPANGA, CA 90290-3938 | | | 12/24/2014 | 97% | Full-Text |
| [redacted] WOODLAND HILLS, CA 91364-3007 | | $340,000.00 | 01/26/2007 | 97% | Full-Text |

## Possible Adverse Information

**Risk Flags Analysis**

## List of Possible Risk Flags

| Risk Flags Name | Yes/No |
|---|---|
| Arrest Record | No |
| Criminal Record | Yes |
| OFAC Listing | No |
| World-Check Listing | No |
| Global Sanctions | No |
| Bankruptcy | No |
| Recorded as Deceased | No |
| Person Associated with Marijuana Related Business | No |
| Multiple SSNs | No |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| Name: | A SABOURI |
|---|---|
| Telephone Confidence Description: | PRIVATE NUMBER VALIDATED WITHIN PAST 12-18 MONTHS |

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

To Summary

## Person Phone Record

### Source Information

| Information Current Through: | 01/15/2021 |
|---|---|
| Database Last Updated: | 02/22/2022 |
| Update Frequency: | MONTHLY |
| Current Date: | 03/21/2022 |

### Phone Information

| Phone Number: | 818-227-9730 |
|---|---|
| Phone Type: | LAND LINE |
| Record Type: | RESIDENTIAL |
| First Reported: | 10/04/2001 |
| Last Reported: | 10/06/2006 |
| Original Service Provider: | PACIFIC BELL |
| Name: | ANOUSHEH SABOURI |
| Listed in Directory Assistance: | DELISTED/ DISCONNECTED |
| Telephone Confidence Description: | DISCONNECT/DELISTED TRANSACTION PRESENT |

### Address Information

| Address: | ██████████ WOODLAND HILLS, CA 91364-3007 |
|---|---|
| County: | LOS ANGELES |
| Address Type: | STREET OR RESIDENTIAL ADDRESS |
| Mail Deliverable: | YES |
| Address Validation Date: | 04/14/2021 |

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

## Real Property Transactions (2)

To Summary

### Real Property Transaction Record

### Source Information

### Transaction Information

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| | |
|---|---|
| **Filings Current Through:** | 03/08/2022 |
| **County Last Updated:** | 03/17/2022 |
| **Frequency of Update:** | WEEKLY |
| **Current Date:** | 03/21/2022 |
| **Source:** | COUNTY RECORDER |

## Owner Information

| | |
|---|---|
| **Owner(s):** | MOJTABA ESFAHANIAN |
| **Owner Relationship:** | HUSBAND AND WIFE |
| **Ownership Rights:** | JOINT TENANTS |
| **Absentee Owner:** | SITUS FROM SALE (OCCUPIED) |
| **Additional Owner #1:** | ESFAHANIAN MOJTABA |
| **Owner Relationship:** | HUSBAND/WIFE |
| **Owner Rights:** | JOINT TENANTS |
| **Additional Owner #2:** | SABOURI ANOUSHEH |
| **Owner Relationship:** | HUSBAND/WIFE |
| **Owner Rights:** | JOINT TENANTS |
| **Property Address:** | [redacted] WOODLAND HILLS, CA 91364-3007 |
| **Mailing Address:** | [redacted] WOODLAND HILLS, CA 91364-3007 |

| | |
|---|---|
| **Transaction Date:** | 01/10/2007 |
| **Seller Name:** | ESFAHANIN MOJTABA |
| **Consideration:** | SALE PRICE (PARTIAL) |
| **Deed Type:** | GRANT DEED |
| **Document Type:** | GRANT DEED |
| **Type of Transaction:** | NOMINAL |
| **Mortgage Amount:** | $340,000.00 |
| **Mortgage Type:** | CONVENTIONAL |
| **Mortgage Term:** | 30 YEARS |
| **Mortgage Deed Type:** | DEED OF TRUST |
| **Mortgage Date:** | 01/10/2007 |
| **Mortgage Due Date:** | 02/01/2037 |
| **Lender Name:** | AEGIS WHOLESALE CORP |
| **Address:** | HOUSTON, TX 77042 |
| **Recording Date:** | 01/26/2007 |
| **Document Number:** | 165956 |
| | FIDELITY NATIONAL TITLE CO |
| **Construction Type:** | SALE IS A RE-SALE |
| **Purchase Payment:** | MORTGAGE |

## Property Information

| | |
|---|---|
| **County:** | LOS ANGELES |
| **Assessor's Parcel Number:** | 2075-035-041 |
| **Property Type:** | SINGLE FAMILY RESIDENCE - TOWNHOUSE |
| **Land Use:** | SINGLE FAMILY RESIDENCE |
| **Building Square Feet:** | 2385 |

TAX ASSESSOR RECORD may be available for this property. The record contains information from the office of the local real property tax assessor office. In addition to identifying the current owner, the record may include tax assessment information, the legal description, and property characteristics. Additional charges may apply.

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

TRANSACTION HISTORY REPORT may be available for this property. The report contains details about all available transactions associated with this property. The report may include information about sales, ownership transfers, refinances, construction loans, 2nd mortgages, or equity loans based on recorded deeds. Additional charges may apply.

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

To Summary

## Real Property Transaction Record

### Source Information

| | |
|---|---|
| **Filings Current Through:** | 03/08/2022 |
| **County Last Updated:** | 03/17/2022 |
| **Frequency of Update:** | WEEKLY |
| **Current Date:** | 03/21/2022 |
| **Source:** | COUNTY RECORDER |

### Transaction Information

| | |
|---|---|
| **Transaction Date:** | 12/05/2014 |
| **Seller Name:** | SABOURI ANOUSHEH |
| **Consideration:** | SALE PRICE (FULL) |
| **Deed Type:** | QUIT CLAIM DEED |
| **Document Type:** | QUIT CLAIM DEED |
| **Type of Transaction:** | NOMINAL |
| **Recording Date:** | 12/24/2014 |
| **Document Number:** | 1399775 |
| | TICOR TITLE |
| **Construction Type:** | SALE IS A RE-SALE |
| **InterFamily Transaction:** | RELEASE OF DEED OF TRUST/MTG |

### Owner Information

| | |
|---|---|
| **Owner(s):** | MIKE ESFAHANIAN |
| **Owner Relationship:** | MARRIED MAN |
| **Ownership Rights:** | SEPARATE PROPERTY |
| **Absentee Owner:** | SITUS FROM SALE (ABSENTEE) |
| **Property Address:** | [redacted] [redacted] TOPANGA, CA 90290-3938 |
| **Mailing Address:** | [redacted] TOPANGA, CA 90290-4395 |

### Property Information

| | |
|---|---|
| **County:** | LOS ANGELES |
| **Assessor's Parcel Number:** | 4436-004-009 |
| **Property Type:** | SINGLE FAMILY RESIDENCE - TOWNHOUSE |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| | |
|---|---|
| **Land Use:** | SINGLE FAMILY RESIDENCE |
| **Building Square Feet:** | 400 |

TAX ASSESSOR RECORD may be available for this property. The record contains information from the office of the local real property tax assessor office. In addition to identifying the current owner, the record may include tax assessment information, the legal description, and property characteristics. Additional charges may apply.

TRANSACTION HISTORY REPORT may be available for this property. The report contains details about all available transactions associated with this property. The report may include information about sales, ownership transfers, refinances, construction loans, 2nd mortgages, or equity loans based on recorded deeds. Additional charges may apply.

End of Document © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## Criminal & Infraction Records (1)

To Summary

### Administrative Office of the Courts Record

### Source Information

| | |
|---|---|
| **Coverage Begin Date:** | 01/01/1985 |
| **Information Current Through:** | 12/23/2013 |
| **Database Last Updated:** | 12/16/2015 |
| **Update Frequency:** | SUSPENDED |
| **Current Date:** | 03/21/2022 |
| **Source:** | CA VENTURA COUNTY COURTS (HISTORICAL) |

### Defendant Information

| | |
|---|---|
| **Offender Name:** | SABOURI, ANOUSHEH |
| **Date of Birth:** | 09/XX/1974 |

### Offense 1

| | |
|---|---|
| **Offense Number:** | 1 |
| **Case Number:** | 2001559708 |
| **Charges Filed Date:** | 07/02/2001 |
| **Offense Charged:** | NOT SPECIFIED |
| **Disposition Date:** | 11/14/2001 |
| **Jurisdiction County:** | VENTURA |

### Order Documents

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387) for on-site manual retrieval of documents related to this or other matters. Additional charges apply.

End of Document © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## Professional Licenses (2)

To Summary

### Professional License Record

### Source Information

### Licensing Information

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| | | | |
|---|---|---|---|
| **Information Current Through:** | 07/15/2021 | **Licensing Agency:** | CALIFORNIA BAR ASSOCIATION |
| **Database Last Updated:** | 08/01/2021 | **License/Certification Type:** | ATTORNEY |
| **Update Frequency:** | SEMI-ANNUAL | **License State:** | CA |
| **Current Date:** | 03/21/2022 | | |
| **Source:** | CA SELF REPORTED ATTORNEYS | | |

## Name & Professional Information

| | |
|---|---|
| **Name:** | ANOUSHEH SABOURI |
| **Address:** | [redacted] [redacted] ENCINO, CA 91436 |
| **Phone:** | 818-990-4810 |

## Employer Information

| | |
|---|---|
| **Employer:** | SAMUELSEN, GONZALEZ, VALENZUELA & BROWN |
| **Organization:** | PERSON |

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

To Summary

**Professional License Record**

## Source Information

| | |
|---|---|
| **Information Current Through:** | 07/15/2021 |
| **Database Last Updated:** | 08/01/2021 |
| **Update Frequency:** | SEMI-ANNUAL |
| **Current Date:** | 03/21/2022 |
| **Source:** | CA SELF REPORTED ATTORNEYS |

## Historical Information

| | |
|---|---|
| **Date Of Change:** | 07/26/2021 |

## Licensing Information

| | |
|---|---|
| **Licensing Agency:** | CA BAR ASSOCIATION |
| **License/Certification Type:** | ATTORNEY |
| **License Number:** | 249526 |
| **License Status:** | ACTIVE |
| **License State:** | CA |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

# EXHIBIT 21

## Possible People Information

### Person Overview

| MOJTABA A ESFAHANIAN<br>[redacted]<br>TOPANGA, CA 90290-4395 \| LOS ANGELES County<br>**Phone Number(s):**<br>310-455-4444<br>818-268-7511<br>818-227-9730<br>**SSN:**<br>[redacted] - issued in FL in 1979<br>**DOB:**<br>01/XX/1963 (Age: 56)<br>**DOD:**<br>02/09/2019 SANTA MONICA, CA \| LOS ANGELES County |  |
|---|---|

### Death Records

| Death | Source |
|---|---|
| 02/09/2019 SANTA MONICA, CA \| LOS ANGELES County | State Death |

### Date of Birth Summary

| Date of Birth | Source |
|---|---|
| 01/XX/1963 (Age: 56) | Address Historical \| Bank Account Header Records \| Experian Credit Header Real Time \| People Household \| State Death |
| 09/XX/1950 (Age: 68) | People Historical |

### SSN Summary

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| SSN | Source |
|---|---|
| [redacted] - issued in FL in 1979 | Bank Account Header Records #1 \| Bank Account Header Records #2 \| Equifax Credit Header \| Experian Credit Header Real Time \| People Find \| People Historical #1 \| People Historical #2 |

### Name Variations

| Name | Source |
|---|---|
| MIKE M ESFAHANAIN | People Find |
| MIKE M ESFAHANIAN | Experian Credit Header Real Time \| Lawsuit \| People Find \| People Historical \| People Household |
| MIKE ESFAHANIAN | Experian Credit Header Real Time \| People Find \| People Household |
| MOJTABA ESFAHANIAN | Address Historical \| Experian Credit Header Real Time \| Liens and Judgments #1 \| Liens and Judgments #2 \| People Find \| People Household \| State Death |
| MR MIKE M ESFAHANIAN | People Household |
| MICHEAL ESFAHANIAN | Experian Credit Header Real Time \| People Historical |
| MOJTABA MIKE ESFAHANIAN | Equifax Credit Header |
| MOJTABA ESFAHANIN | Equifax Credit Header \| Experian Credit Header Real Time |
| MO A ESFAHANIAN | Bank Account Header Records |
| MICHAEL M ESFAHANIAN | Bank Account Header Records |
| M A ESFAHANIAN | Experian Credit Header Real Time |
| MOJTABA M ESFAHANIAN | Experian Credit Header Real Time |
| MICHEAL M ESFAHANIAN | Experian Credit Header Real Time |
| MIKE FSFAHANIAN | Experian Credit Header Real Time |
| MIKE MAJTA ESFAHANIAN | Experian Credit Header Real Time |
| MOGTABA ESFAHANIAN | Experian Credit Header Real Time |
| MOSTABA ESFAHANIAN | Experian Credit Header Real Time |
| MIKE MOJTABA ESFAHANIAN | Experian Credit Header Real Time |
| MOJTABA SABOURI | Experian Credit Header Real Time |
| MIKE F ESFAHANIAN | Experian Credit Header Real Time |
| MIKE M ESPAHANIAN | Experian Credit Header Real Time |
| MIKE MOJTABA | Experian Credit Header Real Time |
| MOITABA ESFAHANIAN | Experian Credit Header Real Time |
| MOJTABA A ESFAHANIAN | Experian Credit Header Real Time |

### Addresses

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| Address | |
|---|---|
| **[REDACTED], TOPANGA, CA 90290-4395 \| LOS ANGELES County** | |
| *Reported 01/01/2011 - 08/04/2018* | |
| By Experian Credit Header Real Time 05/23/2013 - 08/04/2018 | Experian Credit Header Real Time |
| By Phone Records 04/15/2016 - 07/01/2016 | Phone Records #1 \| Phone Records #2 \| Phone Records #3 |
| By Equifax Credit Header 06/01/2013 - 06/30/2013 | Equifax Credit Header |
| By People Household 01/01/2011 - 03/31/2013 | People Household |
| By People Find 10/01/2011 - 10/01/2011 | People Find |
| By Real Property Deeds | Real Property Deeds #1 \| Real Property Deeds #2 \| Real Property Deeds #3 \| Real Property Deeds #4 |
| **[REDACTED], WOODLAND HILLS, CA 91364-3007 \| LOS ANGELES County** | |
| *Reported 02/04/2002 - 10/01/2015* | |
| By Phone Records 10/01/2015 - 10/01/2015 | Phone Records |
| By Experian Credit Header Real Time 02/12/2002 - 07/25/2013 | Experian Credit Header Real Time |
| By People Find 03/05/2007 - 03/05/2007 | People Find |
| By Equifax Credit Header 05/01/2002 - 05/31/2002 | Equifax Credit Header |
| By Bank Account Header Records 02/04/2002 - 02/04/2002 | Bank Account Header Records |
| By Real Property Deeds | Real Property Deeds #1 \| Real Property Deeds #2 \| Real Property Deeds #3 |
| By Real Property Tax Assessor | Real Property Tax Assessor |
| **[REDACTED], TOPANGA, CA 90290-3938 \| LOS ANGELES County** | |
| *Reported 01/01/2014 - 12/31/2014* | |
| By People Household 01/01/2014 - 12/31/2014 | People Household |
| By Real Property Deeds | Real Property Deeds #1 \| Real Property Deeds #2 \| Real Property Deeds #3 |
| By Real Property Tax Assessor | Real Property Tax Assessor |
| **[REDACTED], ENCINO, CA 91416-9171 \| LOS ANGELES County** | |
| *Reported 01/01/1996 - 03/31/2005* | |
| By Equifax Credit Header 03/01/2005 - 03/31/2005 | Equifax Credit Header |
| By People Find 11/13/2000 - 11/13/2000 | People Find |
| By People Historical 01/01/1996 - 12/31/1996 | People Historical |
| By Bank Account Header Records | Bank Account Header Records |
| **[REDACTED] RESEDA, CA 91335-3622 \| LOS ANGELES County** | |
| *Reported 02/01/1985 - 12/15/2004* | |
| By Experian Credit Header Real Time 02/01/1985 - 12/15/2004 | Experian Credit Header Real Time |
| By People Find 01/23/2003 - 01/23/2003 | People Find |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| | |
|---|---|
| By Bank Account Header Records | Bank Account Header Records |
| By People Historical | People Historical |
| **[redacted] NORTHRIDGE, CA 91325-3736 \| LOS ANGELES County** | |
| *Reported 11/01/1988 - 12/11/2003* | |
| By Experian Credit Header Real Time 11/01/1988 - 12/11/2003 | Experian Credit Header Real Time |
| By People Find 01/23/2003 - 01/23/2003 | People Find |
| By Equifax Credit Header 08/01/1999 - 08/31/1999 | Equifax Credit Header |
| By People Historical 01/01/1993 - 12/31/1993 | People Historical #1 \| People Historical #2 \| People Historical #3 |
| By Bank Account Header Records | Bank Account Header Records |
| By Real Property Deeds | Real Property Deeds #1 \| Real Property Deeds #2 |
| By Real Property Tax Assessor | Real Property Tax Assessor |
| **[redacted] CANOGA PARK, CA 91306-3039 \| LOS ANGELES County** | |
| *Reported 07/05/1989 - 05/12/2003* | |
| By Bank Account Header Records 05/12/2003 - 05/12/2003 | Bank Account Header Records |
| By Experian Credit Header Real Time 07/05/1989 - 09/14/2002 | Experian Credit Header Real Time |
| By People Historical 01/01/1992 - 12/31/1996 | People Historical #1 \| People Historical #2 |
| By People Find 08/01/1995 - 08/01/1995 | People Find |
| By Real Property Deeds | Real Property Deeds #1 \| Real Property Deeds #2 \| Real Property Deeds #3 |
| By Real Property Tax Assessor | Real Property Tax Assessor |
| **[redacted], TARZANA, CA 91357-0853 \| LOS ANGELES County** | |
| *Reported 10/15/2001 - 01/23/2003* | |
| By Equifax Credit Header 01/01/2002 - 01/31/2002 | Equifax Credit Header |
| By People Find 10/15/2001 - 10/15/2001 | People Find |
| **[redacted], WOODLAND HILLS, CA 91302-5702 \| LOS ANGELES County** | |
| *Reported 02/02/2001 - 02/02/2001* | |
| By Experian Credit Header Real Time 02/02/2001 - 02/02/2001 | Experian Credit Header Real Time |
| **[redacted], MIDLAND, MI 48642-5824 \| MIDLAND County** | |
| *Reported N/A* | |
| By Address Historical | Address Historical |
| **WINNETKA, CA 91306 \| LOS ANGELES County** | |
| *Reported N/A* | |
| By Real Property Deeds | Real Property Deeds #1 \| Real Property Deeds #2 |

**Phone Numbers**

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| Phone | Source |
|---|---|
| 310-455-4444 | Experian Credit Header Real Time \| People Find \| People Household \| Phone Records #1 \| Phone Records #2 |
| 818-268-7511 | Bank Account Header Records \| Experian Credit Header Real Time \| Phone Records |
| 818-227-9730 | Experian Credit Header Real Time |
| 310-455-4444 | Experian Credit Header Real Time |
| 818-268-7511 | Experian Credit Header Real Time |
| 818-993-9515 | People Find \| People Historical |
| 818-998-2630 | Bank Account Header Records |
| 323-993-4104 | Bank Account Header Records |
| 818-227-9730 | Bank Account Header Records |

**Bank Account Header Records**

| City | State | Last Activity Date | Confidence Score | View Full Text |
|---|---|---|---|---|
| CANOGA PARK | CA | 05/12/2003 | 99% | Full-Text |
| WOODLAND HILLS | CA | 03/08/2010 | 99% | Full-Text |

## Possible Asset Information

**Real Property Tax Assessor Records**

| Property Address | Assessed Total Value | Tax Year | Confidence Score | View Full Text |
|---|---|---|---|---|
| [redacted] WINNETKA, CA 91306-3039 | $205,025.00 | 2020 | 97% | Full-Text |
| [redacted] WOODLAND HILLS, CA 91364-3007 | $845,065.00 | 2020 | 97% | Full-Text |
| [redacted] NORTHRIDGE, CA 91325-3736 | $337,767.00 | 2020 | 97% | Full-Text |
| [redacted] TOPANGA, CA 90290-3938 | $412,226.00 | 2020 | 65% | Full-Text |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

### Real Property Transactions

| Property Address | Sale Price | Mortgage Amount | Recording Date | Confidence Score | View Full Text |
|---|---|---|---|---|---|
| [redacted] TOPANGA, CA 90290-4395 | | | 05/13/2020 | 99% | Full-Text |
| [redacted] WOODLAND HILLS, CA 91364-3007 | $820,000.00 | $656,000.00 | 09/11/2018 | 97% | Full-Text |
| [redacted] TOPANGA, CA 90290-3938 | $400,000.00 | $400,000.00 | 07/03/2018 | 65% | Full-Text |
| [redacted] TOPANGA, CA 90290-3938 | | | 12/24/2014 | 97% | Full-Text |
| [redacted] TOPANGA, CA 90290-3938 | $256,500.00 | | 12/24/2014 | 97% | Full-Text |
| [redacted] WOODLAND HILLS, CA 91364-3007 | | $305,000.00 | 04/16/2013 | 97% | Full-Text |
| [redacted] TOPANGA, CA 90290-4395 | $1,611,000.00 | | 09/27/2011 | 99% | Full-Text |
| [redacted] WOODLAND HILLS, CA 91364-3007 | | $340,000.00 | 01/26/2007 | 97% | Full-Text |
| [redacted] | | $133,000.00 | 08/15/1991 | 92% | Full-Text |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| Property Address | Sale Price | Mortgage Amount | Recording Date | Confidence Score | View Full Text |
|---|---|---|---|---|---|
| WINNETKA, CA 91306-3039 | | | | | |
| [redacted] WINNETKA, CA 91306-3039 | | $133,000.00 | 08/15/1991 | 97% | Full-Text |
| [redacted] NORTHRIDGE, CA 91325-3736 | $161,500.00 | $128,950.00 | 03/17/1988 | 97% | Full-Text |
| [redacted] NORTHRIDGE, CA 91325-3736 | $161,500.00 | | 03/17/1988 | 97% | Full-Text |
| [redacted] WINNETKA, CA 91306-3039 | $120,000.00 | $90,000.00 | 09/11/1986 | 97% | Full-Text |

## Possible Adverse Information

### Risk Flags Analysis

## List of Possible Risk Flags

| Risk Flags Name | Yes/No |
|---|---|
| Arrest Record | No |
| Criminal Record | No |
| OFAC Listing | No |
| World-Check Listing | No |
| Global Sanctions | No |
| Bankruptcy | No |
| Recorded as Deceased | Yes |
| Person Associated with Marijuana Related Business | No |
| Multiple SSNs | No |
| SSN Matches Multiple Individuals | No |
| Age Younger than SSN Issue Date | No |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| RASOL R ESFAHANIAN | [REDACTED], RESEDA, CA 91337-0882 \| LOS ANGELES County |
|---|---|

**Lawsuit Records**

| Plaintiff | Defendant | Case Type | Confidence Score | View Full Text |
|---|---|---|---|---|
| ESFAHANIAN MIKE M | TAYLOR FREDERICK | CIVIL | 90% | Full-Text |

**Liens & Judgments**

| Debtor | Creditor | Amount | Confidence Score | View Full Text |
|---|---|---|---|---|
| ESFAHANIAN, MOJTABA | GREENWOOD TRUST CO | $6,136.00 | 97% | Full-Text |
| ESFAHANIAN, MOJTABA | GREENWOOD TRUST CO | $7,131.00 | 97% | Full-Text |

**Dockets**

| Court | Filing Date | Confidence Score | View Full Text |
|---|---|---|---|
| SUPERIOR COURT | 04/28/1994 | 62% | Full-Text |

## Possible Business & Employment

**FBN/DBA**

| Business Name | Business Address | Confidence Score | View Full Text |
|---|---|---|---|
| IMAGE PICTURES | [REDACTED] RESEDA, 91335 | 97% | Full-Text |
| CR8TIVE COMMUNICATIONS | [REDACTED] AVE NORTHRIDGE, 91325 | 97% | Full-Text |

## Full-Text Documents

**All Full-Text Documents**

## Death Records (1)

To Summary

**State Death Record(s)**

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

PeopleMap Report (Premier) 03/11/2022 15:50:52
MOJTABA A ESFAHANIAN Client ID: 1417-0001

### Source Information

| | |
|---|---|
| **Information Current Through:** | 12/31/2019 |
| **Database Last Updated:** | 07/02/2020 |
| **Update Frequency:** | YEARLY |
| **Current Date:** | 03/11/2022 |
| **Source:** | CALIFORNIA DEPARTMENT OF PUBLIC HEALTH, CENTER FOR HEALTH STATISTICS |

### Information Surrounding Death

| | |
|---|---|
| **Date of Death:** | 02/09/2019 |
| **Death Location:** | SANTA MONICA, CA |
| **Death County:** | LOS ANGELES |
| **Where Death Occurred:** | SANTA MONICA - UCLA MEDICAL CENTER |

### Information Regarding Deceased

| | |
|---|---|
| **Birth Date:** | 01/XX/1963 |
| **Birth Place:** | IRAN |
| **Fathers Name:** | ESFAHANIAN |

### Identifying Information

| | |
|---|---|
| **Name:** | MOJTABA ESFAHANIAN |
| **Gender:** | MALE |

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

## Historical People Records (3)

To Summary

**People Historical**

### Individual Information

| | |
|---|---|
| **Name:** | ESFAHANIAN, MOJTABA A |
| **SSN:** | [redacted] |
| **On File Since:** | 01/01/1983 |
| **Phone Number 1:** | 993-9515 |

### Historical Address Information

| | |
|---|---|
| **Address 1:** | [redacted] NORTHRIDGE, CA 91325-3736 |
| **Address Last Reported:** | 1993 |
| **Address Type:** | STREET OR RESIDENTIAL ADDRESS |
| **Address 2:** | [redacted] WINNETKA, CA 91306-3039 |
| **Address Last Reported:** | 1995 |
| **Address Type:** | STREET OR RESIDENTIAL ADDRESS |

WESTLAW Thomson Reuters. No claim to original U.S. Government Works. 21-010 19
The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

PeopleMap Report (Premier) 03/11/2022 15:50:52
MOJTABA A ESFAHANIAN Client ID: 1017-0001

| Database Last Updated: | 03/04/2022 | Phone Number 1: | 310-455-4444 |
|---|---|---|---|
| Update Frequency: | MONTHLY | Phone Number 2: | 818-993-9515 |
| Current Date: | 03/11/2022 | Address First Reported: | 10/01/2011 |
| Source: | TRANS UNION | | |

## Individual Information

| Name: | ESFAHANIAN, MOJTABA A |
|---|---|
| Also Known As: | ESFAHANIAN, MIKE M<br>ESFAHANIAN, MOJTABA<br>ESFAHANIAN, MIKE<br>ESFAHANAIN, MIKE M |
| SSN: | [redacted] |
| On File Since: | 01/01/1983 |

## Other Address Information

| Previous Address: | [redacted]<br>WOODLAND HILLS, CA 91364-3007 |
|---|---|
| Address First Reported: | 02/01/2007 |
| Previous Address: | [redacted]<br>TARZANA, CA 91357-0853 |
| Address First Reported: | 10/15/2001 |
| Previous Address: | [redacted]<br>RESEDA, CA 91335-3622 |
| Address First Reported: | 07/17/2001 |
| Previous Address: | [redacted]<br>NORTHRIDGE, CA 91325-3736 |
| Address First Reported: | 12/01/1996 |
| Previous Address: | [redacted]<br>ENCINO, CA 91416-9171 |
| Address First Reported: | 05/01/1996 |
| Previous Address: | [redacted]<br>WINNETKA, CA 91306-3039 |
| Address First Reported: | 08/01/1995 |

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

## Experian Credit Header Real Time (1)

To Summary

**CREDIT HEADER REAL TIME**

## Fraud Alert Information

| SSN Alerts | |
|---|---|

## Individual Information

| Best Name: | MIKE M ESFAHANIAN |
|---|---|
| Spouse Name: | ANOUSHEH |

WESTLAW Thomson Reuters. No claim to original U.S. Government Works. 21-011 22
The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| | |
|---|---|
| Inquiry SSN Has Not Been Issued | No |
| Inquiry SSN Recorded As Deceased | No |
| Inquiry Age Younger than SSN Issue Date | No |
| High Probability SSN Belongs to Another | No |
| Inquiry SSN Format Is Invalid | No |
| Best Onfile SSN Recorded as Deceased | No |
| Best Onfile SSN Not Issued as of: | No |
| SSN Reported more Frequently for Another | No |
| Other SSN(s) | No |
| **Address Alerts** | |
| Inquiry/Online Current Address Conflict | No |
| Inquiry Address 1ST Reported <90 Days | No |
| Inquiry Current Address Not Onfile | No |
| Inquiry Address: Alert | No |
| Inquiry Address: Non-Residential | No |
| Inquiry Address: Cautious | No |
| Best Address: Alert | No |
| Best Address: Non-Residential | No |
| Best Address: Cautious | No |
| Inquiry Telephone Number Inconsistent with Address | No |

| | |
|---|---|
| **Other Name(s):** | MIKE ESFAHANIAN |
| | MOJTABA ESFAHANIAN |
| | MOJTABA A ESFAHANIAN |
| | M A ESFAHANIAN |
| | MOJTABA M ESFAHANIAN |
| | MOJTABA ESFAHANIN |
| | MICHEAL M ESFAHANIAN |
| | MIKE FSFAHANIAN |
| | MIKE MAJTA ESFAHANIAN |
| | MICHEAL ESFAHANIAN |
| | MOGTABA ESFAHANIAN |
| | MOSTABA ESFAHANIAN |
| | MIKE MOJTABA ESFAHANIAN |
| | MOJTABA SABOURI |
| | MIKE F ESFAHANIAN |
| | MIKE M ESPAHANIAN |
| | MIKE MOJTABA |
| | MOITABA ESFAHANIAN |
| **Best SSN:** | [redacted] |
| **Times Reported:** | 19 |
| **Date of Birth:** | 01/XX/1963 |
| **Telephone Number(s):** | 310-455-4444 Type: Residence |
| | 818-227-9730 Type: Residence |
| | 818-268-7511 Type: Cellular |

## Best Address Information

| | |
|---|---|
| **Best Address:** | [redacted] TOPANGA, CA 90290 |
| | Reported 8 Times |

## Source Information

| | |
|---|---|
| **Current Date:** | 03/11/2022 |
| **Source:** | Experian Credit Header |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

PeopleMap Report (Premier) 03/11/2022 15:50:52
MOJTABA A ESFAHANIAN Client ID: 1017-0001

## Owner Information

| | |
|---|---|
| **Owner(s):** | MOJTABA ESFAHANIAN |
| **Owner Relationship:** | HUSBAND AND WIFE |
| **Ownership Rights:** | JOINT TENANTS |
| **Absentee Owner:** | SITUS FROM SALE (OCCUPIED) |
| **Property Address:** | [redacted] WOODLAND HILLS, CA 91364-3007 |
| **Mailing Address:** | [redacted] WOODLAND HILLS, CA 91364-3007 |

| | |
|---|---|
| **Mortgage Amount:** | $305,000.00 |
| **Mortgage Type:** | CONVENTIONAL |
| **Mortgage Term:** | 15 YEARS |
| **Mortgage Deed Type:** | DEED OF TRUST |
| **Mortgage Date:** | 03/25/2013 |
| **Mortgage Due Date:** | 04/01/2028 |
| **Lender Name:** | CASHCALL INC |
| **Address:** | ANAHEIM, CA 92806 |
| **Recording Date:** | 04/16/2013 |
| **Document Number:** | 560419 |
| **Refinance Loan:** | LOAN TO VALUE IS MORE THAN 50% |

## Property Information

| | |
|---|---|
| **County:** | LOS ANGELES |
| **Assessor's Parcel Number:** | 2075-035-041 |
| **Property Type:** | SINGLE FAMILY RESIDENCE - TOWNHOUSE |
| **Land Use:** | SINGLE FAMILY RESIDENCE |
| **Building Square Feet:** | 2385 |

TAX ASSESSOR RECORD may be available for this property. The record contains information from the office of the local real property tax assessor office. In addition to identifying the current owner, the record may include tax assessment information, the legal description, and property characteristics. Additional charges may apply.

TRANSACTION HISTORY REPORT may be available for this property. The report contains details about all available transactions associated with this property. The report may include information about sales, ownership transfers, refinances, construction loans, 2nd mortgages, or equity loans based on recorded deeds. Additional charges may apply.

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

To Summary

**Real Property Transaction Record**

## Source Information

| | |
|---|---|
| **Filings Current Through:** | 03/02/2022 |
| **County Last Updated:** | 03/10/2022 |

## Transaction Information

| | |
|---|---|
| **Transaction Date:** | 01/10/2007 |
| **Seller Name:** | ESFAHANIN MOJTABA |

WESTLAW Thomson Reuters. No claim to original U.S. Government Works. 21-013 81
The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

Case 2:22-cv-01986-DSF-AFM    Document 1-1    Filed 03/25/22    Page 342 of 349    Page ID #:354

| | | | |
|---|---|---|---|
| Frequency of Update: | WEEKLY | Consideration: | SALE PRICE (PARTIAL) |
| Current Date: | 03/11/2022 | Deed Type: | GRANT DEED |
| Source: | COUNTY RECORDER | Document Type: | GRANT DEED |
| | | Type of Transaction: | NOMINAL |
| | | Mortgage Amount: | $340,000.00 |
| | | Mortgage Type: | CONVENTIONAL |

## Owner Information

| | | | |
|---|---|---|---|
| Owner(s): | MOJTABA ESFAHANIAN | Mortgage Term: | 30 YEARS |
| Owner Relationship: | HUSBAND AND WIFE | Mortgage Deed Type: | DEED OF TRUST |
| Ownership Rights: | JOINT TENANTS | Mortgage Date: | 01/10/2007 |
| Absentee Owner: | SITUS FROM SALE (OCCUPIED) | Mortgage Due Date: | 02/01/2037 |
| | | Lender Name: | AEGIS WHOLESALE CORP |
| Additional Owner #1: | ESFAHANIAN MOJTABA | | |
| Owner Relationship: | HUSBAND/WIFE | Address: | HOUSTON, TX 77042 |
| Owner Rights: | JOINT TENANTS | Recording Date: | 01/26/2007 |
| Additional Owner #2: | SABOURI ANOUSHEH | Document Number: | 165956 |
| Owner Relationship: | HUSBAND/WIFE | | FIDELITY NATIONAL TITLE CO |
| Owner Rights: | JOINT TENANTS | | |
| Property Address: | ██████ WOODLAND HILLS, CA 91364-3007 | Construction Type: | SALE IS A RE-SALE |
| | | Purchase Payment: | MORTGAGE |
| Mailing Address: | ██████ WOODLAND HILLS, CA 91364-3007 | | |

## Property Information

| | |
|---|---|
| County: | LOS ANGELES |
| Assessor's Parcel Number: | 2075-035-041 |
| Property Type: | SINGLE FAMILY RESIDENCE - TOWNHOUSE |
| Land Use: | SINGLE FAMILY RESIDENCE |
| Building Square Feet: | 2385 |

TAX ASSESSOR RECORD may be available for this property. The record contains information from the office of the local real property tax assessor office. In addition to identifying the current owner, the record may include tax assessment information, the legal description, and property characteristics. Additional charges may apply.

TRANSACTION HISTORY REPORT may be available for this property. The report contains details about all available transactions associated with this property. The report may include information about sales, ownership transfers, refinances, construction loans, 2nd mortgages, or equity loans based on recorded deeds. Additional charges may apply.

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

# EXHIBIT 22

**Obituary**

## Source Information

| | |
|---|---|
| **Information Current Through:** | 10/23/2021 |
| **Database Last Updated:** | 10/26/2021 |
| **Update Frequency:** | WEEKLY |
| **Current Date:** | 03/14/2022 |
| **Source:** | Online Obituaries |

## Information Regarding Deceased

| | |
|---|---|
| **Date of Death:** | 02/09/2019 |
| **Age at Death:** | 56 |
| **State:** | CA |
| **City:** | WESTLAKE VILLAGE |
| **Date of Birth:** | 04/XX/1963 |

## Identifying Information

**Name:**   MIKE M ESFAHANIAN

*Thomson Reuters Legal is not a consumer reporting agency and none of its services or the data contained therein constitute a 'consumer report' as such term is defined in the Federal Fair Credit Reporting Act (FCRA), 15 U.S.C. sec. 1681 et seq. The data provided to you may not be used as a factor in consumer debt collection decisioning, establishing a consumer's eligibility for credit, insurance, employment, government benefits, or housing, or for any other purpose authorized under the FCRA. By accessing one of our services, you agree not to use the service or data for any purpose authorized under the FCRA or in relation to taking an adverse action relating to a consumer application.*

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 23

**DECLARATION OF GEORGE PAPPAS**

I, George Pappas, declare as follows:

1. I am over the age of eighteen. If I were called to testify, I could and would competently testify to the statements set forth below.

2. This declaration is based on my personal knowledge and my knowledge of company documents. I submit this declaration in support of Monsanto Company's notice of removal.

3. I am employed by Wilbur-Ellis Company LLC ("Wilbur-Ellis Company") as Director of Tax. I have been employed by Wilbur-Ellis Company since January 2010. I am familiar with corporate organization issues regarding Wilbur-Ellis Company and other Wilbur-Ellis entities.

4. Since before 2018, Wilbur-Ellis Company has been a limited liability company, and its sole member has been Wilbur-Ellis Holdings II, Inc.

5. Since before 2018, Wilbur-Ellis Holding II, Inc. has been a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of California.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 21, 2022 at San Francisco CA USA

George Pappas

# EXHIBIT 24

# DECLARATION OF SCOTT HUSHBECK

I, Scott Hushbeck, declare as follows:

1. I am over the age of eighteen. If I were called to testify, I could and would competently testify to the statements set forth below.

2. This declaration is based on my personal knowledge and my knowledge of company documents. I submit this declaration in support of Monsanto Company's notice of removal.

3. Until my retirement at the end of March 2021, I was employed as Vice President of Business Integration for Wilbur-Ellis Company LLC ("Wilbur-Ellis Company"). I worked for Wilbur-Ellis Company or related Wilbur-Ellis entities since 1999. Before my retirement, I had worked with Monsanto Company ("Monsanto") for many years. I have extensive knowledge of Wilbur-Ellis Company's business, including the herbicide products that have been sold by Wilbur-Ellis Company.

4. Wilbur-Ellis Company has been in the business of, among other things, distributing and selling certain pesticides and herbicides, including certain Monsanto glyphosate-based Roundup®-branded herbicides. Glyphosate-based herbicide products (including Monsanto's glyphosate-based Roundup®-branded herbicides) have been designed for and sold to three different markets: (a) the agricultural market; (b) the residential-lawn-and-garden market; and (c) what Wilbur-Ellis Company calls the professional market, which involves herbicide products that are designed for and sold to, for example, landscaping companies, golf courses, schools, or state and local government agencies (to maintain roads, parks, and/or rights-of-way). That third market is what Monsanto has called the industrial, turf, and ornamental ("IT&O") market.

5. Wilbur-Ellis Company has been in the business of distributing and selling glyphosate-based herbicide products (including Monsanto's Roundup®-branded herbicides) for the agricultural market and the professional market. Before my retirement in March 2021, Wilbur-Ellis Company had never been in the business of distributing, marketing, or selling Monsanto's glyphosate-based Roundup®-branded herbicides that have been designed for the residential-lawn-and-garden market. For example, before my retirement in March 2021, Wilbur-Ellis Company had never played any role in the chain of distribution leading to Monsanto's glyphosate-based Roundup®-branded lawn-and-garden herbicides being sold at Home Depot, Lowe's, Target, Walmart, Costco, Ace Hardware, or other national retail stores.

6. Before my retirement in March 2021, Wilbur-Ellis Company had never been the sole or exclusive distributor of Monsanto's glyphosate-based Roundup®-branded herbicides in the State of California.

7. Before my retirement in March 2021, Wilbur-Ellis Company had never designed or manufactured Monsanto's glyphosate-based Roundup®-branded herbicides.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 22, 2022 at Reno, Nevada

[signature]

Scott Hushbeck